E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Assistant United States Attorney
Chief, Environmental and Community Safety Crimes Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorney
Environmental and Community Safety Crimes Section
MAXWELL COLL (Cal. Bar No. 312651)
Assistant United States Attorney
Asset Forfeiture and Recovery Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-3359/8644/1785
    E-mail:     Mark.A.Williams@usdoj.gov
                Matthew.O'Brien@usdoj.gov
                Maxwell.Coll@usdoj.gov

KENNTEH A. POLITE
Assistant Attorney General
Criminal Division
CHRISTIAN A. LEVESQUE (D.C. Bar No. 501778)
Trial Attorney
Human Rights and Special Prosecutions Section
United States Department of Justice
    1301 New York Ave
    Washington, DC 20530
    Telephone:  (202) 538-2373
    E-mail:     Christian.Levesque@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>MOHAMAD YASSIN ALCHARIHI,<br>  aka "Mohamad al-Sharihi" and<br>  "Mohamad AlCharihi,<br><br>          Defendant. | No. CR 20-307-GW<br><br>GOVERNMENT'S OPPOSITION TO<br>DEFENDANT'S MOTION TO STRIKE<br>ALLEGATIONS FROM THE INDICTMENT OR<br>DISMISS THE INDICTMENT<br><br>Hearing Date: January 12, 2023<br>Hearing Time: 8:00 a.m.<br>Location:     Courtroom of the<br>              Hon. George H. Wu |

1     The United States of America, by and through its counsel of

2 record, the United States Attorney for the Central District of

3 California and Assistant United States Attorneys Mark Williams,

4 Matthew O'Brien, and Maxwell Coll, and Trial Attorney Christian

5 Levesque, hereby files its opposition to defendant's Motion to Strike

6 Allegations from the Indictment or Dismiss the Indictment (Dkt. No.

7 59.)

8     This opposition is based upon the attached memorandum of points

9 and authorities, the files and records in this case, and such further

10 evidence and argument as the Court may permit.

11 Dated: December 15, 2022          Respectfully submitted,

12                                   E. MARTIN ESTRADA
                                     United States Attorney
13
                                     SCOTT M. GARRINGER
14                                   Assistant United States Attorney
                                     Chief, Criminal Division
15

16
                                     _____/s/_____
17                                   MARK A. WILLIAMS
                                     MATTHEW W. O'BRIEN
18                                   MAXWELL COLL
                                     Assistant United States Attorneys
19
                                     KENNETH A. POLITE
20                                   Assistant Attorney General
                                     Criminal Division
21

22                                   _____/s/_____
                                     CHRISTIAN A. LEVESQUE
23                                   Trial Attorney

24                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA
25

26

27

28

2

# TABLE OF CONTENTS

DESCRIPTION                                                          PAGE

I.    INTRODUCTION.....................................................1

II.   STATEMENT OF FACTS...............................................2

      A.    The Mosaic................................................2

      B.    Defendant's Purchase of the Mosaic........................4

      C.    Defendant's Importation of the Mosaic.....................4

      D.    Defendant's Plans for the Mosaic..........................6

      E.    Defendant's Admissions Regarding the Mosaic in March
            2016......................................................7

III.  ARGUMENT.........................................................7

      A.    Congress Enacted Section 541 To Protect Against Unpaid
            Duties and Illegal Imports................................7

      B.    The Indictment's Allegations Regarding the Quality of
            the Mosaic, Including What It Depicts, Fall Squarely
            Within the Scope of Section 541...........................9

            1.    The Plain Language of the Statute Shows That
                  "Quality" Means the Essential Characteristics and
                  Nature of a Good...................................10

            2.    Even Applying Defendant's Definition Of Quality,
                  the Indictment's Allegations Still Fall Within
                  The Scope Of Section 541...........................14

      C.    The Indictment's Allegations Regarding the Quality of
            the Mosaic, Including What It Depicts, Are Not
            Prejudicial Surplusage...................................16

      D.    The Statute Is Not Unconstitutionally Vague..............18

IV.   CONCLUSION......................................................20

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                          PAGE

**Cases**

Browne v. United States,
     145 F. 1 (2d Cir. 1905) ........................................ 8

Connally v. General Constr. Co.,
     269 U.S. 385 (1926) ........................................... 18

In re Cliquot's Champagne,
     70 U.S. 114 (1865) ............................................ 11

Kolender v. Lawson,
     461 U.S. 352 (1983) ........................................... 18

Lambert v. California,
     355 U.S. 225 (1957) ........................................... 18

Skilling v. United States,
     561 U.S. 358 (2010) ........................................... 19

Schwartzmiller v. Gardner,
     752 F.2d 1341 (9th Cir. 1984) ................................. 19

United States v. Ballard,
     24 F. Cas. 970 (E.D. Mich. 1871) ........................... 8, 9

United States v. Daniel,
     2010 WL 749873 (C.D. Cal. 2010) ......................... 16, 17

United States v. DePalma,
     461 F. Supp. 778 (S.D.N.Y. 1978) ............................. 17

United States v. Hedgepeth,
     434 F.3d 609 (3d Cir. 2006) .................................. 17

United States v. Hernandez,
     85 F.3d 1023 (2d Cir. 1996) .................................. 17

United States v. Hirsch,
     100 U.S. 33 (1879) ............................................ 8

United States v. Jordan,
     626 F.2d 928 (D.C. Cir. 1980) ................................ 17

United States v. Laurienti,
     611 F.3d 530 (9th Cir. 2010) ................................. 16

United States v. Oakar,
     111 F.3d 146 (D.C. Cir. 1997) ................................ 17

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

United States v. Rezaq,
    134 F.3d 1121 (D.C. Cir. 1998) ......................... 16, 17
United States v. Rosenthal,
    126 F. 766 (S.D.N.Y. 1903) ................................. 8
United States v. Scarpa,
    913 F.2d 993 (2nd Cir. 1990) ............................... 16
United States v. Van Winrow,
    951 F.2d 1069 (9th Cir. 1991) ............................. 19
United States v. Williams,
553 U.S. 285 (2008) ..................................... 18, 19

**Statutes**

18 U.S.C. § 541............................................... passim

**Other**

19 C.F.R. § 220.2 ............................................. 12
Fed. R. Crim. P. 7(d) ........................................ 16
C. Wright, Federal Practice and Procedure § 128 (4th ed.) ........ 17
HTSUS § 9701.22.00 ........................................... 9
HTSUS § 9701 ................................................. 9
HTSUS § 6907 ................................................. 9
HTSUS § 2204.10.00 ........................................... 11
HTSUS § 2204.21.50-35 ........................................ 11
HTSUS § 2206.00.45 ........................................... 11
HTSUS § 6403.12 .............................................. 12
HTSUS § 9506.70 .............................................. 12

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In August 2015, defendant MOHAMAD YASSIN ALCHARIHI ("defendant") effected the entry of an ancient Roman floor mosaic of Syrian origin (the "Mosaic") into the United States from the Republic of Turkey. He did so upon a false classification as to the value and quality of the Mosaic.  First, defendant falsely classified the value of the Mosaic (he declared it to be valued at less than $600 but subsequently admitted to federal law enforcement agents that he paid significantly more).  Second, defendant falsely classified the quality of the Mosaic (he classified the import as a generic ceramic mosaic cube from Turkey, but it is actually an ancient Syrian work of art depicting Zeus, Heracles, and Prometheus).

The false classifications occurred just months after the United Nations Security Council adopted a resolution condemning the destruction of cultural heritage in Syria, particularly by the terrorist organizations Islamic State in Iraq and the Levant ("ISIL") and Al-Nusra Front ("ANF").  The Mosaic originated from Syria and was imported into the United States from Turkey.  Customs & Border Protection ("CBP") prohibits the import of floor mosaics from Syria that depict humans or gods as well as mythological scenes.[1]

Weeks before trial, defendant now argues the Court should strike allegations relating to "quality" in the Indictment or, in the alternative, dismiss the entire Indictment, because the government charges defendant with falsely classifying the import with respect to

---

[1] F.R. Doc. 2016-19494, available at: https://www.federalregister.gov/documents/2016/08/15/2016-19491/import-restrictionsimposed-on-archaeological-and-ethnological-material-of-syria.

1  its "quality," including what the Mosaic depicts.[2]  In so arguing,

2  defendant attempts to narrow the scope of 18 U.S.C. § 541 to the

3  false classification of an imported good's "grade" or "degree of

4  excellence."  See, e.g., Mot. at 5, 13.  Defendant's arguments miss

5  the mark.  The unambiguous meaning of "quality" as used in 18 U.S.C.

6  § 541 is the essential characteristics and nature of a particular

7  good.  Moreover, even using defendant's definition of "quality," the

8  Indictment's allegations still fall squarely within the scope of the

9  crime.

10        It is a violation of 18 U.S.C. § 541 to cause the false

11  classification of an imported item as a generic mosaic cube when it

12  is in fact an antiquity from Syria depicting a Greco-Roman

13  mythological scene.  The Court should deny the motion in its entirety

14  and proceed with trial as scheduled.

15  II.  **STATEMENT OF FACTS**

16        A.   **The Mosaic**

17        In August 2015, at defendant's direction, the Mosaic arrived at

18  the Port of Long Beach as part of a shipment from Turkey.  The Mosaic

19  was rolled up inside a large metal shipping container holding a large

20  number of vases and two other mosaics.  An x-ray image of the

21  container taken by CBP showed that the Mosaic was hidden in the front

22  of the container (i.e., away from the rear access doors), behind a

23  pile of vases.  After passing through Customs, the Mosaic was shipped

24  via truck to defendant's home in Palmdale.

25        In March 2016, law enforcement officers executed a search

26  warrant at defendant's home.  In defendant's garage, agents found the

27

28        [2] Defendant does not take issue with the Indictment's
    allegations regarding the mosaic's value.

2

Mosaic, unrolled.  The Mosaic is approximately 18 feet in length and 8 feet in height and weighs approximately 2,000 pounds.  The Mosaic, as it was found in defendant's garage in 2016, is shown below:



The Mosaic depicts a story from Greek and Roman mythology: Prometheus (in the center of the Mosaic) is chained to a rock in the Caucuses Mountains for eternity as retribution from Zeus for stealing fire for humanity.  The scene shows his liver eaten daily by an eagle, only to be regenerated by night, due to his immortality.  The eagle (in the upper left corner) is a symbol of Zeus himself.  Years later, the Greek hero Heracles (Hercules) (on the right) slays the eagle with a bow and arrow and frees Prometheus from his torment.

According to experts (and defendant himself, in emails and a recorded statement), the Mosaic is approximately 2,000 years old and comes from Syria.  Illegal excavations of cultural property such as the Mosaic increased during the long-running civil war in Syria; artifacts looted from Syria are routinely transported from Syria through Turkey.

**B.  Defendant's Purchase of the Mosaic**

When executing the search warrant at defendant's home in March 2016, agents found a sales contract, in Turkish, between defendant and Ahmet Bostanci ("Bostanci").  The contract was dated May 25, 2015.  It showed that defendant agreed to buy the Mosaic for 36,000 Turkish lira (approximately $12,000 to $13,000), including shipping. The Mosaic was described as 220 x 450 centimeters (i.e., 15 feet x 7 feet) and claimed to be inherited "from the family's cultural estate."

**C.  Defendant's Importation of the Mosaic**

In August 2015, defendant hired Soo Hoo Customs Broker, Inc. ("Soo Hoo"), based in Commerce, to assist in the importation of the Mosaic into the United States.  Defendant paid $1,602 to Soo Hoo for its services, which included filling out CBP paperwork based on information that defendant provided to Soo Hoo on August 10, 2015 about the shipment.

In the paperwork defendant provided to Soo Hoo regarding the shipment, he did not tell Soo Hoo that he had paid approximately $12,000 for the Mosaic.  Instead, defendant gave documents to Soo Hoo that included the following:

- An invoice for defendant's purchase of approximately 81 vases and 3 mosaics, from Bostanci, in Turkey, for delivery to defendant's home in Palmdale.  The total price on the invoice for all the items was listed as $2,199.23: specifically, the vases at $7.83 each, two mosaics at $587 each, and one mosaic at $391.

4

- A shipping invoice from a third-party company that reflected the total price paid to ship the items from Turkey to the United States was $2,900.

Soo Hoo asked defendant for a photograph of the Mosaic. Defendant sent Soo Hoo an email which stated, in its entirety, "the vases and the table surface," and attached four photos of vases and the following photo of a mosaic:



The photo shows a new-looking mosaic with a design of fish swimming in a pond. The government's subsequent investigation revealed that the photo did not show a mosaic of Syrian origin, but rather a modern work by the artist Gary Drostle, titled "Fishpond," located in a public garden space in Croydon, England. Photos of this modern work are readily available on the internet.[3]

Despite Soo Hoo's request on August 15, 2015, defendant did not provide Soo Hoo with a photo or an accurate description of any of the mosaics he was importing. Defendant also never told Soo Hoo that the Mosaic was ancient, that it was from Syria, or that it depicted a

---

[3] See, e.g., https://www.drostle.com/the-magic-of-mosaic-fishponds.

5

story from Greek and Roman mythology.  Instead, in emails with Soo
Hoo, defendant described the Mosaic as "mosaic tables stone on
fabric. . .the fabric most likely polyester," "they do not have
frames. . .and it is not like mosaic picture. . .it is small stones
glued on fabric, and rolled like a carpets."  [ALC-GOV-000222]
(elipses in original.)

    Based on defendant's representations, Soo Hoo filled out CBP
Form 7501 and provided it to CBP on August 12, 2015.  The form listed
the Mosaic not as an ancient artwork but rather as "CERAMIC,
UNGLAZED, TILES, CUB."  The form listed the value of the Mosaic as
$391, and the total value of the shipment as $2,199 (<u>i.e.</u>, the same
values listed on the Bostanci invoice).

    As a result of defendant's misrepresentations and omissions, CBP
did not scrutinize the shipment.

**D.   Defendant's Plans for the Mosaic**

    Emails evidence defendant's motive for importing the Mosaic:  he
wanted to sell it for a huge profit.  For example:

- On January 12, 2015, defendant's friend B.A. sent an email
  describing the Mosaic to an antiquities dealer and attached
  several photographs.  The dealer replied that he estimated
  that the Mosaic might be worth $100,000 to $200,000.  The
  next day, B.A. forwarded the email chain to defendant.

- On March 5, 2015, B.A. discussed the Mosaic (via email) with
  an auction house in the United Kingdom.  The auction house
  estimated that the Mosaic might be worth 40,000 to 60,000
  British Pounds (roughly $60,000 to $90,000) but would need to
  be assessed after it was conserved and mounted.

6

- On August 25, 2015, defendant sent photos of the Mosaic to the Getty and stated "attaching pictures my collection of an ancient mosaic I need help in conserving the piece, and selling it...the pieces 15ft x 8ft."

After the Mosaic arrived at defendant's house, defendant paid approximately $40,000 to an artist to restore the Mosaic. Defendant admitted to the restorer that the Mosaic was 2,000 years old.

**E.  Defendant's Admissions Regarding the Mosaic in March 2016**

During the execution of the search warrant in March 2016, defendant provided voluntary, recorded statements to law enforcement agents. He admitted that he paid $12,000 total for the Mosaic and vases. When asked how much the shipment was worth as reported on Customs entry documents, defendant said "twenty four hundred or something like that." When asked why a lower number was reported instead of the $12,000 he had paid, defendant admitted that he did so in an attempt to lower the duties he would pay.

When asked if anything in the shipment was old, defendant admitted one of the objects was old. When asked which one, defendant replied, "The one why I restored it." When asked how old, defendant said, "It's about two thousand years." When asked if defendant had told Soo Hoo how old the Mosaic was, defendant responded, "No." Defendant claimed it was not Soo Hoo's business to know the details.

## III. ARGUMENT

**A.  Congress Enacted Section 541 To Protect Against Unpaid Duties and Illegal Imports**

The statute at issue, 18 U.S.C. § 541, is a customs law that prohibits entry of goods falsely classified, undervalued, or entered into the United States by the payment of less than the amount of duty

7

legally due.  Since its enactment in 1863, the statute has penalized individuals for making false representations to the United States about the value and quality of imported goods.[4]  The primary purpose is to protect against unpaid duties and regulate the importation of goods.  See United States v. Hirsch, 100 U.S. 33, 34 (1879) ("[The law] is, beyond question, a revenue law, and the offence defined by it is therefore a crime arising under the revenue laws of the United States.").

In some cases, importers lie about the weight or quantity of goods.  See, e.g., United States v. Rosenthal, 126 F. 766, 768 (S.D.N.Y. 1903), aff'd sub nom. Browne v. United States, 145 F. 1 (2d Cir. 1905) (false classification as to the weight of fabrics imported from Japan).  In other cases, importers falsely classify the value of goods.  The only allegation in the Indictment at issue in the motion is the false classification as to the quality of the good.

District courts addressing the law shortly after its passing understood the Congressional intent behind the term "quality" and its connection to the classification of the good.  In an 1871 case involving the importation of "one brown horse," the court observed that the law was designed to ensure that correct duties are paid, depending on the classification a good receives:

> Upon other kinds of goods such tax is levied according to quality or value, upon a classification, in that regard, fixed by the act itself, and to this end the importer is required to effect an entry of such goods truly according to such classification.

United States v. Ballard, 24 F. Cas. 969, 970 (E.D. Mich. 1871).  The

---

[4] The title of the original act, passed on March 3, 1863, was "An Act to Prevent and Punish Frauds Upon the Revenue, to Provide for the More Certain and Speedy Collection of Claims in Favor of the United States."  12 Stat. 739.

1   legislative purpose underlying Section 541 was to punish individuals

2   who lied about what goods actually are--not just whether the importer

3   lied about the grade or degree of excellence as compared to other

4   goods of the exact same kind.

5       **B.   The Indictment's Allegations Regarding the Quality of the
        Mosaic, Including What It Depicts, Fall Squarely Within the**

6       **Scope of Section 541**

7       The term "quality" as used in 18 U.S.C. § 541 unambiguously

8   means the essential characteristics and nature of an imported good.

9   And where a floor mosaic is from, its style, and what it depicts --

10  here, a Syrian antiquity with a Greco-Roman mythological scene

11  featuring Heracles, Zeus, and Prometheus -- are essential

12  characteristics of the import.  The style of the Mosaic and depiction

13  of a mythological scene shows that the imported item is not a generic

14  ceramic, as declared, but rather a work of art of an age exceeding

15  100 years.  If defendant had been honest with his customs broker, the

16  broker would have classified the import under HTSUS Section

17  9701.22.00.[5]  Instead, defendant concealed the style and depiction of

18  the artwork, and also where it was from, and caused the import to be

19  classified as a generic ceramic mosaic cube.[6]

20      Defendant argues that the Indictment's allegations regarding the

21

22      [5] Chapter 97 of the HTSUS covers "Works of Art, Collectors'
    Pieces, and Antiques."  Classification Section 9701 must be used for

23  "Painting, drawings and pastels . . . collages, *mosaics* and similar
    decorative plaques[.]" (emphasis added).  Subsection 9701.22 must be

24  used for mosaics of an age exceeding 100 years.  See Harmonized
    Tariff Schedule of the United States Revision 12 (2022), available at

25  https://hts.usitc.gov/view/Chapter%2097?release=2022HTSARev12.

26

27      [6] The HTSUS clarifies that Classification Section 9701 does not
    apply to mosaics that are mass-produced reproductions, casts or works
    of conventional craftsmanship of a commercial character.  Those types

28  of mosaics should be classified under Section 6907 ("ceramic mosaic
    cubes and the like[.]").

1    "quality" of the Mosaic, including what the Mosaic depicts, fall
2    outside the scope of conduct proscribed by 18 U.S.C. § 541.
3    According to defendant's narrow interpretation of the term "quality,"
4    this type of false classification is limited to a good's "grade" or
5    "degree of excellence . . . as compared to other goods of the same
6    type."  Mot. at 2.  Not so.  The plain language of the statute shows
7    that "quality" means the essential characteristics and nature of a
8    good.  Moreover, even using defendant's definition of "quality," the
9    Indictment's allegations fall within the scope of the statute.

10              1.   The Plain Language of the Statute Shows That "Quality"
                     Means the Essential Characteristics and Nature of a
11                   Good

12         As used in 18 U.S.C. § 541, the term "quality" unambiguously
13   means the nature and essential characteristics of the good.
14   Tellingly, defendant omits reference to the ***first*** definition of
15   "quality" used by both Black's Law Dictionary and the Merriam-Webster
16   Dictionary, which is in line with this unambiguous meaning.  Black's
17   Law Dictionary first defines "quality" as: "The particular character
18   or properties of a person, thing, or act, often essential for a
19   particular result."  Quality, Black's Law Dictionary (11th ed. 2019).
20   The Merriam-Webster Dictionary definition is similar: "Quality:
21   peculiar and essential character: NATURE."  Quality, Merriam- Webster
22   Dictionary, https://www.merriam-webster.com/dictionary/quality.
23   These dictionary definitions track the underlying purpose of the
24   legislation--to penalize the false classification of a good.

25         Ignoring these definitions, defendant relies on the example of
26   wine to argue that quality must have the narrow meaning of "grade" or
27   "degree of excellence as compared to other goods of its kind."  But
28   the example of wine highlights the flaws in defendant's position.  In

10

the context of wine, the grade or degree of excellence can be essential characteristics of the good, thus determining the quality and which classification applies.  But in addition to "grade" or "degree of excellence," an importer must truthfully classify the good with respect to whether it is sparkling wine (HTSUS Classification Section 2204.10.00), red wine and certified organic (HTSUS Classification Section 2204.21.50-35), or rice wine/sake (HTSUS Classification Section 2206.00.45).  If an importer shipped tons of red certified organic wine into the United States, but classified the goods as rice wine, the violation would fall within the scope of 18 U.S.C. § 541 because the importer lied about the essential characteristics and nature of the wine.

Defendant's reliance on In re Cliquot's Champagne, 70 U.S. 114 (1865), is misplaced.  In that case, revenue officers of the United States investigated a scheme to import wine from France and provide fraudulent invoices to the government that were below the usual French prices of the wine.  Id. at 128.  The case largely addresses false classifications as to the value of a product, which is not at issue in the motion.  But in describing the wine, counsel used the term "quality" to distinguish the *essential characteristics and nature of the wine*.  For example, it was argued that wine sent for wholesale distribution in a "new country like California" must be of a different quality than wine made for the "fashionable cafes of Paris."  Id. at 132.  Defendant seems to rely on such language to suggest that "quality" must therefore be limited to "grade of wines." But the case does not hold, nor suggest, that customs laws are limited to false classifications as to "grade" or "degree of excellence."

11

Moreover, it makes no sense to argue that the essential characteristics of wine must apply to false classifications of other goods.  Some products do not have "grade" or "degree of excellence" as distinguishing factors.  For example, in the context of sports footwear, the proper classification of imports can depend on whether the item has the characteristics of a ski boot (HTSUS Classification Section 6403.12) versus an ice skate (HTSUS Classification Section 9506.70).  If the footwear has a plastic top and attaches to a ski, it must be classified under the first category and may be subject to certain restrictions and duties; if the footwear is made of leather and attaches to a blade, it must be classified under the second category and may be subject to different restrictions and duties.  It cannot be the case, as defendant suggests, that it is not a violation of 18 U.S.C. § 541 to declare ski boots as hockey skates because the term "quality" is limited to "grade" or "degree of excellence." Rather, it is plainly a violation of the statute, because making such a false classification would go directly to the quality of the imported goods, <u>i.e.</u>, the essential characteristics.

Defendant ignores the entire HTSUS and CBP guidance on import classifications, and instead cites to irrelevant language found in a broad search of the CBP regulatory code.  In one instance, defendant cites to 19 C.F.R. § 220.2(h)(2), a regulation covering the process for consideration of petitions for duty suspensions and reductions. Under a subsection titled "domestic production," the regulation defines the word "like" to mean a "domestic article that is substantially identical in inherent and intrinsic characteristics (i.e., materials from which made, appearance, quality, texture, etc.) . . . ."  Because "quality" is used as separate from "appearance" in

1  this subsection, defendant argues the meaning of "quality" in 18

2  U.S.C. § 541 must also be separated from "appearance."  Defendant

3  cites several other irrelevant regulations to patch the argument

4  together.  This line of reasoning makes no sense.  *Congress* employed

5  the language of "quality" in passing the customs law to protect

6  against false classifications.  The plain language of Section 541 is

7  unambiguous.

8       Moreover, the unambiguous meaning of quality--the essential

9  characteristics and nature of the goods--has significance in the

10 realm of protecting against the illegal importation of cultural

11 artifacts.  The United States is a signatory to the 1970 United

12 Nations Educational, Scientific and Cultural Organization ("UNESCO")

13 Convention on the Means of Prohibiting and Preventing the Illicit

14 Import, Export, and Transfer of Ownership of Cultural Property.  This

15 Treaty prohibits the importation of certain ethnological and cultural

16 artifacts.  Syria is not a signatory to the UNESCO treaty, but in

17 August 2016, CBP banned importation of categories of archaeological

18 or ethnological material removed from Syria on or after March 15,

19 2011.[7]  Specific to floor mosaics, CBP ruled that the following types

20 of floor mosaics from Syria are banned from import:

21       Greco-Roman and Byzantine, including landscapes, humans
         or gods, mythological scenes, and quotidian activities
22       such as hunting and fishing.  There may also be
         vegetative, floral, or decorative motifs.  They are made
23       from stone cut into small pieces (tesserae) and laid
         into a plaster matrix.
24

25 Id.  CBP officers who specialize in HTSUS classifications that

26

27      [7] F.R. Doc. 2016-19494, available at:
   https://www.federalregister.gov/documents/2016/08/15/2016-
28 19491/import-restrictionsimposed-on-archaeological-and-ethnological-
   material-of-syria.

cover works of art, collectors' pieces, and antiquities are trained to inspect shipments of cultural artifacts, including Greco-Roman floor mosaics, especially when the shipment originates from certain countries, including Turkey.  If defendant had been truthful about what the Mosaic depicted, and thus properly classified the item as artwork of an age exceeding 100 years, CBP would have been in a better position to scrutinize the item for a potential violation of the UNESCO treaty.  That is, had defendant accurately disclosed the essential characteristics and nature of the ancient floor mosaic, i.e., the artwork's quality, the U.S. government could have better protected against the illegal importation of a cultural artifact.

> 2. <u>Even Applying Defendant's Definition Of Quality, the Indictment's Allegations Still Fall Within The Scope Of Section 541</u>

The unambiguous meaning of the term "quality" in 18 U.S.C. § 541 is the essential characteristics and nature of an imported good.  The Court need not apply any other definition of the term.  But even if the Court were to adopt defendant's definition, the allegations in the Indictment about what the floor mosaic depicts still fall within the scope of the statute.

In the context of works of art and cultural artifacts, what an imported item depicts is intertwined with its degree of excellence as compared to goods of a similar kind.  Features such as size, style, condition, period, and provenance also bear on grade and degree of excellence, as they are essential characteristics of the piece. Importantly, the period and provenance of the artwork, which defendant concealed, are particular factors in assessing the quality

1    of the piece, given the treaties and domestic laws governing the

2    export and import of ancient objects of international importance.

3    The age and provenance of the piece distinguish it from other goods

4    because they relate to the right to own the piece and export it.

5    These are essential characteristics that go far beyond the value of

6    the object and speak also to its nature and characteristics.

7        Take the example of the importer of a stolen painting, "The

8    Concert" by Johannes Vermeer.  If the importer classified the good as

9    a paperboard (Chapter 48) instead of a work of art (Chapter 97), the

10   false classification would arise in part because the actual item

11   imported ("The Concert") is a painting that depicts characters in a

12   style reminiscent of the Dutch Golden Age.

13       Applying defendant's definition to the facts at hand shows the

14   flaw of his logic.  Here, defendant's customs broker asked for a

15   photograph of the mosaic.  Defendant sent Soo Hoo a photo of a modern

16   mosaic depicting a fish swimming in a pond.  This modern-looking fish

17   mosaic suggested that it should be classified as a general mosaic

18   cube made for mass production, perhaps for a koi pond.  The

19   difference in the style and depiction of a fish swimming in a pond

20   versus a Greco-Roman mythological scene weighs on the comparative

21   degree of excellence of these two items.  The same is true for the

22   period and provenance of the piece.  The actual Mosaic is a cultural

23   artifact of international importance depicting a mythological scene

24   and is thus of a higher quality, and degree of excellence, as

25   compared to a generic modern mosaic.

26       Even under defendant's overly narrow definition of "quality,"

27   the Indictment's allegations as to what the Mosaic depicts, along

28

15

with other features including condition, age, style, and provenance, still fall within the scope of 18 U.S.C. § 541.

### C. The Indictment's Allegations Regarding the Quality of the Mosaic, Including What It Depicts, Are Not Prejudicial Surplusage

As explained <u>supra</u>, the allegations regarding the quality of the Mosaic are relevant to the actual charge and present a legally valid means of charging the offense.  The Court should not strike these allegations as prejudicial surplusage.

Under Federal Rule of Criminal Procedure 7(d), a court may strike surplusage from the indictment or information.  The Advisory Committee's notes state that "[t]his rule introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial." <u>Id.</u>, Advisory Committee's notes.  Thus, the purpose of a motion to strike under Rule 7(d) is to protect the defendant only from "immaterial," "irrelevant," "prejudicial or inflammatory allegations that are neither relevant nor material to the charges." <u>United States v. Laurienti</u>, 611 F.3d 530, 546-47 (9th Cir. 2010) (citations omitted); <u>see</u> <u>also</u> <u>United States v. Daniel</u>, 2010 WL 749873, at *4 (C.D. Cal. 2010) (Morrow, J.) ("Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial") (quoting <u>United States v. Scarpa</u>, 913 F.2d 993, 1013 (2d Cir. 1990)).

Thus, "a motion to strike surplusage should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." <u>United States v. Rezaq</u>, 134 F.3d 1121, 1134 (D.C. Cir. 1998) (internal quotations and citations

omitted); see also United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996) ("We have cautioned that motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial.") (citations and quotation marks omitted).

The "scope of a district court's discretion to strike material from an indictment is narrow." United States v. Oakar, 111 F.3d 146, 157 (D.C. Cir. 1997) (citing United States v. Jordan, 626 F.2d 928, 931 n.1 (D.C. Cir. 1980)); see also Rezaq, 134 F.3d at 1134 ("Rule 7(d) has been strictly construed against striking surplusage."); United States v. DePalma, 461 F. Supp. 778, 797 (S.D.N.Y. 1978) (standard for striking allegations as surplusage is "exacting").

Accordingly, "[m]otions to strike surplusage are rarely granted." United States v. Hedgepeth, 434 F.3d 609, 612 (3d Cir. 2006); C. Wright, Federal Practice and Procedure § 128 (4th ed.) ("[N]o matter how framed, it is an exacting standard, and courts are often slow to grant a motion to strike surplusage."). "The burden of showing that surplusage should be stricken as inflammatory and/or prejudicial rests with the defendant." Daniel, 2010 WL 749873, at *4.

As discussed at length above, the Indictment's allegations about the false classification of the Mosaic as to its quality fall squarely within the scope of the offense identified in the statute. Moreover, defendant creates a false dichotomy between the "quality" and "value" prongs of this statute. Distinct though they are, essential characteristics bearing on quality such as the size, condition, style, period, and provenance of the artifact are all important factors in assessing its value,

1  as one of the government's experts will testify.  Because the

2  allegations state a valid charge, defendant falls far short of

3  meeting the applicable standard.

4       **D.   The Statute Is Not Unconstitutionally Vague**

5       The statute puts the general public on notice that they would be

6  committing a criminal act by misrepresenting the value of

7  merchandise, or by misrepresenting the merchandise's quality, meaning

8  the essential characteristics of the imported good.  The term

9  "quality" does not have a number of contradictory or confusing

10 definitions; in fact, as discussed above, different dictionaries

11 provide consistent definitions of "quality."  As applied, a person of

12 ordinary intelligence would understand that a 2,000-year-old Roman

13 mosaic depicting a Greco-Roman mythological scene should be

14 classified as a work of art or a cultural artifact, not a modern

15 standard ceramic cube.  The statute is not vague, and the Court

16 should deny defendant's motion as to void for vagueness.

17      The Due Process Clause of the Fifth Amendment requires that a

18 person receive fair warning of the conduct that is prohibited.

19 Lambert v. California, 355 U.S. 225, 228 (1957).  Under the "void for

20 vagueness" doctrine, a criminal statute must define an offense with

21 sufficient definiteness that an ordinary person can understand what

22 conduct is prohibited, and in a manner that does not encourage

23 arbitrary and discriminatory enforcement.  Kolender v. Lawson, 461

24 U.S. 352, 357 (1983).  A statute is unconstitutionally vague if

25 persons of common intelligence must "necessarily guess at its meaning

26 and differ as to its application."  Connally v. General Constr. Co.,

27 269 U.S. 385, 391 (1926).  A statute is not void for vagueness

28 because its applicability is unclear at the margins, United States v.

1  *Williams*, 553 U.S. 285, 306 (2008), or because reasonable jurists

2  might disagree on where to draw the line between lawful and unlawful

3  conduct in particular circumstances, *Skilling v. United States*, 561

4  U.S. 358, 403 (2010).

5       In general, there are two types of vagueness challenges: facial

6  challenges and as-applied challenges.  These two forms of analysis

7  are "mutually exclusive" and "[t]he threshold question in any

8  vagueness challenge is whether to scrutinize the statute for

9  intolerable vagueness on its face or whether to do so only as the

10  statute is applied in the particular case."  *Schwartzmiller v.*

11  *Gardner*, 752 F.2d 1341, 1346 (9th Cir. 1984).  Where, as here, a

12  defendant's vagueness challenge does not involve a First Amendment

13  claim, this Court has made it clear that the challenge must be

14  examined "as applied," in light of the facts of the case at hand.

15  *United States v. Van Winrow*, 951 F.2d 1069, 1072 (9th Cir. 1991).

16       Here, it is obvious that falsely classifying the quality of a

17  mosaic, *i.e.*, its essential characteristics--including where it is

18  from and what it depicts--is a violation of the statute.  In arguing

19  that such a definition is unconstitutionally vague, defendant again

20  tries to fit the proverbial square peg in a round hole by comparing

21  an importer of olive oil to an importer of artifacts of ethnological

22  and cultural import.  According to defendant, a person reading the

23  statute would understand that it is a crime to import olive oil

24  declared as "extra virgin" and claim at Customs that it is in fact

25  "refined olive oil."  *Mot*. at 12.  Yet, according to defendant, that

26  same person reading the statute would apparently not understand, in

27  the context of art, that it is a crime to import a Vincent van Gogh

28  painting depicting landscapes and claim it as a modern paperboard.

Defendant is wrong.  Applying the statute to cultural items, it is clear to an ordinary person that a Dogon sculpture from Mali from 1850 A.D. should be classified as a piece of ethnographic and historical interest (9705.00.0070), and that misrepresentations about its essential characteristics, such as classifying it as a common souvenir, would be a violation of 18 U.S.C. § 541.[8]  As applied here, a mosaic "[o]f an age exceeding 100 years" must be classified under Subheading 9701.22.00.  Instead, defendant caused the false classification of the import as a generic mosaic cube, when in fact the quality of the Mosaic is that of an ancient mosaic that depicts Greco-Roman gods in a mythological scene.

An ordinary person can understand what conduct is prohibited. The statue is not unconstitutionally vague.

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny the Motion in its entirety.

---

[8] "The tariff classification of a Dogon figure from Mali." N194135: Ruling Date: Nov 23, 2011, available at: https://rulings.cbp.gov/ruling/N194135.

20