CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ASHLEY MAHMOUDIAN (Bar No. 316638)
(E-Mail: ashley_mahmoudian@fd.org)
ISABEL BUSSARAKUM (Bar No. 295046)
(E-Mail: isabel_bussarakum@fd.org)
JOSHUA D. WEISS (Bar No. 338918)
(E-Mail: Josh_Weiss@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
MOHAMAD ALCHARIHI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        v.<br><br>MOHAMAD ALCHARIHI,<br><br>                Defendant. | Case No. CR 20-307-GW<br><br>**DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY OF MICHAEL COHN; EXHIBITS**<br><br>**Hearing Date: 4/20/2023**<br>**Hearing Time: 10:00 a.m.** |

Defendant Mohamad Alcharihi, by and through his counsel of record, hereby moves *in limine* for an order precluding the government from introducing at trial the expert testimony of Michael Cohn and/or a *Daubert* hearing regarding the admissibility of his testimony.

The government has provided notice of, and confirmed during a meet-and-confer phone call, its intent to call Michael Cohn to opine on the mosaic's fair market value in its restored condition.

//

1       This Motion is based upon the attached memorandum of points and authorities,

2  the files and records in this case, and any further evidence and argument as the Court

3  may permit.

4                               Respectfully submitted,

5                               CUAUHTEMOC ORTEGA
                                Federal Public Defender

6

7

8  DATED:  March 9, 2023         By   */s/ Isabel Bussarakum*

9                               ASHLEY MAHMOUDIAN
                                ISABEL BUSSARAKUM

10                              JOSH WEISS
                                Deputy Federal Public Defenders

11                              Attorneys for MOHAMAD ALCHARIHI

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                        2

# **TABLE OF CONTENTS**

Page

1  I. INTRODUCTION .................................................................................... 1

2  II. PROFERRED EXPERT TESTIMONY ................................................... 1

3  III. ARGUMENT ....................................................................................... 2

4    A.   Legal Standard Under Federal Rule of Evidence 702 and *Daubert* ............ 2

5    B.   Cohn's Testimony Should Be Excluded Under Rule 702 Because It Is
6         Irrelevant .................................................................................................. 3

7    C.   Cohn's Testimony Should Be Excluded Under Rules 702 and 703
         Because It Is Based on Insufficient Comparative Data, and Facts Not
8         Reasonably Relied on By Art Appraisers .................................................. 10

9    D.   Cohn's Testimony Should Be Excluded Under Rule 702 Because It
         Fails to Reliably Apply the Market Data Comparison Approach to the
10        Facts of This Case ..................................................................................... 13

11   E.   A *Daubert* Hearing Is Necessary ............................................................. 16

12   F.   Cohn's Testimony Should Be Excluded Under Rule 403 Because Its
         Minimal Probative Value Is Substantially Outweighed by the Danger
13        of Confusing the Issues, Misleading the Jury, Undue Delay, Wasting
         Time, and Needlessly Presenting Cumulative Evidence .......................... 17

14  IV. CONCLUSION .................................................................................... 18

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The government has provided notice of its intent to call Michael Cohn as an expert witness to opine that the mosaic at issue in this case has a fair market value of $450,000 in its restored condition.  However, the only relevant "value" under the charged statute, 18 U.S.C. § 541, is the purchase price that Mr. Alcharihi paid for the mosaic.  Accordingly, Mr. Alcharihi moves to exclude Cohn's testimony on four grounds:  (1) it is irrelevant under Federal Rule of Evidence 702 and *Daubert*; (2) it is based on insufficient comparative data and facts not reasonably relied on by art appraisers under Rules 702 and 703; (3) it fails to reliably apply the principles and methods to the facts of this case under Rule 702 and *Daubert*; and (4) its minimal probative value is substantially outweighed by the danger of unfair prejudice, misleading the jury, undue delay, wasting time, and needlessly presenting cumulative evidence under Rule 403.

### II. PROFERRED EXPERT TESTIMONY

Attached as Exhibit 1 is a copy of the government's expert disclosure dated September 28, 2021, which enclosed a copy of Michael Cohn's appraisal report dated September 27, 2018, and Cohn's CV.  In the appraisal report, Cohn describes the mosaic, its condition, its authenticity, and the history of Syria.  (Ex. 1 at 9-10.)  He includes a picture of the mosaic, which reflects the mosaic in its restored condition.  (*Id.* at 9.)  Cohn describes 4 sale comparisons:  (1) a mosaic with a symposium scene from the Eastern Mediterranean, circa 3rd to 4th Century, A.D., measuring 98.4" x 137.8," which sold for $6,000,000 in July 2018; (2) a Byzantine Mosaic Panel from Syria, circa 5th to 6th Century A.D., measuring 54.375" x 56.75," which sold for $34,375 on December 10, 2008; (3) a Byzantine mosaic fragment depicting a deer, circa 5th to 6th Century, A.D., measuring 46" x 37," which sold for $6,875 on December 12, 2013; and (4) a Byzantine mosaic panel depicting the seated god Hermes, circa 5th to 6th Century, A.D., measuring 69" x 39," which sold for $124,239

1

on May 2, 2013.  (Ex. 1 at 11-14.)  Comparing the size, condition, and date of the mosaic at issue in this case with these four sale comparisons, Cohn estimates the mosaic's fair market value at $450,000 in its restored condition.  (*Id.* at 8, 16.)

### III. ARGUMENT

### A.   Legal Standard Under Federal Rule of Evidence 702 and *Daubert*

Federal Rule of Evidence 702 permits opinion testimony by an expert who is qualified by "knowledge, skill, expertise, training, or education," if four conditions are met:  (a) "the expert's . . . specialized knowledge will help the trier or fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

Rule 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"  *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell DowPharms., Inc.*, 509 U.S. 579, 589 (1993)) (holding that *Daubert*'s gatekeeping obligation applies not only to "scientific" testimony, but to all expert testimony).  The Court's gatekeeping function is of utmost importance because "[u]nlike an ordinary witness . . . , an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge," and "expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."  *Daubert*, 509 U.S. at 592, 595.

"It is the proponent of the expert who has the burden of proving admissibility."  *Lust By and Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  The party presenting the expert must demonstrate that the expert's findings are based on sound principles.  *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316 (9th Cir. 1995).

2

## B.     Cohn's Testimony Should Be Excluded Under Rule 702 Because It Is Irrelevant

Rule 702 requires that the proffered evidence "help the trier of fact to understand the evidence or to determine a fact in issue."  F. R. Evid. 702.  "This condition goes primarily to relevance."  *Daubert*, 509 U.S. at 591.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Id.* (everything omitted); *see also United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985) ("An additional consideration under Rule 702—another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.").

Mr. Alcharihi is charged, in part, with knowingly "importing a shipment of a mosaic and other items valued at $2,199," when he knew that the mosaic "itself was valued at more than $2,199," in violation of 18 U.S.C. § 541.  (ECF No. 1.)  Cohn's proffered testimony is irrelevant in two ways:  (1) it is about fair market value, when the relevant value for purposes of the charged offense is purchase price; and (2) it opines on the value of the mosaic in its restored condition, when the relevant condition for purposes of the charged offense is the condition at the time of importation, which was unrestored.

*First*, the relevant "value" for purposes of this offense is not the fair market value of the mosaic, but the purchase price that Mr. Alcharihi paid for it.  As the Fourth Circuit explained in *United States v. Ismail*, 97 F.3d 50, 62 (4th Cir. 1996):

> Prior to 1980, the "value" of imported merchandise, for Customs purposes, was determined by reference to the market value of the goods in the country of manufacture.  After 1980, value has been calculated in terms of "transaction value," defined as "the price actually paid or payable for the merchandise."  19 U.S.C. § 1401a(b)(1)).  "Price actually paid or payable" is further defined as "the total payment (whether direct or indirect, and exclusive of any costs, charges, or expenses incurred for transportation,

3

insurance, and related services incident to the international shipment of merchandise . . .) made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller."  19 U.S.C. § 1401a(b)(4)(A).  *Id.*

Although there is no Ninth Circuit Model Criminal Jury Instruction for 18 U.S.C. § 541, the District of South Carolina's Pattern Jury Instructions for Federal Criminal Cases includes a model instruction for this offense.[1]  *See* Eric Wm. Ruschky, *Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina*, 18 U.S.C. § 541 (2020 Online Edition), http://www.scd.uscourts.gov/pji/PatternJuryInstructions.pdf.  The South Carolina model cites to both 19 U.S.C. § 1401a and *Ismail* in defining value as "the price actually paid or payable for the merchandise, exclusive of any costs, charges, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise."  Ruschky, 18 U.S.C. § 541.

The government provided a glimpse into its theory of value in it Reply in Support of Motion *in Limine* to Admit Mosaic as Evidence at Trial.  (ECF No. 66.)  There, it argued that "there are numerous methodologies for determining the value of an imported object," as set forth in 19 U.S.C. § 1401a(a)-(f).  (ECF No. 66 at 6.)  The government argued that while "the purchase price can determine the value," "an

---

[1] Charleston, South Carolina is the site of a CBP training academy, and thus, may have a higher prevalence of expertise or cases related to customs issues.  *See* U.S. Customs and Border Protection, *CBP Field Operations Academy*, https://www.cbp.gov/careers/car/cbp-fo-academy (last visited Jan. 16, 2023) (describing CBP's Field Operations Academy as located in Glynco, GA with a satellite campus in Charleston); *see also* Federal Law Enforcement Training Centers, *Charleston, South Carolina*, https://www.fletc.gov/charleston-south-carolina (last visited Jan. 16, 2023) (describing a CBP satellite academy that was founded in Charleston in FY 2007).

4

object's value may also be ascertained by alternative means such as (as is most relevant here) an appraisal obtained by Customs."[2]  (ECF No. 66 at 6.)

The government's argument is disingenuous.  The governing statute, 19 U.S.C. § 1401a, lists a hierarchy of 6 methods of valuing merchandise, as follows:

(1) Except as otherwise specifically provided for in this chapter, imported merchandise shall be appraised, for the purposes of this chapter, on the basis of the following:

(A) The transaction value provided for under subsection (b).

(B) The transaction value of identical merchandise provided for under subsection (c), if the value referred to in subparagraph (A) cannot be determined, or can be determined but cannot be used by reason of subsection (b)(2).

(C) The transaction value of similar merchandise provided for under subsection (c), if the value referred to in subparagraph (B) cannot be determined.

(D) The deductive value provided for under subsection (d), if the value referred to in subparagraph (C) cannot be determined and if the importer does not request alternate valuation under paragraph (2).

(E) The computed value provided for under subsection (e), if the value referred to in subparagraph (D) cannot be determined.

---

[2] The government also recently disclosed its intent to call CBP Import Specialist William F. Tarter at trial.  It is anticipated that Tarter will testify that the correct value to declare for artwork is "the amount an importer anticipates the artwork would be valued at auction."  However, as noted in the concurrently filed motion *in limine* to limit Tarter's testimony, there is no supporting legal authority for this statement.  The defense reserves the right to further address Tarter's anticipated testimony when more information about the reasons and bases for Tarter's opinion.

5

1    (F)  The value provided for under subsection (f), if the value referred

2    to in subparagraph (E) cannot be determined.

3

4    19 U.S.C. § 1401a(a)(1).

5        At the very top of this hierarchy—in other words, the default method of valuing

6    merchandise—is "transaction value," or "the price actually paid or payable for the

7    merchandise."  19 U.S.C. § 1401a(a)(1)(A), (b)(1).  Under the structure of the statute,

8    you only proceed to the next form of valuation if the previous form of valuation cannot

9    be determined.  *See generally* 19 U.S.C. § 1401a(1)(1).

10       Indeed, according to the CBP, "[u]nder the [Trade Agreements Act of 1979,

11   codified at 19 U.S.C. § 1401a, et. seq.], the preferred method of appraisement is

12   **transaction value**.  Generally, the appraised value of all merchandise imported into the

13   United States is the **transaction value** of the goods."  U.S. Customs and Border

14   Protection, *What Every Member of the Trade Community Should Know About: Customs*

15   *Value* at 7 (July 2006) [hereinafter "Customs Value"], *available at*

16   https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/ICP-Customs-

17   Value-2006-Final.pdf (emphasis in original).  As the CBP publication goes on to

18   explain, "[i]n the event the merchandise cannot be appraised on the basis of transaction

19   value, the secondary bases are considered in the following order:

20       Transaction Value of Identical Merchandise

21       Transaction Value of Similar Merchandise

22       Deductive Value

23       Computed Value

24       Values if Other Values Cannot Be Determined."

25   *Id.*  With regard to the transaction value of identical merchandise and the transaction

26   value of similar merchandise, CBP specifies that it "must be a previously accepted

27   customs value."  *Customs Value* at 14.  In other words, those forms of valuation are not

28   the equivalent of a fair market value (at least not how Cohn derives it).

6

Notably, "fair market value" is not listed at all as a form of valuation in 19 U.S.C. § 1401a(1)(A). The government cited to the last valuation method, § 1401a(f), as authorizing an appraisal by Customs. (ECF No. 66 at 6.) Subsection (f) states that "[i]f the value of imported merchandise cannot be determined . . . under subsections (b) through (e), the merchandise shall be appraised for the purposes of this chapter on the basis of a value that is derived from the methods set forth in such subsections, with such methods being reasonably adjusted to the extent necessary to arrive at a value." 19 U.S.C. § 1401a(f)(1). In other words, subsection (f) permits an appraisal using the methods specified in subsections (b) through (e) as "reasonably adjusted." It does not explicitly refer to fair market value. Likewise, the CBP never refers to "fair market value" in its publication, *What Every Member of the Trade Community Should Know About: Customs Value. See generally Customs Value.*

This is a criminal case requiring that the defendant "knowingly" misclassify value. It is not possible for a defendant to "knowingly" misclassify the mosaic's fair market value, when that is not a form of valuation identified in 19 U.S.C. § 1401a or CBP's own published explanation of valuation. What appears to happen in practice is that the importer declares the transaction value to CBP. If CBP thinks there is an issue with the entered value, that is when it could potentially proceed to one of the secondary methods of valuation. (*See, e.g.*, ECF No. 66 at 6 (government referring to the fact that *Customs* can obtain an appraisal).) Thus, fair market value cannot be the definition of value for purposes of the initial declaration on the customs form under 18 U.S.C. § 541.

Introducing Cohn's expert testimony on the fair market value of the mosaic is irrelevant to the question of whether Mr. Alcharihi knowingly misclassified the transaction value, *i.e.*, "the price actually paid or payable,"19 U.S.C. § 1401a(b)(1)), for the mosaic. Therefore, Cohn's testimony is not helpful to the jury under Rule 702.

*Second*, even if the mosaic's fair market value is somehow relevant, Cohn opines on the value of the mosaic in its restored condition,[3] whereas it was imported in an unrestored condition. In Cohn's report, he describes the condition of the mosaic as "previously restored" (Ex. 1 at 10), and comments that "[r]estoration on the appraised piece is acceptable" (*id.* at 15). However, the charged offense addresses the value of the mosaic at the time of importation. *See* 18 U.S.C. § 541 (criminalizing "knowingly effect[ing] any *entry* of goods . . . upon a false classification as to quality or value") (emphasis added). At the time Mr. Alcharihi imported the mosaic, it had been rolled up like a carpet and was unrestored.

As explained in more detail in Mr. Alcharihi's Opposition to Motion *in Limine* to Admit Mosaic as Evidence at Trial, Mr. Alcharihi hired Stephen Miotto to restore the mosaic after it was imported into the country. (ECF No. 63 at 3-5.) According to Miotto, when he first saw the mosaic it "appear[ed] similar to an old rug with stones." (*Id.* at 4 (citing Ex. F a 2).) Miotto believes that the mosaic had been removed from its original setting by "gluing a canvas to the mosaic's surface first and then the mortar underneath the mosaic was broken off." (*Id.*) When Miotto first saw the mosaic, "many of the tessara were damaged, either through wear and tear through time or in the removal process or rolling it up." (*Id.* at 4 (citing Ex. D at 1).) He "believe[s] many tessera were crushed when the mosaic was rolled into itself, with the fabric on the outside and the tessera on the inside of the roll." (*Id.* at 4 (citing Ex. D at 1, Ex. E at 1).) Instead, "[t]he mosaic should have been rolled with the stones on the outside." (*Id.*

---

[3] In the government's Reply in Support of Motion *in Limine* to Admit Mosaic as Evidence at Trial, it mentions that its "appraisal expert valued the Mosaic at $410,000 without any restoration work." (ECF No. 66 at 5.) However, the government has not produced a report or other document to the defense regarding Cohn's opinion of the mosaic's fair market value in its unrestored condition. During a meet-and-confer call on March 8, 2023, the government informed the defense that it would be producing a supplemental appraisal by Cohn of the mosaic in its unrestored condition, but did not have a timeline as to when. The defense reserves the right to make additional arguments once it has received the supplemental appraisal.

8

at 4 (citing Ex. E at 1.).)  Miotto described the mosaic as being in a "fragile state." (*Id.* at 4 (citing Ex. D at 1).)

A concise summary of Miotto's restoration steps include: dividing the mosaic into 5 panels and transferring it onto a new hard substrate; removing the fabric that was laid on the front of the mosaic; cleaning the mosaic extensively through rounds of chemical washing, brushing, picking, and steam cleaning; and replacing most of the damaged, cracked, or missing stones.  (*See* ECF No. 63 at 4-5, and Ex. D at 2-13 (more detailed description of restoration).)

Below are (1) a photo of the unrestored mosaic from Miotto's report; and (2) the photo of the restored mosaic included in Cohn's report:



Photo of unrestored mosaic from Miotto's report.



Photo of restored mosaic from Cohn's report. (Ex. 1 at 9.)

It is obvious that mosaic that Cohn appraised in 2018 was in a drastically improved condition from the mosaic that Mr. Alcharihi imported in 2015.

In sum, Cohn's expert testimony on the *fair market value* of the *restored* mosaic is irrelevant to the question of whether Mr. Alcharihi knowingly misclassified the *transaction value* of the *unrestored* mosaic, and, thus, not helpful to the jury under Rule 702.

## C. Cohn's Testimony Should Be Excluded Under Rules 702 and 703 Because It Is Based on Insufficient Comparative Data, and Facts Not Reasonably Relied on By Art Appraisers

Rule 702 also requires that an expert's testimony be "based on sufficient facts or data" in order to be admissible. Fed. R. Evid. 702. There are at least 2 problems with Cohn's proffered testimony under this prong.

*First*, Cohn's testimony should be excluded because it is not based on sufficient comparative data that is reflective of the actual art market. Cohn applied the "Market Data Comparison Approach," which he defines as follows: "The 'market data comparison' approach analyzes recent sales of comparable articles at major international and regional fine art auctions, private and public sales, shows and exhibitions, as well as prevailing prices at retail shops and galleries where the article may normally be traded." (Ex. 1 at 24.) He defines the "Marketplace" as "Auction, Retail Dealer /Geographic Region: Global." (*Id.*)

Cohn bases his conclusion on 4 supposedly comparable mosaics. (*Id.* at 11-14.) However, Cohn does not provide an explanation of how he picks these comparisons. They range vastly in size, quality, style, subject matter, and date of last sale. (*Id.*) One is larger than the mosaic at issue in this case and depicts a symposium scene; two are much smaller and depict non-narrative images of animals; and the fourth is much smaller and depicts a non-narrative image of Hermes. (*Id.*) None of the 4 comparisons depict a Greek mythological story as the mosaic in this case supposedly does. With regard to date of sale, one comparison was sold in 2008, two in 2013, and one in 2018.

10

(*Id.*)  It appears that the first comparable mosaic was sold by a dealer, and the other three were sold at auction.  (*Id.*)

Moreover, Cohn states in his report:  "The auction prices generally for the beginning of the 21st Century were stable with no great increases.  *The market has* softened in more recent times and *become very thin in the public sphere; much of the sales are done privately*."  (Ex. 1 at 16 (emphasis added).)  Given Cohn's comment that the public market has become "very thin," and the fact that the 4 comparisons he uses do not seem similar in various respects to the mosaic at issue in this case, it appears that Cohn's conclusion is not based on sufficient data.  Indeed, if "much of the sales are done privately," how reliable is a conclusion based primarily on publicly available data?  Based on Cohn's report, it is impossible to tell whether the market data he relied on is sufficient, and whether this data is reflective of the actual market.  In light of this, his testimony should be excluded for insufficient data.  Or at the very least, the Court should hold a *Daubert* hearing to inquire further into the comparisons that Cohn selected, his methodology for selecting the comparable mosaics, and how reflective those comparisons are of the actual market.

*Second*, Cohn's testimony should be excluded because it is based on facts not reasonably relied upon by art appraisers.  While Rule 702 requires that testimony must be based on "sufficient facts or data," Rule 703 sets forth the permissible bases of expert opinion testimony.  "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  An expert can rely on hearsay, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  *Id.*

Here, Cohn appears to have relied heavily on an FBI Report of Investigation dated March 10, 2017 in appraising the mosaic.  He cites to the FBI report in describing the mosaic, its condition, and its authenticity.  For example:

- "Description: . . . According to specialist interviewed at investigation on March 10, 2017 in the Federal Bureau of Investigation report, the mosaic is

11

dated 'after 100 to 460 AD.' The Specialist advised that the mosaic is 'approximately 2,000 years old.' The Specialist also indicated 'he previously worked on about 1,000 similar mosaics when he was in Syria.'" (Ex. 1 at 10.)

- "Condition: According to a Specialist interviewed at investigation on March 10, 2017 in the FBI report, 'the mosaic was previously restored. The border on top of the mosaic was missing.' The Specialist identified new tiles added to the border. Furthermore, the Specialist identified new tiles added to the border. Furthermore, the Specialist indicated some deteriorated tesserae and a lacuna (gap) on the left side of the mosaic. Also, it was indicated that the mosaic would probably have been larger originally." (*Id.*)

- "Authenticity: According to the March 10, 2017 FBI report, the Specialist viewed the mosaic and advised that, in his opinion, the mosaic was authentic and was previously on a floor or pavement. He noted that on some edges of the mosaic there were new tesserae. He also noted a depression on the mosaic. The mosaic showed new and old material/tesserae on the border." (*Id.*)

The FBI Report of Investigation dated March 10, 2017 was written by FBI Special Agents Elizabeth Rivas and Steven M. Young, and summarizes their interview of Basileus Zeno. (*See* Ex. 2.) Notably, the report was not written by Basileus Zeno, but by law enforcement agents who are not experts in ancient mosaics.[4] A law

---

[4] If the Court ultimately permits Cohn to testify at trial, and to testify about his reliance on the March 10, 2017 Report of Investigation or other hearsay, the defense requests that the jury be instructed that references to the March 10, 2017 Report of Investigation or other hearsay are not offered for the matter of the truth asserted therein, but assumptions that underlie his opinion. *See* Fed. R. Evid. 703, Advisory Committee's 2000 Notes ("When information is reasonably relied upon by an expert and yet is admissible only for the purpose of assisting the jury in evaluating an expert's opinion, . . . [t]he information may be disclosed to the jury, upon objection, only if the trial court finds that the probative value of the information in assisting the jury to evaluate the expert's opinion substantially outweighs its prejudicial effect. If the otherwise inadmissible information is admitted under this balancing test, the trial judge must give a limiting instruction upon request, informing the jury that the underlying

12

enforcement report of investigation prepared by law enforcement agents for the purposes of investigating and charging a criminal offense is *not* the type of information that an art appraiser would reasonably rely on in appraising an art object. This presents an additional reason that Cohn's testimony should be excluded. Fed. R. Evid. 703. At the very least, the Court should hold a *Daubert* hearing to inquire further as to whether this is the type of information Cohn typically relies on when appraising art, how often has he relied on this type of information, and whether he has ever relied on this type of information for clients who are not tied in some way to law enforcement.

**D.** **Cohn's Testimony Should Be Excluded Under Rule 702 Because It Fails to Reliably Apply the Market Data Comparison Approach to the Facts of This Case**

Admissible expert testimony must not only be "the product of reliable principles and methods," but the expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(c)-(d). Here, Cohn's testimony should be excluded because he has not "reliably" applied the principles and methods to the facts of this case.

As noted above, Cohn applied the Market Data Comparison Approach to reach his conclusion about the mosaic's fair market value. His report appears to contain two different definitions of this approach. In the attached "Appraisal Terminology & Definitions" appendix, he defines the Comparative Market Data Approach (presumably the same thing) as using "past prices for similar works by the **same artist or artisan**, or similar works by another artist or artisan of equal standing and related reputation." (Ex.

---

information must not be used for substantive purposes. In determining the appropriate course, the trial court should consider the probably effectiveness or lack of effectiveness of a limiting instruction under the particular circumstances.") (citation omitted); *see also Williams v. Illinois*, 567 U.S. 50, 78 (2012) ("The purpose of disclosing the facts on which the expert relied is . . . not to prove the truth of the underlying facts."); *United States v. Sowards*, 339 F.2d 401, 402 (10th Cir. 1964) ("As a general rule, an expert may testify as to hearsay matters, not to establish substantive facts, but for the sole purpose of giving information upon which the witness relied in reaching his conclusion as to value. When evidence is given for this purpose, the jury should be so instructed.") (citation omitted).

1 at 24 (emphasis added).)  Presumably, the "artist or artisan" of antique mosaics is typically unknown, and an appraiser cannot find a comparable by the same or similar artist.  Therefore, in the section describing the "Scope of Work" for *this* particular appraisal, Cohn provides a slightly different definition of the approach as being based on "recent sales of comparable articles."  (*Id.* at 18.)

However, nowhere does Cohn explain what is considered a comparable article to the mosaic at issue in this case.  Nor does he explain how he chose the 4 "comparable" mosaics on which he bases the appraisal.  As noted above, none of the 4 "comparable" mosaics depict a Greek mythological story.  None of them are of a similar size.  There is no information about whether the other 4 mosaics were restored, or what materials they consist of.  There is no information about whether the price of sale is affected by the venue, *i.e.*, auction, art dealer, private sale, etc.  And there is no information about whether these were the only comparable articles Cohn could find, or if he eliminated other possible comparable articles and, if so, for what reason.

In an earlier draft of the report, Cohn used only 3 of the 4 "comparable" articles from the final report, and arrived at a fair market value of just $400,000.  (Ex. 3 at 6.) The draft also contains no explanation or mathematical calculation supporting the $400,000 figure.  It appears that one main difference between the draft and the final report is that Cohn found a fourth "comparable" article with a higher sales price to justify a higher conclusion.  (*See id.* at 2-5 (describing only 3 comparable articles).) This further begs the questions as to how Cohn chose the 4 "comparable" articles, whether they are actually comparable to the mosaic, and whether 4 "comparable" articles is a sufficient data pool to provide a reliable valuation.

Furthermore, the sale prices of the 4 "comparable" mosaics vary widely.  The first sold for $6 million; the second for $34,375; the third for $6,875; and the fourth for $124,239.  (Ex. 1 at 11-14.)  The differential between the most expensive and the least expensive "comparable" article is $5,993,125.  The mean price of the 4 "comparable" articles is $1,541,372.25 (clearly skewed upward by the most expensive one), while the

14

median price is just $158,614.  The variation in price begs the question whether these 4 articles are all actually comparable.

Finally, Cohn provides no actual calculations or quantitative explanation for how he reached a fair market value of $450,000.  He states—without citation or supporting authority—that size, condition, period, and provenance are all important factors in valuing an object, and that earlier pieces (2nd-4th century) are usually valued higher than later (4th-6th century).  (Ex. 1 at 15.)  He also qualitatively describes how the mosaic at issue compares to each "comparable" article.  (*Id.*)  But Cohn does not provide any calculations or mathematical basis for the $450,000 valuation.  It appears that the mosaic at issue is somewhere in between the 4 "comparable" articles in terms of size and condition.  But as noted above, there is wide variation in the 4 articles' sales prices, including a $5,993,125 differential between the most expensive and least expensive item.  It is unclear how Cohn arrives at the $450,000 figure within that large range.  One of the *Daubert* factors for assessing the reliability of expert testimony is "whether the technique or theory can be objectively tested, or whether it is a subjective, conclusory approach whose reliability cannot be assessed."  Fed. R. Evid. 702, Committee Notes 2000 Amendment; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993) ("the word 'knowledge' connotes more than subjective belief or unsupported speculation"); *id.* at 593 ("a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested").  Without a quantitative or mathematical explanation for how Cohn arrived at the $450,000 figure, it cannot be "objectively tested," and is instead, "a subjective, conclusory approach whose reliability cannot be assessed."  *Id.*

In sum, Cohn's testimony should be excluded because he has not reliably applied the Market Data Comparison Approach.  There is no explanation as to why the 4 "comparable" articles are considered comparable to the mosaic at issue in this case, no supporting citations or authority for his underlying assumptions about the relevant

factors and how they affect valuation, and no explanation or mathematical basis for how he arrived at $450,000 as the fair market value. At the very least, the Court should hold a *Daubert* hearing to inquire into these issues and determine the reliability of Cohn's opinion.

**E.** **A *Daubert* Hearing Is Necessary**

If the Court is not inclined to grant this Motion, it must at least hold a *Daubert* hearing to fulfill its gatekeeping role before determining that Cohn's testimony is sufficiently relevant and reliable. The district court has the obligation to "perform a gatekeeping role of ensuring that testimony is both relevant and reliable under" Federal Rule of Evidence 702. *United States v. Ruvacalba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (citing *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)) (quotation marks omitted). Because an expert's testimony must "have a reliable basis in the knowledge and experience of the relevant discipline[,]" the "district court must assess whether the reasoning or methodology underlying the testimony is scientifically valid and properly can be applied to the facts in issue, with the goal of ensuring that the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 1188-89 (citations and quotation marks omitted).

Although "district courts are vested with broad latitude to decide how to test an expert's reliability and whether or not an expert's relevant testimony is reliable[,]" they "do not have discretion to abandon the gatekeeping function altogether, for Rule 702 clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." *Id.* at 1189 (citations and quotation marks omitted). Therefore, "a district court abuses its discretion when it either abdicates its role as gatekeeper by failing to assess the scientific validity or methodology of an expert's proposed testimony, or delegates that role to the jury by admitting the expert testimony without first finding it to be relevant and reliable." *Id.* (quotation marks omitted). An implicit

16

reliability finding is not sufficient—a district court "must make an explicit reliability finding" to "satisfy its gatekeeping duty[.]" *Id.* at 1190 (quotation marks omitted).

Here, the Court should hold a *Daubert* hearing to evaluate Cohn's testimony, including why Cohn's opinion of the fair market value of the restored mosaic is relevant; whether Cohn's opinion is based on sufficient data and facts reasonably relied upon by art appraisers; and whether he reliably applied the market data comparison approach.

**F.     Cohn's Testimony Should Be Excluded Under Rule 403 Because Its Minimal Probative Value Is Substantially Outweighed by the Danger of Confusing the Issues, Misleading the Jury, Undue Delay, Wasting Time, and Needlessly Presenting Cumulative Evidence**

Pursuant to Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. If the Court finds Cohn's proffered testimony minimally relevant and reliable, it should still exclude Cohn's testimony under Rule 403.

Cohn's testimony has minimal probative value for the same reasons it is irrelevant and unreliable. *See supra* Sections II.A.2 through II.A.4. Value for the purposes of the charged statute, 18 U.S.C. § 541, is the purchase price that Mr. Alcharihi paid for the mosaic, and thus, Cohn's testimony about its fair market value has no probative value.

Worse yet, permitting Cohn to testify, as an expert, at length, about the mosaic's fair market value would confuse the definition of value at issue in this case, and mislead the jury into thinking that Mr. Alcharihi was required to report the fair market value (as opposed to the purchase price) to customs. If Cohn were permitted to testify about fair market value, it would waste the jury's time on an irrelevant topic, and lead to undue delay in the trial as the defense would be required to spend additional time

17

presenting evidence and argument as to why fair market value is irrelevant and Cohn's testimony is unreliable.  Finally, the government may argue that the mosaic's fair market value is relevant to illustrating Mr. Alcharihi's motive and intent of importing the mosaic in order to resell it for a much higher value.  However, the government can already tell this story through other evidence it seeks to introduce.  For example, the government intends to introduce Mr. Alcharihi's own statements about how much he thought the mosaic was worth, and other email communications about the mosaic's estimated market value.  Therefore, with regard to permitting the government to show Mr. Alcharihi's motive and intent for importing the mosaic, Cohn's opinion is needlessly cumulative of other evidence the government will already introduce.

## IV. CONCLUSION

The Court should exclude Cohn's testimony on the fair market value of the restored mosaic because it is irrelevant, based on insufficient comparative data and facts not reasonably relied upon by art appraisers, and failed to reliably the market data comparison approach under Federal Rules of Evidence 702 and 703.  The Court should also exclude Cohn's testimony because its minimal probative value is outweighed by the danger of unfair prejudice, misleading the jury, undue delay, wasting time, and needlessly presenting cumulative evidence under Federal Rule of Evidence 403.  If the Court is not inclined to grant this Motion, it should at least hold a *Daubert* hearing to fulfill its gatekeeping function of determining that Cohn's testimony is both relevant and reliable.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  March 9, 2023          By   */s/ Isabel Bussarakum*

ASHLEY MAHMOUDIAN
ISABEL BUSSARAKUM
JOSH WEISS
Deputy Federal Public Defenders
Attorney for MOHAMAD ALCHARIHI

18