CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ASHLEY MAHMOUDIAN (Bar No. 316638)
(E-Mail: ashley_mahmoudian@fd.org)
ISABEL BUSSARAKUM (Bar No. 295046)
(E-Mail: isabel_bussarakum@fd.org)
JOSHUA D. WEISS (Bar No. 338918)
(E-Mail: Josh_Weiss@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
MOHAMAD ALCHARIHI

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MOHAMAD ALCHARIHI, <br><br> Defendant. | Case No. CR 20-307-GW <br><br> **DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY OF DR. ERIC DOEHNE; EXHIBITS** <br><br> Hearing Date: 4/20/2023 <br> Hearing Time: 10:00 a.m. |

Defendant Mohamad Alcharihi, by and through his counsel of record, hereby moves *in limine* for an order precluding the government from introducing at trial the expert testimony of Eric Doehne and/or a *Daubert* hearing regarding the admissibility of his testimony.

The government has provided notice of, and confirmed during a meet-and-confer phone call, its intent to call Eric Doehne to opine on the mosaic's authenticity and

1

likely country of origin, among other things.

This Motion is based on the attached memorandum of points and authorities, the files and records in this case, and any further evidence and argument as the Court may permit.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: March 9, 2023        By  */s/ Isabel Bussarakum*
ASHLEY MAHMOUDIAN
ISABEL BUSSARAKUM
JOSH WEISS
Deputy Federal Public Defenders
Attorneys for MOHAMAD ALCHARIHI

2

## **TABLE OF CONTENTS**

Page

I. INTRODUCTION ............................................................................................... 1

II. PROFERED EXPERT TESTIMONY .................................................................. 1

III. ARGUMENT ........................................................................................................ 3

    A.    Legal Standard Under Federal Rule of Evidence 702 and *Daubert* ............ 3

    B.    Dr. Doehne's Testimony as Summarized in the May 20, 2019 Materials Report Should Be Excluded Under Rule 702 .............................. 4

        1.    The May 20, 2019 Materials Report Is Irrelevant ............................ 4

        2.    The May 20, 2019 Materials Report Is Unreliable ........................... 5

    C.    Dr. Doehne's Testimony as Summarized in the January 17, 2023 Supplemental Statement Should Be Excluded Under Rule 702 ................ 10

        1.    The Mosaic's Iconography and Characteristic Wear ..................... 10

        2.    Looting ............................................................................................ 13

    D.    A *Daubert* Hearing Is Necessary ............................................................... 15

    E.    Dr. Doehne's Testimony Should Be Excluded Under Rule 403 Because Its Minimal Probative Value Is Substantially Outweighed by the Danger of Unfair Prejudice, Undue Delay, and Wasting Time ........... 16

IV. CONCLUSION ................................................................................................... 17

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The government has provided notice of its intent to call Dr. Eric Doehne as an expert witness to describe the iconography on the mosaic at issue in this case, and to opine that the mosaic is authentic, likely from Syria, and likely looted from a floor location in Syria. Mr. Alcharihi moves to exclude Dr. Doehne's testimony on the following grounds: (1) it is irrelevant under Federal Rule of Evidence 702 and *Daubert* because, with the exception of the mosaic's iconography, Dr. Doehne's testimony appears to address allegations of "quality" not alleged in the Indictment or covered by the meaning of quality in 18 U.S.C. § 541, and because it does not help the jury determine what Mr. Alcharihi *knew* about the mosaic at the time of importation; (2) there is insufficient information about the bases and reasons underlying Dr. Doehne's analysis and conclusions, and thus, it is unreliable under Rule 702 and *Daubert*; (3) the proposed testimony about the mosaic's iconography and characteristic wear appear to be the opinions of another expert, and Dr. Doehne should be precluded from presenting those opinions as his own; (4) the government has failed to establish that Dr. Doehne is qualified under Rule 702 to testify about the mosaic's iconography and looting; and (5) the proposed testimony about looting, in particular, should be excluded under Rule 403 because its minimal probative value is outweighed by the extreme prejudice it poses to Mr. Alcharihi.

## II. PROFERED EXPERT TESTIMONY

Attached as Exhibit 1 is a copy of the government's expert disclosure dated September 28, 2021, which enclosed a copy of Dr. Doehne's report dated May 20, 2019 and his curriculum vitae. In the disclosure, the government states that Dr. Doehne will testify that "various factors indicate that the composition and condition of the Mosaic's tesserae are consistent with the Mosaic being ancient and from the Eastern Mediterranean area. He will also testify that the Mosaic is authentic and likely to be from Syria." (Ex. 1 at 1-2.)

1

1  In his May 20, 2019 Materials Report, Dr. Doehne states that "[t]he mosaic appears to be from Syria, a conflict area where looting of antiquities is common." (Ex. 1 at 6.) He states:

> The results of the scientific analysis of the mosaic, presented here, reveal the presence of altered glass tesserae, the composition and weathered condition of which are consistent with the object being ancient and from the Eastern Mediterranean area. The composition and condition of the stone tesserae are also consonant with what is expected of an ancient, weathered, and worn mosaic. The pink tesserae are most similar to limestone quarried in Bethlehem and Jerusalem, and the black tesserae are chemically similar to a type of stone type commonly found in Syria. An encrustation on the stone was also found to be similar in composition to ancient encrustations."

(*Id.*)

Dr. Doehne further states that "[a] number of lines of evidence also come together that support the likely source of the mosaic as Syrian, including the type, composition, and weathering of the stone and glass tesserae, evidence from the condition, restoration, and manufacture of the mosaic as evaluated by conservator Eduardo Sanchez, and previously cited stylistic similarities to mosaics found near Idlib, Syria." (*Id.*)

In January 2023, the parties met and conferred about motions *in limine*. The government noted that it would not be calling 2 of the 5 experts—Eduardo Sanchez and Basileus Zeno—noticed in its September 28, 2021 disclosure. The government stated that Sanchez's and Zeno's opinions would be covered by Dr. Doehne's testimony.

On January 17, 2023, the government provided a supplemental expert disclosure regarding Dr. Doehne's testimony. Attached as Exhibit 2 is a copy of the January 17, 2023 supplemental disclosure, and the enclosed statement signed by Dr. Doehne that same day. Dr. Doehne will also testify "about the Mosaic's iconography" and explain "the story" it depicts "from Greek and Roman mythology." (Ex. 2 at 3.)

2

Dr. Doehne will also "explain that the Mosaic's surface wear patterns, weathering, deterioration, coloring, pitting, corrosion, and other characteristics indicate alterations that took place over centuries." (Ex. 2 at 3.) This "strongly support[s] the conclusion that the Mosaic is ancient (approximately 2000 years old from the Roman era) and was created in the same geographic area that is now Syria." (*Id.*)

Finally, "Dr. Doehne will testify regarding his research, training, teaching, and experience with respect to antiquities looted and smuggled from conflict areas. Dr. Doehne will testify that Syria has experienced extensive looting of antiquities due to civil war, economic and social stresses, and other factors." (*Id.*) As such, Dr. Doehne "will opine" that "the Mosaic is consistent with having been looted likely from a floor location in Syria." (*Id.*)

### III. ARGUMENT

**A.  Legal Standard Under Federal Rule of Evidence 702 and *Daubert***

Federal Rule of Evidence 702 permits opinion testimony by an expert who is qualified by "knowledge, skill, expertise, training, or education," if four conditions are met: (a) "the expert's . . . specialized knowledge will help the trier or fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell DowPharms., Inc.*, 509 U.S. 579, 589 (1993)) (holding that *Daubert*'s gatekeeping obligation applies not only to "scientific" testimony, but to all expert testimony). The Court's gatekeeping function is of utmost importance because "[u]nlike an ordinary witness . . . , an expert is permitted wide latitude to offer opinions, including those that are not based on

3

firsthand knowledge," and "expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 592, 595.

"It is the proponent of the expert who has the burden of proving admissibility." *Lust By and Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). The party presenting the expert must demonstrate that the expert's findings are based on sound principles. *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316 (9th Cir. 1995).

**B.  Dr. Doehne's Testimony as Summarized in the May 20, 2019 Materials Report Should Be Excluded Under Rule 702**

  1. The May 20, 2019 Materials Report Is Irrelevant

Rule 702 requires that the proffered evidence "help the trier of fact to understand the evidence or to determine a fact in issue." F. R. Evid. 702. "This condition goes primarily to relevance." *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (everything omitted); *see also United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985) ("An additional consideration under Rule 702—another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.").

Mr. Alcharihi is charged with violating 18 U.S.C. § 541, in part, by "knowingly misrepresent[ing] the quality of the mosaic, including what the mosaic depicted."[1] (ECF No. 1 at 2.) As previously briefed by the defense (ECF Nos. 59, 61), it is highly unclear what the government means by "quality," and it did not specify what "quality" means in the Indictment, other than to include "what the mosaic depicted" (ECF No. 1). Mr. Alcharihi maintains that Dr. Doehne's opinion about the mosaic's likely authenticity, modern-day country of origin, and original location being on the floor is

---

[1] It does not appear that Dr. Doehne's opinion goes to the allegations regarding value. For example, even the government's fair market value expert, Michael Cohn, did not appear to rely on Dr. Doehne's report in his appraisal. For this reason, this Motion focuses on the quality allegations.

4

irrelevant because (1) those characteristics are not alleged in the Indictment as relating to quality, and (2) they are not covered by the statutory meaning of quality in 18 U.S.C. § 541. (*See* ECF Nos. 59, 61.) Moreover, as briefed in the concurrently filed Motion *in Limine* to Exclude Evidence Regarding Means of Violating 18 U.S.C. § 541 That Are Not Charged in the Indictment, permitting the government to prove means of violating § 541 charged in the Indictment (such as authenticity, country of origin, and location) amounts to an unconstitutional amendment of the Indictment. For these reasons, the analysis and opinions in Dr. Doehne's May 20, 2019 Materials Report are irrelevant.

Even if the Court disagrees and finds that quality does encompass these traits, this case is not about whether the mosaic actually is authentic, whether it actually came from a floor, or which country it actually came from. Section 541 does not criminalize getting these facts wrong. It criminalizes "*knowingly*" misclassifying the mosaic's quality. 18 U.S.C. § 541 (emphasis added). This case is about what Mr. Alcharihi knew about the mosaic at the time of importation. Nothing in Dr. Doehne's proffered opinion speaks to Mr. Alcharihi's knowledge. Even if Dr. Doehne's opinions are correct—but Mr. Alcharihi had no knowledge of this information at the time of importation—Dr. Doehne's testimony is irrelevant. It does not assist the jury determine whether Mr. Alcharihi knew at the time of importation that the mosaic was authentic, likely came from the floor, and came from modern-day Syria.

### 2. The May 20, 2019 Materials Report Is Unreliable

Rule 702 requires that expert testimony be based on "sufficient facts or data," be "the product of reliable principles and methods," and that the expert "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702. As summarized in the Advisory Committee's 2000 Notes, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) "set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony." Fed. R. Evid. 702, Advisory Committee's 2000 Notes. The *Daubert* factors are: (1) "whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can

5

be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability"; (2) "whether the technique or theory has been subject to peer review and publication"; (3) "the known or potential rate of error of the technique or theory when applied"; (4) "the existence and maintenance of standards and controls"; and (5) "whether the technique or theory has been generally accepted in the scientific community." *Id.* These factors are "neither exclusive nor dispositive," and the Advisory Committee Notes list at least 5 other factors that courts have found relevant, including "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion," and "[w]hether the expert has adequately accounted for obvious alternative explanations," among others. *Id.*

In Dr. Doehne's report, there are several layers of analysis to evaluate. At the first level is his analysis of the samples of materials from the mosaic: for example, the corrosion of the green glass tesserae; the chemistry, texture, and alteration of different stone tesserae; the mortar; and the encrustation on the mosaic. (Ex. 1 at 10-12.) While it is possible that he applied reliable, objectively-testable scientific methods to test and analyze these materials, we do not have enough information to make that determination. One possible exception may be his analysis of the green glass, about which he gives the most detail. (*Id.* at 10.) But for the other materials, he provides cursory descriptions of his analysis. For example: "Mosaic – Sample 5 - White Tesserae – Interpreted as a fine-grained, partially recrystallized limestone with some staining from iron oxides." (*Id.* at 11.) There is no explanation as to how he deduced the chemistry or characteristics of the sample, or how or why he "[i]nterpreted" it as he did. Another example is that for "Sample 8 - Red Glass" and "Sample 9 - Orange Glass," he simply states "Contains lead, iron, and cooper (Pb, Fe, Cu)." (*Id.*) Again, there is no explanation for how derived this chemistry composition. And there is no description of the "texture" and "alteration," even though he concludes that they are "consistent with other red Roman mosaic glass tesserae." (*Id.*) Dr. Doehne provides

6

1   this type of cursory description of the materials for Samples 4-16.  (*Id.* at 11-12.)  There
2   simply is not enough information to determine if his analysis of these materials is based
3   on sufficient facts or data, if it is the product of reliable principles and methods, and if
4   he reliably applied those principles and methods to the facts of the case.

5        At the next layer of analysis, Dr. Doehne draws sub-conclusions about each
6   individual sample of material.  For example, after interpreting "Sample 5 – White
7   Tesserae" as "a fine-grained, partially recrystallized limestone with some staining from
8   iron oxides," Dr. Doehne concludes, "[t]his is typical of Eastern Mediterranean
9   mosaics." (*Id.* at 11.)  However, there is no explanation as to how he reached this
10  conclusion; what methodology, technique, or criteria he applied; or whether he
11  excluded other categories of items the sample could be consistent with.  Another
12  example is that for "Sample 8 - Red Glass" and "Sample 9 - Orange Glass," he states,
13  "[c]hemistry, texture, and alteration are interpreted as consistent with other red Roman
14  mosaic glass tesserae." (*Id.*)  Here, there is no description of the samples' chemistry,
15  texture, and alteration; no explanation of how Dr. Doehne' reached his conclusion; no
16  explanation of what methodology, technique, or criteria he applied; and no explanation
17  of whether he excluded other categories of items the samples could be consistent with.
18  (*Id.*)  Dr. Doehne provides this type of cursory sub-conclusion without much
19  explanation for Samples 4-16.  (*Id.* at 11-12.)  Again, there is not enough information to
20  determine if the sub-conclusion for each individual sample is based on sufficient facts
21  or data, if it is the product of reliable principles and methods, and if Dr. Doehne
22  reliably applied those principles and methods to the facts of the case.

23       Finally, at the last layer of analysis are Dr. Doehne's overall conclusions about
24  mosaic.  He concludes that "[t]he mosaic appears to be from Syria," and that "the
25  available evidence strongly supports the authenticity of the mosaic." (Ex. 1 at 6.)  Dr.
26  Doehne's conclusion that the mosaic is from Syria is based on "[a] number of lines of
27  evidence" (*id.*):  (1) his own analysis of the mosaic's materials; (2) the analysis by
28  "conservator Eduardo Sánchez," who concluded in a separate report that "the mosaic . .

7

. may be from a Mediterranean geographical location (Ex. 2 at 7); and (3) "previously cited stylistic similarities to mosaics found near Idlib, Syria" (Ex. 1 at 6), which appears to refer to the work of Basileus Zeno[2] (*see* Ex. 1 at 2 (government disclosure stating that "Zeno will testify that the Mosaic is authentic and consistent with the style and iconography of mosaics found in Syria).)

In his own report, Dr. Doehne states that "[d]eciding on questions of authenticity and source depends on evaluating probabilities *in context*, which is different for every object. While no single perspective can decide such a question, by gathering multiple threads of evidence this report makes a significant contribution of evidence for authenticity and a likely Syrian source of the mosaic." (Ex. 1 at 6.) The vague reference to "evaluating probabilities *in context*" and the acknowledgement that no "single perspective" can answer questions about authenticity and source, beg the questions: (1) is there a standard protocol, or set of criteria, or lines of evidence that should be used for evaluating the authenticity and source of a piece of art; (2) is that standard or methodology subject to peer review, or is it generally accepted in the art-science community; and (3) was that standard or methodology applied here?

At least two other non-*Daubert* reliability factors cited by the Rule 702's Advisory Committee Notes appear to be relevant here. The first factor is "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion." Fed. R. Evid. 702, Advisory Committee Notes 2000 (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered")). Here, there appears to be a large jump between Dr. Doehne's sub-conclusions about the individual samples of material to his overall conclusion that the mosaic is from Syria. Of the 16 individual material samples, only his sub-conclusion

---

[2] If the defense is correct that this is referring to Zeno's work, Dr. Doehne should testify clearly about whose work he is referring to, and that he is assuming Zeno's conclusions are correct without having independently tested or verified them.

about the black tesserae reference Syria.  Although "[i]nitial work to narrow down a specific source of this stone was not successful," "there are examples in the literature on Roman tesserae of use of local igneous rock for black tesserae, and basalt used to create Syrian ancient artifacts."  (Ex. 1 at 11.)  In other words, Dr. Doehne could not pinpoint the exact source of the black tesserae, but found literature indicating that basalt was quarried in Syria and used in Syria artifacts.  He did not tie any of the other specific materials to Syria.  (*Id.* at 10-12.)  Indeed, the pink tesserae was tied to Bethlehem and Jerusalem (in Israel).  (*Id.* at 12.)  As noted above, Sánchez's report only concludes that the mosaic may be from a Mediterranean location, and does not specify Syria.  (Ex. 2 at 7.)  And Zeno indicates that the mosaic is stylistically consistent with other mosaics in Syria.  (Ex. 1 at 2.)  Given that Dr. Doehne's analysis of the individual material samples does not seem to definitively point to Syria, and that Sánchez does not reach such a specific conclusion, how is it that Dr. Doehne can conclude that the mosaic is from Syria?  Is it primarily based on Zeno's report?  Is that sufficient vis-à-vis the standards in his field?

      Furthermore, the other non-*Daubert* factor implicated here is "[w]hether the expert has adequately accounted for obvious alternate explanations."  Fed. R. Evid. 702, Advisory Committee Notes 2000 (citing *Claar v. Burlington, N.R.R.*, 29 F.3d 499 (9th Cir. 1994)).  Here, Dr. Doehne found that the pink tesserae were consistent with pink limestone quarried in ancient times near Bethlehem and Jerusalem (Ex. 1 at 12), so why was Israel ruled out as a possible location for the mosaic?  He found that the white tesserae was typical of Eastern Mediterranean mosaics, triggering the question of why other Eastern Mediterranean countries (*e.g.*, Greece, Turkey, Egypt, Lebanon, Israel, Jordan, Palestine) were ruled out.  Likewise, did Dr. Doehne rule out alternate explanations for the findings that the mosaic are consistent with being ancient?

      In sum, Dr. Doehne does not provide enough information in the May 20, 2019 Materials Report about the facts, data, principles, and methods used to analyze the mosaic's materials, to reach his sub-conclusions, and to reach his overall conclusions

about the mosaic. Therefore, his testimony should be excluded under Rule 702. At the very least, the Court should hold a *Daubert* hearing to inquire into the reliability of his data and methodology.

### C. Dr. Doehne's Testimony as Summarized in the January 17, 2023 Supplemental Statement Should Be Excluded Under Rule 702

#### 1. The Mosaic's Iconography and Characteristic Wear

Dr. Doehne should be precluded from testifying about the second and third paragraphs regarding the mosaic's iconography and characteristic wear, respectively, in the January 17, 2023 supplemental statement for a number of reasons.

*First*, the second and third paragraphs appear to summarize the opinions of another expert, Eduardo P. Sánchez, and Dr. Doehne should be precluded from offering them as his own opinions. The second and third paragraphs do not correspond to any part of Dr. Doehne's Materials Report dated May 20, 2019, but do correspond to opinions from Sánchez's report dated May 20, 2019. (Ex. 3.) Compare as follows:

| *Dr. Doehne's 1/17/2023 Statement* | *Eduardo P. Sánchez Report* |
|---|---|
| "Dr. Doehne will testify about the Mosaic's iconography, including that the Mosaic depicts a story from Greek and Roman mythology. He will explain that Prometheus (in the center of the Mosaic) is chained to a rock in the Caucases Mountains for eternity as retribution from Zeus for stealing fire for humanity. The scene shows his liver being eaten daily by an eagle, only to be regenerated by night, due to immortality. The eagle is a | "attribution This mosaic depicts a story from Greek and Roman mythology: Prometheus is chained to a rock in the Caucus Mountains for eternity as retribution from Zeus for stealing fire for humanity. There his liver is eaten daily by an eagle, only to be regenerated by night, due to his immortality. The eagle is a symbol of Zeus himself. Years later, the Greek hero Heracles (Hercules) slays |

10

| | |
|---|---|
| symbol of Zeus himself.  Years later, the Greek hero Heracles (Hercules) slays the eagle with a bow and arrow and frees Prometheus from his torment." <br><br> (Ex. 2 at 3, ¶ 2.) | the eagle and frees Prometheus from his torment." <br><br><br><br> (Ex. 3 at 1.) |
| "Dr. Doehne will testify that the Mosaic is composed of cut stone and glass tesserae that have characteristics, including characteristic wear, that match other ancient Mediterranean mosaics.  He will explain that the Mosaic's surface wear patterns, weathering, deterioration, coloring, pitting, corrosion, and other characteristics indicate alterations that took place over centuries.  As such, Dr. Doehne will opine that based on his training and experience, his analysis of the Mosaic and the materials he reviewed in connection with this investigation strongly support the conclusion that the Mosaic is ancient (approximately 2000 years old from the Roman era) and was created in the same geographic area that is now Syria." <br><br> (Ex. 2 at 3, ¶ 3.) | "[E]nough evidence remains to indicate characteristic wear that matches that of other mosaics from the ancient Mediterranean period/s.  These types of long-term physical changes contribute to specific types of deterioration.  There is physical evidence of micro-fracturing of the tesserae . . . . There is noticeable change to the surface of each of the colored stones. . . . Significant surface wear patterns on the stone combined with surface pitting are also indicators of centuries old patterns of deterioration. . . . Based on my expertise and based on the combined information that has been presented by me and by Dr. Eric Doehne regarding this particular object, I conclude that the mosaic has a high probability of being ancient and may be from a Mediterranean geographical location." |

11

|  |  |
|---|---|
|  | (Ex. 3 at 6-7.) |

Dr. Doehne cannot simply present Sánchez's opinions and conclusions as his own. "[O]ne expert may not give the opinion of another expert who does not testify." *Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry. Co.*, No. 98-1050, 98-1077, 1999 WL 12931, *4 (4th Cir. Jan. 14, 1999) (Unpub. Disp.); *see also Flagstone Dev., LLC v. Joyner*, No. CV-08-100-BLG-RFC, 2011 WL 5040663, at *3 (D. Mont. Oct. 24, 2011), *aff'd*, 545 F. App'x 602 (9th Cir. 2013) ("[A]n expert's opinion must be excluded if that expert is merely 'parroting' some other person's opinion rather than formulating his own."). Accordingly, the Court should preclude Dr. Doehne from testifying about the second and third paragraphs in the January 17, 2023 statement.

*Second*, with regard to the mosaic's iconography (*i.e.*, the second paragraph in the January 17, 2023 statement), Dr. Doehne does not appear qualified to opine about the iconography. Dr. Doehne is a scientist. Specifically, all of his higher education degrees (B.S., M.S., and Ph.D.) are in Geology. (Ex. 1 at 30.) In his Curriculum Vitae, he describes himself as a "geologist, microscopist, lab manager, and museum scientist." (*Id.*) While he uses scientific analysis in support of what he terms "heritage preservation" (*id.*), he is not an art historian or archaeologist. He does not have the "knowledge, skill, experience, training, or education" to opine on the mosaic's iconography. Fed. R. Evid. 702.

*Third*, there is not enough information about the bases and reasons for the conclusions set forth in the second and third paragraphs of the January 17, 2023 statement to determine if they are reliable under Rule 702. The second paragraph describes the mosaic's story without providing any underlying bases or reasons. (Ex. 2 at 3.) There are no cited authorities or sources. Nor is there any explanation of how Dr. Doehne concluded that the mosaic depicts the story of Prometheus's punishment.

12

Likewise, the third paragraph concludes that the mosaic has characteristics matching other ancient Mediterranean mosaics; and the mosaic's surface wear patterns, weathering, deterioration, coloring, pitting, corrosion, and other characteristics indicate alterations that took place over centuries.[3]  (Ex. 2 at 3.)  But it does not provide the bases and reasons for those conclusions.  What are the mosaic's characteristics that match other ancient Mediterranean mosaics?  What is the methodology for matching it to other ancient Mediterranean mosaics?  How do the mosaic's surface wear patterns, weathering, deterioration, coloring, pitting, corrosion, and other characteristics indicate alterations that took place over centuries?  How did Dr. Doehne analyze these characteristics?  In short, the third paragraph provides conclusions with no explanation of how Dr. Doehne reached those conclusions, and there is insufficient information to determine if the conclusions are reliable.

For all of these reasons, the Court should preclude Dr. Doehne from testifying about the second and third paragraphs in the January 17, 2023 statement.  However, if the Court is disinclined to do so, it should at least permit a *Daubert* hearing to further inquire into Dr. Doehne's bases, reasons, and methodology for his conclusions.

**2.    Looting**

The fourth and final paragraph of the January 17, 2023 statement summarizes Dr. Doehne's proffered testimony about looting.  It states in full:

> In addition, Dr. Doehne will testify regarding his research, training, teaching, and experience with respect to antiquities looted and smuggled from conflict areas.  Dr. Doehne will testify that Syria has experienced extensive looting of antiquities due to civil war, economic and social stresses, and other factors.  As such, Dr. Doehne will opine that based on his training and experience, his analysis of the Mosaic (including its cracking and that it was rolled), and the materials he reviewed in

---

[3] The third paragraph of the January 17, 2023 statement is also irrelevant for the same reasons stated in Section III.B.1.

    connection with this investigation (including the lack of official
    documentation), the Mosaic is consistent with having been looted likely
    from a floor location in Syria.

(Ex. 2 at 3.) The Court should exclude this testimony for the following reasons.

  *First*, while the notice states that Dr. Doehne will "testify regarding his research, training, teaching, and experience with respect to antiquities looted and smuggled from conflict areas," it does not state what those qualifications are. (*Id.*) Dr. Doehne's curriculum vitae lists under "Areas of Expertise & Research Interests": "Detection of Loot and Forgeries" and "Connecting Forgery, Looting, Tourism & Film." (Ex. 1 at 30.) But that certainly does not elucidate his qualifications. The Court should exclude the testimony on looting because the government has not demonstrated that Dr. Doehne is "qualified" on this topic. Fed. R. Evid. 702. At the very least, the Court should hold a *Daubert* hearing to inquire into Dr. Doehne's qualifications.

  *Second*, the proffered testimony on looting should be excluded because it is irrelevant. As stated above, this case is not about whether the mosaic is actually authentic, or whether it was actually from Syria, or whether it was actually looted. It is about whether Mr. Alcharihi knowingly misclassified the mosaic's value or quality in a 1-page customs entry form in August 2015. There is no concrete evidence that the mosaic was looted. There is no concrete evidence that Mr. Alcharihi knew the mosaic was looted. Allowing Dr. Doehne to opine that the mosaic was looted would permit speculation that is not based on any actual evidence in this case to be dressed up in the guise of expert testimony.

  *Third*, the proffered testimony on looting should be excluded because it is unreliable. Rule 702 requires that the proffered testimony be "based on sufficient facts or data," be "the product of reliable principles and methods," and that the expert "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). According to the January 17, 2023 statement, Dr. Doehne will testify that factors such as Syria's experience of extensive looting, the mosaic's cracking and being

14

rolled, and the mosaic's lack of official documentation are "consistent with having been looted likely from a floor location in Syria." (Ex. 2 at 3.) This is a very thin set of "facts or data" to draw the conclusion that the mosaic was looted. Fed. R. Evid. 702(b). Moreover, there is absolutely no explanation of Dr. Doehne's "principles and methods." *Id.* 702(c). What methodology, technique, or criteria is he applying to conclude that the mosaic was looted? If so, how do his methodology hold up under the *Daubert* factors: (1) can it, or has it been "tested"; (2) has it "been subject to peer review and publication"; (3) what is "the known or potential rate of error of the technique or theory when applied"; (4) is it subject to "standards and controls"; and (5) has it been "generally accepted"? Fed. R. Evid. 702, Advisory Committee's 2000 Notes. If Dr. Doehne's conclusion that the mosaic was looted is based primarily on the lack of official documentation, that does not require expert testimony, but is evidence and argument that a lay juror would understand. The Court should exclude the looting testimony because the government has not demonstrated that Dr. Doehne's conclusion that the mosaic was looted is based on "sufficient facts or data," "the product of reliable principles and methods," or that Dr. Doehne "has reliably applied the principles and methods to the facts of [this] case." Fed. R. Evid. 702.

### D.  A *Daubert* Hearing Is Necessary

If the Court is not inclined to grant this Motion, it must at least hold a *Daubert* hearing to fulfill its gatekeeping role before determining that Cohn's testimony is sufficiently relevant and reliable. The district court has the obligation to "perform a gatekeeping role of ensuring that testimony is both relevant and reliable under" Federal Rule of Evidence 702. *United States v. Ruvacalba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (citing *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)) (quotation marks omitted). Because an expert's testimony must "have a reliable basis in the knowledge and experience of the relevant discipline[,]" the "district court must assess whether the reasoning or methodology underlying the testimony is scientifically valid and properly can be applied to the facts in issue, with the goal of ensuring that the

15

1    expert employs in the courtroom the same level of intellectual rigor that characterizes
2    the practice of an expert in the relevant field." *Id.* at 1188-89 (citations and quotation
3    marks omitted).

4    Although "district courts are vested with broad latitude to decide how to test an
5    expert's reliability and whether or not an expert's relevant testimony is reliable[,]" they
6    "do not have discretion to abandon the gatekeeping function altogether, for Rule 702
7    clearly contemplates some degree of regulation of the subjects and theories about which
8    an expert may testify." *Id.* at 1189 (citations and quotation marks omitted).  Therefore,
9    "a district court abuses its discretion when it either abdicates its role as gatekeeper by
10   failing to assess the scientific validity or methodology of an expert's proposed
11   testimony, or delegates that role to the jury by admitting the expert testimony without
12   first finding it to be relevant and reliable." *Id.* (quotation marks omitted).  An implicit
13   reliability finding is not sufficient—a district court "must make an explicit reliability
14   finding" to "satisfy its gatekeeping duty[.]" *Id.* at 1190 (quotation marks omitted).

15   Here, the Court should hold a *Daubert* hearing to determine the relevance and
16   reliability of Dr. Doehne's testimony on the topics in the May 20, 2019 Materials
17   Report and the January 17, 2023 Supplemental Statement, as well as to determine his
18   qualifications to testify about the mosaic's iconography and looting,

19   **E.    Dr. Doehne's Testimony Should Be Excluded Under Rule 403 Because
20         Its Minimal Probative Value Is Substantially Outweighed by the Danger
21         of Unfair Prejudice, Undue Delay, and Wasting Time**

22   Pursuant to Federal Rule of Evidence 403, "[t]he court may exclude relevant
23   evidence if its probative value is substantially outweighed by a danger of . . . unfair
24   prejudice, . . . undue delay, [or] wasting time." Fed. R. Evid. 403.  Dr. Doehne's
25   testimony on the topics summarized in the May 20, 2019 Materials Report and January
26   17, 2023 Supplemental Statement has minimal probative value for the same reasons
27   that it is irrelevant and unreliable set forth above.  Because it is irrelevant and lacks
28   probative value, it would waste the jury's time and create undue delay in the jury trial.

Moreover, Dr. Doehne's proposed testimony on looting would be extremely prejudicial to Mr. Alcharihi. It insinuates that Mr. Alcharihi was willing to take advantage of a war-torn country to illegally obtain a cultural artifact, when there is no evidence that he did that or had knowledge that the mosaic was looted. Even worse, the looting in Syria has largely been perpetrated by terrorist groups such as the Islamic State in Iraq and the Levant ("ISIL") and Al-Nusrah Front ("ANF"), as the government has stated in prior briefing. (ECF No. 60 at 6.) Thus, allowing Dr. Doehne's testimony on looting would associate Mr. Alcharihi with terrorist groups, which are regularly demonized in American media and official U.S. government statements. Such an association would be terrifying to lay jurors, who may be inclined to convict Mr. Alcharihi simply based on his supposed terrorist ties, rather than any actual evidence in this case. Thus, an additional basis to exclude the looting testimony is that its minimal probative value is substantially outweighed by the danger of unfair prejudice.

## IV. CONCLUSION

The Court should exclude Dr. Doehne's testimony wholesale because it is irrelevant and unreliable. Moreover, the proposed testimony on the mosaic's iconography and characteristic wear appear to be the work of a different expert, Eduardo Sánchez, and Dr. Doehne should be precluded from presenting Sánchez's work as his own expert opinion. What is more, the government has not demonstrated that Dr. Doehne is qualified to testify about the mosaic's iconography and looting. Finally, the proposed testimony on looting should be excluded because it's minimal probative value is outweighed by the extreme prejudice it poses to Mr. Alcharihi.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: March 9, 2023      By  /s/ Isabel Bussarakum
ASHLEY MAHMOUDIAN
ISABEL BUSSARAKUM
JOSH WEISS
Deputy Federal Public Defenders
Attorney for MOHAMAD ALCHARIHI

17