1  E. MARTIN ESTRADA
   United States Attorney
2  MACK E. JENKINS
   Assistant United States Attorney
3  Chief, Criminal Division
   MARK A. WILLIAMS (Cal. Bar No. 239351)
4  Assistant United States Attorney
   Chief, Environmental and Community Safety Crimes Section
5  MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
   Assistant United States Attorney
6  Environmental and Community Safety Crimes Section
   MAXWELL COLL (Cal. Bar No. 312651)
7  Assistant United States Attorney
   Asset Forfeiture and Recovery Section
8       1300 United States Courthouse
        312 North Spring Street
9       Los Angeles, California 90012
        Telephone:  (213) 894-3359/8644/1785
10      E-mail:    Mark.A.Williams@usdoj.gov
                   Matthew.O'Brien@usdoj.gov
11                 Maxwell.Coll@usdoj.gov

12 KENNTEH A. POLITE
   Assistant Attorney General
13 Criminal Division
   CHRISTIAN A. LEVESQUE (D.C. Bar No. 501778)
14 Trial Attorney
   Human Rights and Special Prosecutions Section
15 United States Department of Justice
        1301 New York Ave
16      Washington, DC 20530
        Telephone:  (202) 538-2373
17      E-mail:    Christian.Levesque@usdoj.gov

18 Attorneys for Plaintiff
   UNITED STATES OF AMERICA

19

20               UNITED STATES DISTRICT COURT

21            FOR THE CENTRAL DISTRICT OF CALIFORNIA

22 UNITED STATES OF AMERICA,            No. CR 20-307-GW

23          Plaintiff,                  GOVERNMENT'S OPPOSITION TO
                                        DEFENDANT'S MOTION *IN LIMINE* TO
24          v.                          EXCLUDE EXPERT TESTIMONY OF DR.
                                        ERIC DOEHNE
25 MOHAMAD YASSIN ALCHARIHI,
     aka "Mohamad al-Sharihi" and      Hearing Date: April 20, 2023
26   "Mohamad AlCharihi,               Hearing Time: 8:00 a.m.
                                        Location:     Courtroom of the
27          Defendant.                                Hon. George H. Wu

28

The United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mark Williams, Matthew O'Brien, and Maxwell Coll, and Trial Attorney Christian Levesque, hereby files its opposition to Defendant MOHAMAD YASSIN ALCHARIHI's motion *in limine* to exclude expert testimony of Dr. Eric Doehne at trial.

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 23, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


_/s/_
MARK A. WILLIAMS
MATTHEW W. O'BRIEN
MAXWELL COLL
Assistant United States Attorneys

KENNETH A. POLITE
Assistant Attorney General
Criminal Division


_/s/_
CHRISTIAN A. LEVESQUE
Trial Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES.............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..............................2

I.    INTRODUCTION...............................................2

II.   ARGUMENT...................................................3

      A.    Legal Standard.......................................3

      B.    Dr. Doehne's Testimony Is Highly Relevant, Will Help
            The Jury Understand The Evidence At Trial, And Is
            Admissible Under FRE 702 And *Daubert*...................5

      C.    Dr. Doehne's Testimony Is Reliable Under FRE 702 and
            *Daubert*............................................6

      D.    Dr. Doehne Is Qualified To Testify Regarding The
            Mosaic's Iconography And Characteristic Wear............10

      E.    Evidence Regarding Looting Is Relevant, Reliable, And
            Admissible At Trial..................................11

      F.    Dr. Doehne's Testimony Is Not Unduly Prejudicial........13

      G.    A *Daubert* Hearing Is Not Required Or Necessary..........13

III.  CONCLUSION................................................14

## TABLE OF AUTHORITIES

FEDERAL CASES:                                                    PAGE(S)

United States v. 14.38 Acres of Land,
  80 F.3d 1074 (5th Cir. 1996) ..................................... 4

United States v. Alatorre,
  222 F.3d 1098 (9th Cir. 2000) .................................... 14

United States v. Amaral,
  488 F.2d 1148 (9th Cir. 1973) .................................... 4

United States v. Arvin,
  900 F.2d 1385 (9th  Cir. 1990) ................................... 3

United States v. Christophe,
  833 F.2d 1296 (9th Cir. 1987) .................................... 4

United States v. Hankey,
  203 F.3d 1160 (9th Cir. 2000) .................................... 4

United States v. Weitzenhoff,
  35 F.3d 1275 (9th Cir. 1993) ..................................... 3

Federal Rules

Fed. R. Evid. 702.................................... 3, 4, 5, 6

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3      The government opposes defendant's motion to exclude expert

4  testimony of Dr. Eric Doehne and, alternatively, for a *Daubert*

5  hearing (the "Motion").  The Motion presents a laundry list of

6  purported problems with Dr. Doehne's testimony, all of which are

7  premised on mischaracterizing the government's case, ignoring

8  significant portions of Dr. Doehne's expert report, or both.

9      Defendant is charged with falsely classifying the quality and

10  value of the ancient Mosaic that he imported from Syria, through

11  Turkey, and into the United States.  In order to determine whether

12  defendant misrepresented what he was importing, the jury will need to

13  assess: the Mosaic's nature and characteristics; the Mosaic's origin

14  and provenance; defendant's motive for importing the Mosaic illegally

15  as opposed to properly declaring it; and how much the Mosaic was

16  worth and the profit defendant intended to recoup by selling it

17  (*i.e.*, defendant's motive).  Dr. Doehne's testimony is relevant and

18  helpful to all of these issues.

19      Dr. Doehne's qualifications and anticipated testimony fall

20  squarely within the framework of expert testimony under Rule 702.  He

21  is one of the leading experts, if not the foremost expert, in using

22  scientific methods to evaluate stone and glass in the context of

23  antiquities.  Defendant's complaints about the scope and substance of

24  his testimony are best addressed via cross-examination, not a *Daubert*

25  hearing or the preclusion of evidence.

26

27

28

## II.   ARGUMENT

### A.   Legal Standard

Federal Rule of Evidence 702 governs the admission of expert testimony.  It is based on the recognition that "an intelligent evaluation of the facts is often difficult or impossible without the application of specialized knowledge."  Rule 702 Adv. Comm. Note. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert*, the Supreme Court adopted a flexible test for determining whether to admit scientific expert testimony under Rule 702.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993). The Supreme Court later extended *Daubert* to apply to "technical or other specialized knowledge" in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  However, *Kumho Tire* rejected the proposition that the *Daubert* factors should be rigidly applied, stating instead that those factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 138.  The admission of expert testimony is within the discretion of the trial court and reversible only for abuse of discretion or manifest error.  *United States v. Arvin*, 900

3

F.2d 1385, 1388–89 (9th  Cir. 1990), *cert. denied* 498 U.S. 1024
(1991); *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir.
1993) (Expert testimony is properly admissible when it serves to
assist the trier of fact to understand the evidence or determine a
fact in issue).

While *Daubert* directs trial courts to serve as "gatekeepers" by
excluding testimony that is genuinely unreliable, the gatekeeper role
"is not intended to serve as a replacement for the adversary system."
Fed. R. Evid. 702 Adv. Comm. Notes (quoting *United States v. 14.38
Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996)).  Indeed, *Daubert*
made clear that "vigorous cross examination, presentation of contrary
evidence, and careful instruction on the burden of proof are the
traditional and appropriate means of attacking shaky but admissible
evidence."  *Daubert*, 509 U.S. at 595.

Further, the Ninth Circuit has stated that Rule 702 should be
"construed liberally," as a rule of inclusion and <u>not</u> of exclusion.
*United States v. Hankey*, 203 F.3d 1160, 1168–69 (9th Cir. 2000)
(testimony by expert on gang activity properly admitted as
specialized knowledge where expert had extensive personal
observations of gangs; "Rule 702 works well for this type of data
gathered from years of experience and special knowledge.").

The standard in this Circuit is whether "scientific, technical,
or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue."  *United
States v. Christophe*, 833 F.2d 1296, 1299 (9th Cir. 1987).  "The main
inquiry is whether the jury will receive 'appreciable help' from
expert testimony."  *Id.* (*quoting United States v. Amaral*, 488 F.2d
1148, 1152 (9th Cir. 1973)).  Courts have emphasized that "the

4

testimony of these experts need not be based on 'generally accepted' methodologies, but rather must be based on 'scientific knowledge' that will 'assist the trier of fact.'"  *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir. 1994).

> **B.  Dr. Doehne's Testimony Is Highly Relevant, Will Help The Jury Understand The Evidence At Trial, And Is Admissible Under FRE 702 And *Daubert***

Defendant first attempts to exclude Dr. Doehne's testimony based on the strained argument that the Mosaic's authenticity, country of origin, and original floor location are irrelevant to the Mosaic's quality.  This argument defies logic and the evidence in this case.

Through defendant's own emails and recorded admissions, the government will establish at trial that defendant knew he was importing a 2000-year-old Roman mosaic that was worth more than he declared it for.  Dr. Doehne's expert testimony that the Mosaic is authentic and depicts an ancient Greco-Roman myth will be relevant and helpful for the jury because it corroborates that evidence.

Further, in order to determine if defendant knowingly misclassified the Mosaic as stone tiles instead of as an antiquity, the jury must hear evidence about what the Mosaic actually is.  As defendant asserts, "[t]his case is about what Mr. Alcharihi knew about the mosaic at the time of importation."  *Id.*  Dr. Doehne's testimony that the Mosaic is authentic, depicts an ancient Greco-Roman myth, and is likely from Syria corroborates evidence that defendant knew he was importing an antiquity that he improperly declared to customs in order to avoid detection.  Dr. Doehne's testimony regarding the Mosaic's true qualities provides the jury with evidence that defendant lied about the Mosaic when he imported it.

To be clear, Dr. Doehne's testimony is relevant to both the quality and value of the Mosaic.  In a short footnote, defendant claims that "[i]t does not appear that Dr. Doehne's opinion goes to the allegations regarding value."  (Opposition at 4.)  That is false.  Dr. Doehne's analysis establishes that the Mosaic is an authentic antiquity.  An authentic antiquity is obviously worth more than a fake, as defendant was well aware.  As such, Dr. Doehne's testimony will assist the jury in making determinations regarding the Mosaic's quality <u>and</u> value, and thus whether defendant lied about quality and value in order to import it.

**C.   Dr. Doehne's Testimony Is Reliable Under FRE 702 and *Daubert***

Next, defendant argues that Dr. Doehne's report itself is unreliable because the "several layers of analysis" are flawed.  Defendant begins by arguing that there is inadequate information provided regarding Dr. Doehne's scientific analysis of the Mosaic.  In doing so, defendant only cites to Dr. Doehne's summaries of his conclusions and data.  Defendant neglects to mention Dr. Doehne's extensive analytical testing and results that support his conclusions.  (<u>See</u> Dr. Doehne Report, Appendix 1, attached hereto as Exhibit 1.)

Dr. Doehne is a conservation/museum scientist and cultural heritage educator with extensive experience evaluating cultural heritage resources.  He applies his Ph.D. in geology and decades of experience to the field of art and cultural property by using analytical imaging, measurements, electron microscopy, and other scientific techniques to evaluate antiquities.  He worked at the Getty Conservation Institute for 22 years where he conducted

1    research, field work, and taught regarding the evaluation of stone
2    and glass in cultural heritage materials (subjects present in this
3    case).  Dr. Doehne also lectures on various topics including art
4    crime and forensics, conservation methods, and stone conservation,
5    and has published research on topics including stone conservation,
6    salt weathering, decay and testing of building materials, and high-
7    resolution energy-dispersive x-ray analysis.  Further, Dr. Doehne
8    authored a book titled "Stone Conservation" and contributed to 73
9    other publications on various subject matters.  (Defense MIL, Ex. 1,
10   pp. 31-51.)

11        Dr. Doehne has extensive experience in using scientific methods
12   to evaluate stone and glass in the context of antiquities.  In this
13   case, Dr. Doehne applied these sound scientific methods -- none of
14   which are contested by defendant -- to evaluate the Mosaic.  Dr.
15   Doehne evaluated samples taken from the Mosaic by using various
16   tools, including optical imaging, electron imaging, and x-ray spectra
17   -- all reliable scientific methods and techniques.  After analyzing
18   the results, which are included in both summary form and in a
19   detailed appendix to his report, Dr. Doehne concluded that the
20   alteration, condition, weathering, and composition of the Mosaic's
21   tesserae indicate that they are ancient and likely from the Eastern
22   Mediterranean area.

23        In addition, Dr. Doehne examined the Mosaic in person and via
24   photographs, reviewed the iconography depicted on the Mosaic, and
25   compared the characteristics of the Mosaic to other Mosaics.  He also
26   reviewed the reports prepared by his colleague (conservator Eduardo
27   Sanchez) and by the person defendant hired to restore the Mosaic
28   (Stephen Miotto).  Dr. Doehne drew upon his research, experience, and

knowledge of looting in conflict areas, including Syria, when analyzing where the Mosaic was likely from.  Based on his experience, research, scientific testing, and analysis, Dr. Doehne opined that the Mosaic was authentic (ancient) and likely from the Syria area.

In attacking Dr. Doehne's analysis and conclusions, defendant ignores all of his citations to supporting materials that provide the context (and support) for his work.  For example, those materials establish how Dr. Doehne and experts in the field analyze ancient glass -- by doing x-ray and morphology analysis to determine, with confidence, that the glass is ancient.  The same applies for Dr. Doehne's stone analysis.  Consistent with methodologies cited in the supporting materials included in Dr. Doehne's report (which defendant again ignores), Dr. Doehne examined the weathering, wear patterns, elemental composition, and coloring on the Mosaic's stone tesserae to determine that it was ancient and likely from Syria.

Further, Appendix 1 to Dr. Doehne's report includes electron imaging, optical images, x-ray spectra, and other scientific testing and analysis that support his conclusions.  He also provided imaging and analysis of weathering rinds, corrosion features, and cracking in the glass tesserae, and testing showing that the black tesserae have a basalt composition (a common rock in Syria).  Defendant's motion does not question or object to this underlying analytical analysis that provides the basis for Dr. Doehne's conclusions.

Defendant also ignores other materials supporting Dr. Doehne's analysis and conclusions, including photographs of other mosaics for comparison/analysis.  As further support for his analysis, Dr. Doehne cited scientific papers regarding water influence on chemical corrosion of Roman glass, growth rings on ancient glass surfaces, XRF

spectrometry to analyze glass tesserae, Syrian basalt, weathered archaeological glass, geochemical data from Israel for the provenance analysis of basaltic rock artifacts, the examination of opacifier crystals related to ancient glass, alteration layers in medieval glass, evaluation of tesserae from Paphos mosaics (about 250 miles from Syria), and several other scientific articles and resources. These materials support Dr. Doehne's methodology and analysis and establish that he was applying reliable principles and methods.

The analytical methodology and underlying data cited above provide ample support for Dr. Doehne's opinions regarding the Mosaic (and, again, defendant does not contest any of the underlying testing or data). Nonetheless, defendant next proceeds to attack Dr. Doehne's "sub-conclusions" and "overall conclusions" by making the conclusory argument that they are unsupported. To the contrary, Dr. Doehne's conclusions regarding the Mosaic's authenticity and likely Syrian origin are supported by his scientific testing and analysis (as well as defendant's own documents and statements). The altered glass tesserae, weathering of tesserae, and composition of the tesserae documented through Dr. Doehne's testing overwhelmingly confirm his conclusion that the Mosaic's tesserae are very old and that the materials originated in the Eastern Mediterranean area. Moreover, when combined with Dr. Doehne's observation about the Greco-Roman myth depicted on the Mosaic, the stylistic similarities to other mosaics from the Syrian region, and the looting that was occurring in Syria in 2015, Dr. Doehne reliably concluded that the Mosaic likely originated in Syria.

It appears that defendant simply disagrees with Dr. Doehne's conclusions. As such, cross examination at trial -- not a motion *in*

9

*limine* or a *Daubert* hearing -- is the vehicle through which defendant can attempt to attack Dr. Doehne's analysis and conclusions.

**D.   Dr. Doehne Is Qualified To Testify Regarding The Mosaic's Iconography And Characteristic Wear**

Defendant contends that Dr. Doehne is not qualified to testify that the Mosaic depicts the widely known ancient myth involving Prometheus chained to a rock and being rescued by Hercules. Defendant's own documents seized from his house confirm this same information, and no expert has rendered an opinion to the contrary. Dr. Doehne's extensive background with cultural heritage resources -- including published research papers, published books, teaching at the undergraduate and graduate levels, and two decades working at the Getty -- more than qualifies him to testify regarding a popular ancient Roman myth.  This information is less opinion than fact, and Dr. Doehne is certainly permitted to testify regarding observable facts related to the Mosaic -- including its size, color, and what it depicts.

Defendant also claims that Dr. Doehne cannot testify regarding the Mosaic's characteristics, including corrosion and other surface wear patterns, simply because another expert also included that information in a related expert report.  This is incorrect, for two reasons.  First, these characteristics were observed and recorded by Dr. Doehne in his report when he examined the Mosaic.  (See Defense Motion, Ex. 1, pp. 22, 23 (noting corrosion).)  Second, Federal Rule of Evidence 703 provides that "*[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of* or personally observed."  (Emphasis added.)  Even if another expert made Dr. Doehne aware of certain characteristics about the Mosaic, Dr.

10

1   Doehne is permitted to incorporate that information into his analysis

2   and render his own independent conclusions based on it.  Moreover,

3   defendant does not claim that this information is the product of

4   unsound scientific principles.  As such, Dr. Doehne is permitted to

5   testify regarding his analysis and conclusions regarding corrosion

6   and surface wear patterns.

7       **E.    Evidence Regarding Looting Is Relevant, Reliable, And
             Admissible At Trial**

8

9       Finally, defendant attempts to exclude Dr. Doehne's opinion that

10  the Mosaic was likely looted by claiming that he is not qualified to

11  render this opinion and that this evidence is irrelevant, unreliable,

12  and unduly prejudicial.  Defendant is wrong, for three reasons.

13      First, Dr. Doehne's background, training, and experience make

14  clear that he is qualified to render this opinion.  Dr. Doehne

15  teaches a class titled "Art and Crime: Plunder, Fakes, and Forensics"

16  that covers looting of cultural heritage materials.  He has also

17  analyzed antiquities, and evaluated the work of others, for the Getty

18  to determine if antiquities were looted.  To deepen his knowledge of

19  this topic, Dr. Doehne reviewed additional materials related to

20  looting in Syria.  (See Exhibit 2, attached hereto.)  Further, as

21  discussed above, Dr. Doehne's training and experience in applying

22  various scientific methods to analyze the Mosaic qualifies him to

23  determine where the Mosaic was originally from.  These qualifications

24  and experience combine to make Dr. Doehne one of the most qualified

25  experts to opine regarding looted antiquities.

26      Second, Dr. Doehne's opinion that the Mosaic was likely looted

27  from Syria is highly relevant to defendant's motive.  The fact that

28  the Mosaic was looted establishes defendant's motive for falsely

11

classifying it to avoid detection by authorities.  The government also intends to introduce at trial: (1) false paperwork that defendant had his neighbor sign, claiming that defendant purchased the Mosaic from her in Palmdale, California; and (2) dubious documents in defendant's possession that purport to show that the Syrian government authorized defendant to remove the Mosaic from Syria.  Dr. Doehne's testimony regarding looting in the Syria region provides context for this evidence and explains why defendant would need to illegally import the Mosaic and create a false provenance for it.

Third, defendant incorrectly claims that "there is a very thin set of 'facts or data' to draw the conclusion that the mosaic was looted."  To the contrary -- there is no evidence that the Mosaic was legally obtained.  Instead, a combination of evidence establishes that the Mosaic was likely looted.  First, the Mosaic is authentic (fakes are not looted).  Second, defendant's own statements, false documents, and Dr. Doehne's analysis establish that the Mosaic is likely from Syria.  Third, as Dr. Doehne will testify, looting was very prevalent in Syria in 2015 (but not Israel).  Fourth, Dr. Doehne will testify that it is common for a mosaic to be lifted from the ground and rolled when it is looted, and the fractured mortar and tesserae on the Mosaic indicate that it was lifted from the ground and crudely rolled as opposed to properly removed by qualified archaeologists.  Fifth, the Mosaic was rolled up and placed behind other items away from the shipping container door when it was imported into the United States.  It was not properly packaged and securely shipped like a legally obtained antiquity would have been.

As such, there is ample evidence for Dr. Doehne's conclusion that the Mosaic was likely looted.

Moreover, the evidence that the Mosaic was on the floor and looted from Syria prior to arriving in the United States is inextricably intertwined with the violation of section 541. Defendant and/or his cohorts coordinated its removal and shipment to the United States, which explains why defendant had to mislead Customs in order to bring it into the country. Precluding evidence regarding the Mosaic's origin would confuse jurors, who would be left wondering about defendant's motive.

**F. Dr. Doehne's Testimony Is Not Unduly Prejudicial**

Without any additional argument or support, defendant makes the conclusory argument that Dr. Doehne's testimony has "minimal probative value" for "the same reasons that it is irrelevant and unreliable." This argument fails for the reasons discussed above. Dr. Doehne's analysis and opinions are relevant to the Mosaic's authenticity and provenance, both of which corroborate the government's evidence regarding the Mosaic's quality and value.

Finally, defendant claims that Dr. Doehne's testimony would be unduly prejudicial because it would "associate Mr. Alcharihi with terrorist groups." That is false. Dr. Doehne's report does not mention terrorist groups, and the government does not intend to elicit testimony from Dr. Doehne regarding terrorist groups.

**G. A *Daubert* Hearing Is Not Required Or Necessary**

The Court is not required to hold a Daubert hearing, "but rather must merely make a determination as to the proposed expert's qualifications." *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir. 1994). The Ninth Circuit has held that "[i]n light of the

13

Supreme Court's emphasis on the broad discretion granted to trial courts in assessing the relevance and reliability of expert testimony, and in the absence of any authority mandating such a hearing, we conclude that trial courts are not compelled to conduct pretrial hearings in order to discharge the gatekeeping function." *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000).  A *Daubert* hearing is not necessary because defendant raises no serious questions about Dr. Doehne's methodology, reliability, or qualifications.

**III. CONCLUSION**

    For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion.