E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Assistant United States Attorney
Chief, Environmental and Community Safety Crimes Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorney
Environmental and Community Safety Crimes Section
MAXWELL COLL (Cal. Bar No. 312651)
Assistant United States Attorney
Asset Forfeiture and Recovery Section
        1300 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone:  (213) 894-3359/8644/1785
        E-mail:     Mark.A.Williams@usdoj.gov
                    Matthew.O'Brien@usdoj.gov
                    Maxwell.Coll@usdoj.gov

KENNTEH A. POLITE
Assistant Attorney General
Criminal Division
CHRISTIAN A. LEVESQUE (D.C. Bar No. 501778)
Trial Attorney
Human Rights and Special Prosecutions Section
United States Department of Justice
        1301 New York Ave
        Washington, DC 20530
        Telephone:  (202) 538-2373
        E-mail:     Christian.Levesque@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

             FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-307-GW |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE PARTS OF WILLIAM TARTER'S EXPERT TESTIMONY |
| v. | |
| MOHAMAD YASSIN ALCHARIHI, aka "Mohamad al-Sharihi" and "Mohamad AlCharihi, | Hearing Date: April 20, 2023 Hearing Time: 8:00 a.m. Location:    Courtroom of the             Hon. George H. Wu |
| Defendant. | |

///

The United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mark Williams, Matthew O'Brien, and Maxwell Coll, and Trial Attorney Christian Levesque, hereby files its opposition to Defendant MOHAMAD YASSIN ALCHARIHI's motion in limine to exclude parts of William Tarter's expert testimony.

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 23, 2023          Respectfully submitted,

                               E. MARTIN ESTRADA
                               United States Attorney

                               MACK E. JENKINS
                               Assistant United States Attorney
                               Chief, Criminal Division


                               _____/s/_____
                               MARK A. WILLIAMS
                               MATTHEW W. O'BRIEN
                               MAXWELL COLL
                               Assistant United States Attorneys

                               KENNETH A. POLITE
                               Assistant Attorney General
                               Criminal Division


                               _____/s/_____
                               CHRISTIAN A. LEVESQUE
                               Trial Attorney

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

2

**TABLE OF CONTENT**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.   INTRODUCTION....................................................1

II.  BACKGROUND AND ANTICIPATED TESTIMONY............................1

III. ARGUMENT........................................................3

    A.   Legal Standard.............................................3

    B.   Mr. Tarter's Testimony Is Highly Relevant, Will Help
         The Jury Understand The Evidence At Trial, And Is
         Admissible Under FRE 702 And Daubert.....................5

         1.   The Emergency Red List, United Nations Security
              Council Resolution, and CBP Policy on Syrian
              Artifacts Are Highly Relevant to Defendant's
              Efforts to Misclassify the Ancient Mosaic and
              Avoid CBP Scrutiny...................................6

         2.   Testimony About False Invoicing and Undervaluing
               Imported Items Is Highly Relevant to Defendant's
              Conduct.............................................9

         3.   Testimony About Quality, Including Origin, Size,
               Style, Condition, or Period........................10

    C.   Mr. Tarter's Testimony Is Reliable Under FRE 702 and
         Daubert.................................................10

         1.   Mr. Tarter's Opinions Are Based On His
               Involvement   in Thousands of Imports, Including
               Ancient Works of Art...............................11

         2.   The Testimony Is Within the Reasonable Confines
               of His Area of Expertise...........................11

    D.   No Daubert Hearing Is Necessary.........................15

    E.   Mr. Tarter Should Be Allowed To Testify About Looting....15

    F.   Mr. Tarter Should Not Be Precluded from Using the Term
         "Correct"...............................................16

IV.  CONCLUSION.....................................................17

i

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>                                                                 <u>Page(s)</u>

3

4

<u>Avila v. Willits Envtl. Remediation Tr.</u>,

5

    633 F.3d 828 (9th Cir. 2011) ............................... 14

<u>Daubert v. Merrell Dow Pharm., Inc.</u>,

6

    509 U.S. 579 (1993) ................................. 5, 6, 17

7

<u>Hopkins v. Dow Corning Corp.</u>,

8

    33 F.3d 1116 (9th Cir. 1994) ........................... 7, 17

<u>Karmelich v. Transportacion Maritima Mexicana S.A. de C.V.</u>,

9

    114 F.3d 1194 (9th Cir. 1997) ............................. 14

10

<u>Kumho Tire Co. v. Carmichael</u>,

11

    526 U.S. 137 (1999) ........................................ 5

12

<u>United States v. 14.38 Acres of Land</u>,

    80 F.3d 1074 (5th Cir. 1996) ............................... 5

13

<u>United States v. Alatorre</u>,

14

    222 F.3d 1098 (9th Cir. 2000) ............................. 17

15

<u>United States v. Amaral</u>,

    488 F.2d 1148 (9th Cir. 1973) .............................. 7

16

<u>United States v. Arvin</u>,

17

    900 F.2d 1385 (9th Cir. 1990), <u>**cert. denied**</u>

18

    498 U.S. 1024 (1991)....................................... 6

<u>United States v. Christophe</u>,

19

    833 F.2d 1296 (9th Cir. 1987) .............................. 6

20

<u>United States v. Halamek</u>,

21

    5 F.4th 1081 (9th Cir. 2021) .............................. 14

22

<u>United States v. Hankey</u>,

    203 F.3d 1160 (9th Cir. 2000) ........................... 6, 13

23

<u>United States v. Holguin</u>,

24

    51 F. 4th 841 (9th Cir. 2022) ........................... 7, 14

25

<u>United States v. Johnson</u>,

    916 F.3d 579 (7th Cir. 2019) .............................. 7

26

27

28

**TABLE OF AUTHORITIES (Cont'd)**

**<u>Cases</u>**                                                          **<u>Page(s)</u>**

<u>United States v. Ruvalcaba-Garcia</u>,
     923 F.3d 1183 (9th Cir. 2019) ................................. 7

<u>United States v. Weitzenhoff</u>,
     35 F.3d 1275 (9th Cir. 1993) ................................. 5

**<u>Federal Rules</u>**

Fed. R. Evid. 702 ......................................... passim

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

The government opposes defendant's motion to exclude parts of the expert testimony of William Tarter and, alternatively, for a Daubert hearing.  Defendant only challenges portions of Mr. Tarter's testimony.  Each argument fails.  First, Mr. Tarter's expert testimony will help the jury evaluate defendant's efforts to obfuscate the true nature of his imported mosaic (the "Mosaic") and avoid scrutiny by Customs.  Second, the testimony falls squarely within the confines Mr. Tarter's extensive experience as an import specialist and is thus reliable.

### II.   BACKGROUND AND ANTICIPATED TESTIMONY

Mr. Tarter is a leading expert on the importation and classification of cultural property.  During his roughly 35 years as an import specialist with CBP, Mr. Tarter has extensive experience with the U.S. Harmonized Tariff Schedule and the documentation required to import goods into the United States.  Mr. Tarter has experience with cultural property specifically, including collaboration with the Department of State and art professionals to investigate the importation of items of cultural and ethnological import from across Latin America.

As an import specialist, Mr. Tarter has extensive experience determining whether goods are admissible into the United States, or if the imported items are prohibited under U.S. laws, regulations, or treaty agreements.  For example, as an import specialist, Mr. Tarter was tasked with determining whether to exclude merchandise under the Uyghur Forced Labor Prevention Act.  He has also ensured compliance

1

with the Qualifying Industrial Zones in Jordan, the African Growth Opportunity Act, Central America-U.S. Free Trade Agreement, and the North American Free Trade Agreement.

As part of his work at CBP, Mr. Tarter was involved in deployments to Honduras, El Salvador, Canada, and Jordan.  He has over 60 CBP awards for superior achievement and a Medallion of Distinction from the attaché in Rome for textile work in Jordan, among other recognitions.

During the government's case-in-chief, Mr. Tarter will testify regarding his review of the documentation defendant submitted to his customs broker in order to import the Mosaic, including a CBP Form 7501, or "Entry Summary."  See **Exhibit A**.  Mr. Tarter will also testify about the CBP process for evaluating documentation and scrutinizing imports.  The testimony will help the jury assess, among other evidence and facts described more fully infra:

- Defendant's CBP Form 7501, which he used to declare the Mosaic's value, classification, origin, and size, among other qualities;

- CBP's process for evaluating the documentation provided and procedures regarding the inspection of shipments; and

- CBP's implementation of targets on goods of certain kinds from specific regions, including the International Council of Museum's Emergency Red List regarding Syrian cultural objects, issued on September 25, 2013.

In order to allow the jury to assess the documentation and import classification at issue, and the knowledge and intent underlying defendant's misclassification, Mr. Tarter will testify about the proper way to classify value of artwork and CBP's scrutiny

of imports of cultural property.  None of this non-scientific expert testimony is irrelevant nor unreliable.  Rather, Mr. Tarter's opinions are based on his extensive experience and analysis of the CBP forms at issue in this case.  His testimony is admissible.

## III.  ARGUMENT

### A.   Legal Standard

Federal Rule of Evidence 702 governs the admission of expert testimony.  It is based on the recognition that "[a]n intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge."  Rule 702 Adv. Comm. Note.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In Daubert, the Supreme Court adopted a flexible test for determining whether to admit scientific expert testimony under Rule 702.  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 588 (1993).  The Supreme Court later extended Daubert to apply to "technical or other specialized knowledge" in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).  However, Kumho Tire rejected the proposition that the Daubert factors should be rigidly applied, stating instead that those factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."

1    Kumho Tire, 526 U.S. at 138.  The admission of expert testimony is

2    within the discretion of the trial court and reversible only for

3    abuse of discretion or manifest error.  United States v. Arvin, 900

4    F.2d 1385, 1388-89 (9th  Cir. 1990), cert. denied 498 U.S. 1024

5    (1991); United States v. Weitzenhoff, 35 F.3d 1275, 1287 (9th Cir.

6    1993) (expert testimony is properly admissible when it serves to

7    assist the trier of fact to understand the evidence or determine a

8    fact in issue).

9        While Daubert directs trial courts to serve as "gatekeepers" by

10   excluding testimony that is genuinely unreliable, the gatekeeper role

11   "is not intended to serve as a replacement for the adversary system."

12   Fed. R. Evid. 702 Adv. Comm. Notes (quoting United States v. 14.38

13   Acres of Land, 80 F.3d 1074, 1078 (5th Cir. 1996)).  Indeed, Daubert

14   made clear that "vigorous cross examination, presentation of contrary

15   evidence, and careful instruction on the burden of proof are the

16   traditional and appropriate means of attacking shaky but admissible

17   evidence."  Daubert, 509 U.S. at 595.

18       Further, the Ninth Circuit has stated that Rule 702 should be

19   "construed liberally," as a rule of inclusion and not of exclusion.

20   United States v. Hankey, 203 F.3d 1160, 1168-69 (9th Cir. 2000)

21   (testimony by expert on gang activity properly admitted as

22   specialized knowledge where expert had extensive personal

23   observations of gangs; "Rule 702 works well for this type of data

24   gathered from years of experience and special knowledge.").

25       The standard in this Circuit is whether "scientific, technical,

26   or other specialized knowledge will assist the trier of fact to

27   understand the evidence or to determine a fact in issue."  United

28   States v. Christophe, 833 F.2d 1296, 1299 (9th Cir. 1987).  "The main

4

1  inquiry is whether the jury will receive 'appreciable help' from

2  expert testimony."  <u>Id</u>. (quoting <u>United States v. Amaral</u>, 488 F.2d

3  1148, 1152 (9th Cir. 1973)).  Courts have emphasized that "the

4  testimony of these experts need not be based on 'generally accepted'

5  methodologies, but rather must be based on 'scientific knowledge'

6  that will 'assist the trier of fact.'"  <u>Hopkins v. Dow Corning Corp.</u>,

7  33 F.3d 1116, 1124 (9th Cir. 1994).

8      For non-scientific testimony such as Mr. Tarter's, the Court

9  must make a threshold determination under a standard that favors

10  admissibility.  "[I]n considering the admissibility of testimony

11  based on some 'other specialized knowledge,' Rule 702 generally is

12  construed liberally."  <u>Id</u>.  The inquiry for reliability "need not be

13  exhaustive," so long as the Court makes more than a "conclusory

14  statement."  <u>United States v. Holguin</u>, 51 F. 4th 841, 855 (9th Cir.

15  2022) (citing <u>United States v. Johnson</u>, 916 F.3d 579, 587-88 (7th

16  Cir. 2019) (gatekeeping obligation fulfilled by court which

17  considered expert's "significant qualifications and experience" and

18  explained how they shed light on topics of testimony)).  The Court's

19  reliability findings must be made explicit on the record.  <u>United</u>

20  <u>States v. Ruvalcaba-Garcia</u>, 923 F.3d 1183, 1190 (9th Cir. 2019).

21      **B.  Mr. Tarter's Testimony Is Highly Relevant, Will Help The**
       **Jury Understand The Evidence At Trial, And Is Admissible**
22     **Under FRE 702 And <u>Daubert</u>**

23      Defendant attempts to exclude parts of Mr. Tarter's testimony as

24  irrelevant. (Opposition at 4.)  Not so.  Each of the five categories

25  of testimony defendant targets is relevant to critical issues in this

26  case: the misclassification of the imported Mosaic and defendant's

27  obfuscation of the facts in order to avoid CBP scrutiny.

28

1.  The Emergency Red List, United Nations Security Council Resolution, and CBP Policy on Syrian Artifacts Are Highly Relevant to Defendant's Efforts to Misclassify the Ancient Mosaic and Avoid CBP Scrutiny.

During the government's case-in-chief, the evidence will show that defendant imported the Mosaic originating from Syria through a port in Turkey and into the United States.  At the time defendant imported the Mosaic, the International Council of Museums ("ICOM"), through an Emergency Red List, specifically alerted law enforcement to the smuggling of floor mosaics from Syria.  The Red List was followed by a U.N. Security Council resolution condemning the pillaging of cultural artifacts from Syria, which passed just three months before defendant's importation of the Mosaic.

First, Mr. Tarter will explain that on September 25, 2013, some two years before defendant shipped the Mosaic, ICOM issued the Emergency Red List on Syrian cultural objects at risk.  See **Exhibit B.**  Following reports of widespread damage and looting at cultural heritage sites in Syria by the Islamic State of Iraq and al-Sham and Al-Nusra Front, ICOM published the emergency document with the aim to help law enforcement officials and art and heritage professionals identify Syrian objects protected by national and international law. In order to facilitate identification, the Emergency Red List illustrates the categories or types of cultural items that are most likely to be illegally bought and sold.  In the Emergency Red List, ICOM listed **mosaics "[f]rom floors** and walls, stone, ceramic and glass cubes; presenting humans, buildings, landscapes":

**Architectural elements**        *Antiquity to Ottoman period (3rd millennium BC - AD 1918)*

**Mosaics:** From floors and walls, stone, ceramic and glass cubes; presenting humans, buildings, landscapes. [19]

19. Limestone cube mosaic of a shrine with animals and vegetal motifs (whole scene and a detail), At Tamani'ah, second half of the 5th century AD, 85 x 85 cm total piece, individual cubes 0.8-1 cm.
© Maarat al-Nu'man Museum / Kamit Abdallah

Mr. Tarter will explain that ICOM Red Lists help CBP customs officials identify objects at risk and prevent such works of art from being illegally sold or imported. Mr. Tarter will explain that a CBP import specialist references ICOM Red Lists when an imported item is classified as a work of art or originates from a conflict area covered by the list. Such testimony is highly relevant to defendant's efforts to conceal the import and cause a false classification, in order to avoid CBP scrutiny.

Moreover, the testimony is relevant to evidence explaining defendant's failed efforts to enlist art professionals, including specialists at the Getty Museum, to restore and sell the Mosaic. For example, on August 25, 2015, defendant emailed the Getty Museum seeking advice on an "ancient mosaic" and stating that he needed help "conserving the piece, and selling it.." [sic]. See **Exhibit C**. And on August 27, 2015, defendant emailed the Department of Antiquities for the Getty Museum stating that he had a "piece of mosaic with a size of 15x8 ft" that "needs some conservation, so I can move it out to it final place." See **Exhibit D**. Defendant struggled to enlist museums because the Syrian floor mosaic was subject to an ICOM Emergency Red List.

Second, Mr. Tarter will testify that on February 12, 2015, just three months before defendant imported the mosaic from Turkey, the U.N. Security Council passed a resolution condemning the pillaging of cultural artifacts from Syria and banning trade in artifacts illegally removed from Syria since 2011 and from Iraq since 1990. See **Exhibit E**.  Against that backdrop, the Council decided "that all Member States shall take appropriate steps to prevent the trade in Iraqi and Syrian cultural property and other items of . . . historical, cultural, rare scientific and religious importance illegally removed from Iraq since 6 August 1990 and from Syria since 15 March 2011."  The U.N. Council called upon Interpol, among other international organizations, to assist in the implementation of the resolution.  Mr. Tarter's testimony on this topic will be limited and tailored to the impact the resolution had on CBP policies and procedures regarding works of art originating from the region.  Such testimony is relevant because it helps the jury understand defendant's knowing efforts to obfuscate the nature of his import to avoid CBP scrutiny.

Third, Mr. Tarter's testimony about the CBP's amendment to its policies regarding the importation of cultural artifacts from Syria is also relevant.  See **Exhibit F**.  Mr. Tarter will testify that on August 15, 2016, CBP issued a final amendment to its policies regarding the importation of cultural artifacts from Syria.  The CBP policy change reflects the imposition of the Protect and Preserve International Cultural Property Act, signed into law by President Barack Obama on May 9, 2016.  While the CBP final regulation change post-dates defendant's importation of the Mosaic, the legislation history predates the importation.  The House of Representatives

8

passed the bill on June 6, 2015, following the U.N. Security Council resolution, and two months **before** defendant imported the Mosaic. This brief testimony is highly relevant to defendant's efforts to obfuscate the importation and his subsequent struggle to restore and sell the Mosaic.  Cross-examination is the proper vehicle for the defense to highlight the fact that the final CBP change in policy occurred after the importation.

> ## 2. Testimony About False Invoicing and Undervaluing Imported Items Is Highly Relevant to Defendant's Conduct.

Defendant seeks to exclude testimony about his submission of false documents and misinformation to his customs broker.  The Court should reject his argument.

Mr. Tarter will testify, as an expert on the CBP Form 7501, or Entry Summary, that when an importer actually pays $12,000 for one imported item but declares the total value of all items in the shipment to be $2,199, this is considered false invoicing and constitutes the provision of false material information.  Defendant is charged with causing the misclassification of his import with respect to both value and quality.  In causing that misclassification, defendant provided false information to his customs broker, including a photograph of an entirely different floor mosaic and a false invoice.  Defendant submitted an invoice declaring the items to be valued at a price significantly less than what he paid.  The Court should permit Mr. Tarter to explain that when an importer submits false documentation including false invoices, the value declared to CBP is also false.  This is directly relevant to the crime charged.

Similarly, defendant seeks to exclude testimony about the impact of undervaluing an imported item and its effect on revenues. Defendant argues this testimony is "vague and broad."  (Motion at 6.) The purpose of this testimony is to explain the CBP forms, including the CBP Form 7501, and the import-classification process.  The testimony will help the jury understand why an importer must correctly declare the value of a good, and why the submission of false documentation impacts that declaration.  Again, such testimony is directly relevant to the crime charged; defendant lied about the value of the good, and the Court should permit Mr. Tarter to explain to the jury the reasons why an importer is required to accurately declare a good's value.

>    3.    Testimony About Quality, Including Origin, Size, Style, Condition, or Period.

As explained in the government's opposition to defendant's motion in limine to exclude evidence about quality, the Court has already held that the government may introduce expert testimony about the quality of the mosaic.  Mr. Tarter will testify that in his 35 years of experience as an import specialist, with a focus on cultural property and artwork, the quality of an imported good impacts which tariff classification the piece should receive.  For example, Mr. Tarter will explain that when a work of art exceeds 100 years, an importer must use a specific tariff code.  This tariff code differs from a general commercial mosaic.  The Court should stand by its previous decisions and allow this highly relevant testimony.

**C.    Mr. Tarter's Testimony Is Reliable Under FRE 702 and Daubert**

Next, defendant argues that seven of Mr. Tarter's non-scientific opinions are unreliable.  Not so.  Mr. Tarter's opinions are derived

from his extensive experience with imports, false classifications, and artwork smuggling.  Defendant's attempt to muddy the waters -- by claiming that Mr. Tarter's opinions are somehow unreliable -- should be rejected.

>    1.    <u>Mr. Tarter's Opinions Are Based On His Involvement in Thousands of Imports, Including Ancient Works of Art</u>

Mr. Tarter's opinions are based on the thousands of imports he has investigated and worked on over the last 35 years.  Mr. Tarter has extensive experience with the Harmonized Tariff Schedule and the documentation required to classify imports, including the correct value to declare.  Moreover, Mr. Tarter has extensive experience with cultural property specifically, including international efforts involving items of ethnological import.  Mr. Tarter has worked with museums and third-party appraisers to determine the correct value of artwork.

>    2.    <u>The Testimony Is Within the Reasonable Confines of His Area of Expertise</u>

Defendant's legal argument that Mr. Tarter's opinions are unreliable should be rejected because the opinions are within the reasonable confines of his subject area.

Reliability is established for a non-scientific expert if the expert adequately presents the basis of his or her opinion and demonstrates that the information is "of the type normally obtained in his day-to-day [import specialist] activity."  <u>Hankey</u>, 203 F.3d at 1170.  Unlike for experts qualified in the sciences, the reliability of an import expert "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it."  <u>Id.</u>

at 1169; <u>United States v. Holguin</u>, 51 F.4th 841, 855 (9th Cir. 2022) (non-scientific experts testify reliably even if they "testify based on their experience rather than any systematic methodology"). Reliability can be established through extensive interviews with individuals involved in the phenomena described.  <u>United States v. Halamek</u>, 5 F.4th 1081, 1088 (9th Cir. 2021) (expert properly testified about the relationship between child victims and adult abuses based on interviews with victims).

For obvious reasons, including the multifarious and ever-evolving nature of criminal activity, courts do not restrict reliability only to those cases where the expert has encountered a nearly identical prior case.  <u>See</u>, <u>e.g.</u>, <u>Holguin</u>, 51 F. 4th at 859 (permitting gang expert to interpret coded gang language that he was unfamiliar with).  Instead, an expert's proffered testimony is reliable –– even as to matters which he or she lacks lack specialization –– so long as the testimony is "within the reasonable confines of [the expert's] subject area." <u>Avila v. Willits Envtl. Remediation Tr.</u>, 633 F.3d 828, 839 (9th Cir. 2011) (citation and quotation marks omitted); <u>see also</u> <u>Karmelich v. Transportacion Maritima Mexicana S.A. de C.V.</u>, 114 F.3d 1194, at *1 (9th Cir. 1997). Here, the Court satisfies its gatekeeping responsibilities if it finds an adequate basis, borne out of Mr. Tarter's experience with tariff classifications, the proper value to declare on the CBP Entry Summary form, and CBP practices.  The Court should so hold for the following reasons.

<u>First</u>, defendant argues the Court should exclude the following testimony as unreliable: "[W]ith respect to artwork and items of cultural import, the correct value to declare is the amount an

importer anticipates the artwork would be valued at auction."
(Motion at 8.)  This testimony stems from Mr. Tarter's extensive
experience with the importation of works of art.  Mr. Tarter will
explain that based on his experience in the trade of ancient
artifacts and works of art, the typical importer is a museum or known
entity involved in the trade.  CBP then engages with those importers
and a third-party appraiser to determine what a buyer is willing to
pay for the imported good.  That amount is subsequently used as the
correct value to declare on the CBP Form 7501.  This testimony is
reliable because it falls squarely within the reasonable confines of
Mr. Tarter's experience with classifications of works of art,
including the correct value to declare.

Second, defendant attacks six portions of testimony about the
additional scrutiny the import would have received if defendant had
been truthful about the value and quality of the Mosaic.  This
testimony includes:

- "[H]ad the Country of Origin been listed as Syria or
  Turkey, the import would have been scrutinized and held
  for further processing, with a likely request for
  additional supporting documentation and contact made to
  other government agencies, including the Department of
  State."

- "CBP would not scrutinize or pay much attention to items
  from Israel since many goods are imported from there."

- "When the mosaic entered the United States in August 2015,
  there would have been extra scrutiny just by listing the
  Country of Origin as Syria. . . . CBP considers items over
  $100,000 as high value which would also be flagged.  That

13

is especially true for a high value piece of artwork
originating from Syria."

- "[I]f an importer declared an item to be worth $10,000 or
  more, he would give the import more scrutiny."

- "[I]mport specialists scrutinize imports classified under
  Chapter 97. . . . [T]he company or individual importing
  artwork and items of cultural import under Chapter 97 are
  also scrutinized. . . . [A]n importation of artwork under
  Chapter 97 by an unknown importer—i.e., not a known museum
  or art gallery—would also be scrutinized."

- "[C]laiming the mosaic under Chapter 96 was clever as this
  would likely have caused it to receive less scrutiny at
  the time of import." (Ex. 2 at 2.)

- "[T]he mosaic would have caught [Tarter's] eye for further
  scrutiny because the value was so low relative to its
  large weight and length. . . . However, even though the
  mosaic was heavy, the declared value was so low this would
  have raised less scrutiny and CBP has to prioritize the
  items they flag and inspect."

- "[H]ad the correct value and country of origin been
  declared for the Mosaic import, the shipment would have
  received additional scrutiny by CBP." (Ex. 2 at 3.) "[T]he
  mosaic would not have been legally imported if the
  Alcharihi 7501 listed the correct description or value."

(Opp'n at 8-9.)

This testimony is reliable.  Mr. Tarter has extensive experience
ensuring compliance with treaty obligations and is aware of the
enhanced scrutiny applied to imports from conflict areas.  He has

14

1   ensured compliance with the Qualifying Industrial Zones in Jordan,

2   the African Growth Opportunity Act, Central America-U.S. Free Trade

3   Agreement, and the North American Free Trade Agreement.  Testimony

4   about CBP's enhanced scrutiny to imports from Syria as opposed to

5   Israel is well within the confines of his experience with imports.

6   The same is true with respect to the value declared on the CBP forms.

7   All of this testimony falls squarely within the confines of Mr.

8   Tarter's experience and is admissible.

9        **D.   No <u>Daubert</u> Hearing Is Necessary**

10       The Court is not required to hold a <u>Daubert</u> hearing, "but rather

11  must merely make a determination as to the proposed expert's

12  qualifications."  <u>Hopkins v. Dow Corning Corp.</u>, 33 F.3d 1116, 1124

13  (9th Cir. 1994).  The Ninth Circuit has held that "[i]n light of the

14  Supreme Court's emphasis on the broad discretion granted to trial

15  courts in assessing the relevance and reliability of expert

16  testimony, and in the absence of any authority mandating such a

17  hearing, we conclude that trial courts are not compelled to conduct

18  pretrial hearings in order to discharge the gatekeeping function."

19  <u>United States v. Alatorre</u>, 222 F.3d 1098, 1100 (9th Cir. 2000).

20       No <u>Daubert</u> hearing is necessary because defendant raises no

21  serious questions about Mr. Tarter's analysis or opinions.

22       **E.   Mr. Tarter Should Be Allowed To Testify About Looting**

23       Next, defendant argues that Mr. Tarter should be precluded from

24  testify about looting.  (Motion at 11.)  As explained <u>supra</u> and in

25  the government's opposition to the motion <u>in limine</u> to exclude the

26  expert testimony of Dr. Eric Doehne, the fact that the Mosaic was

27  likely looted establishes defendant's motive for falsely classifying

28  it to avoid detection by authorities.  The government also intends to

introduce at trial: (1) false paperwork that defendant had his neighbor sign, claiming that defendant purchased the Mosaic from her in Palmdale, California; and (2) dubious documents in defendant's position that purport to show that the Syrian government authorized defendant to remove the Mosaic from Syria.  Mr. Tarter's discussion of the U.N. Security Council and ICOM Emergency Red List regarding the looting in the Syria region provides context for the evidence and explains why defendant would need to illegally import the Mosaic and create a false provenance for it.

### F.   Mr. Tarter Should Not Be Precluded from Using the Term "Correct"

Finally, defendant argues that Mr. Tarter's anticipated use of the word "correct" is unduly prejudicial.  (Motion at 12.) Defendant's position is bizarre and unnecessary.

Mr. Tarter will testify about the tariff-classification process and the correct tariff codes used for works of art versus other types of goods.  Here, defendant caused his customs broker to declare the Mosaic as a general ceramic under Chapter 69 of the Harmonized Tariff Schedule, but that chapter does not cover works of art or items of cultural import.  Mr. Tarter will explain that the correct chapter to use for an ancient floor mosaic is Chapter 97, which covers ancient works of art, including floor mosaics exceeding 100 years.  This testimony is based on Mr. Tarter's experience with the Harmonized Tariff Schedule and is directly relevant to the false classification at issue.

Moreover, the Court should allow Mr. Tarter to testify about the correct country to declare on the Form 7501.  For example, the "correct" country of origin on a CBP Entry Summary can depend on a

16

substantial alteration of the good in an intermediary country.  If a good were extracted from China, shipped to Germany, but did not substantially change in the intermediary country, it would be incorrect to declare the country of origin as Germany instead of China.  Here, Mr. Tarter's anticipated use of the word "correct" is necessary and not prejudicial—-the Mosaic originated from Syria, but defendant suggested the country of origin was Turkey, and the CBP Entry Summary listed the country of origin as Israel.  Defendant can adequately address any issue with the word "correct," including the country of origin, on cross-examination.

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion and permit Mr. Tarter's expert testimony at trial.