1  E. MARTIN ESTRADA
   United States Attorney
2  MACK E. JENKINS
   Assistant United States Attorney
3  Chief, Criminal Division
   MARK A. WILLIAMS (Cal. Bar No. 239351)
4  Assistant United States Attorney
   Chief, Environmental and Community Safety Crimes Section
5  MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
   Assistant United States Attorney
6  Environmental and Community Safety Crimes Section
   MAXWELL COLL (Cal. Bar No. 312651)
7  Assistant United States Attorney
   Asset Forfeiture Section
8       1300 United States Courthouse
        312 North Spring Street
9       Los Angeles, California 90012
        Telephone: (213) 894-3359/8644/1785
10      Facsimile: (213) 534-4300
        E-mail:    Mark.A.Williams@usdoj.gov
11                 Matthew.O'Brien@usdoj.gov
                   Maxwell.Coll@usdoj.gov
12
   KENNTEH A. POLITE
13 Assistant Attorney General
   Criminal Division
14 CHRISTIAN A. LEVESQUE (D.C. Bar No. 501778)
   Trial Attorney
15 Human Rights and Special Prosecutions Section
   United States Department of Justice
16      1301 New York Ave
        Washington, DC 20530
17      Telephone:  (202) 538-2373
        E-mail:    Christian.Levesque@usdoj.gov
18
   Attorneys for Plaintiff
19 UNITED STATES OF AMERICA

20                 UNITED STATES DISTRICT COURT

21             FOR THE CENTRAL DISTRICT OF CALIFORNIA

22 UNITED STATES OF AMERICA,          No. CR 20-307-GW

23          Plaintiff,                OPPOSITION TO DEFENDANT'S RULE 29
                                      MOTION
24             v.
                                      Hearing Date: March 21, 2024
25 MOHAMAD YASSIN ALCHARIHI,          Hearing Time: 8:00 a.m.
     aka "Mohamad al-Sharihi" and     Location:     Courtroom of the
26   "Mohamad AlCharihi,"                           Hon. George H. Wu

27          Defendant.

28

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mark A. Williams, Matthew W. O'Brien, and Maxwell Coll, and United States Department of Justice Trial Attorney Christian Levesque, hereby files its opposition to defendant MOHAMAD YASSIN ALCHARIHI's Motion for Judgment of Acquittal Under Federal Rule of Criminal Procedure 29.

Dated: February 22, 2024          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


                    /s/
MARK A. WILLIAMS
MATTHEW W. O'BRIEN
MAXWELL COLL
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

KENNETH A. POLITE
Assistant Attorney General
Criminal Division


                    /s/
CHRISTIAN A. LEVESQUE
Trial Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**<u>TABLE OF CONTENTS</u>**

I.     INTRODUCTION...............................................1

II.    FACTUAL BACKGROUND.........................................1

     A.    Initial Discovery and Purchase of the Mosaic........1

     B.    Defendant's Importation of the Mosaic...............2

     C.    Seizure of the Mosaic and Defendant's Recorded
        Admissions..........................................4

     D.    The Mosaic's Authenticity and Value.................4

     E.    Belal AlJrad's Absence From Trial...................6

III.   LEGAL FRAMEWORK............................................7

IV.    ARGUMENT..................................................9

     A.    The Government Did Not Have To Prove That the
        "Mistakes" on the CBP Entry Forms Caused the Entry of
        the Mosaic Into the United States...................9

          1.   There Is No Materiality Standard in Section
              541.............................................9

          2.   Even If There Were a Materiality Requirement in
              Section 541, the Government Satisfied It......11

     B.    The Government Proved That Defendant Effected the
        Entry of the Mosaic................................16

     C.    The Government Did Not Need to Prove That Defendant
        Deprived the United States of Revenue..............19

     D.    The Government Proved That Defendant Caused the False
        Classification of the Mosaic's Quality.............19

V.     CONCLUSION...............................................21

i

# TABLE OF AUTHORITIES

DESCRIPTION                                                              PAGE

**Cases**

Jackson v. Virginia,
    443 U.S. 307 (1979) ................................................8
Kungys v. United States,
    485 U.S. 759 (1988) ...............................................11
United States v. Alarcon-Simi,
    300 F.3d 1172 (9th Cir. 2002) ..................................8, 9
United States v. An Antique Platter of Gold,
    184 F.3d 131 (2d Cir. 1999) .......................................10
United States v. Armstrong,
    909 F.2d 1238 (9th Cir. 1990) .....................................18
United States v. Bagnall,
    907 F.2d 432 (3d Cir. 1990) ...................................10, 11
United States v. Chen,
    324 F.3d 1103 (9th Cir. 2003) .....................................11
United States v. Corona-Verbera,
    509 F.3d 1105 (9th Cir. 2007) ......................................8
United States v. Holmquist,
    36 F.3d 154 (1st Cir. 1994) ...................................10, 11
United States v. Nevils,
    598 F.3d 1158 (9th Cir. 2010) ......................................7
United States v. Rocha,
    598 F.3d 1144 (9th Cir. 2010) ......................................7
United States v. Rojas,
    554 F.2d 938 (9th Cir. 1977) .......................................8
United States v. Salinas-Ceron,
    731 F.2d 1375 (9th Cir. 1984) .....................................11
United States v. Spillone,
    879 F.2d 514 (9th Cir. 1989) ......................................18
United States v. Teraoka,
    669 F.2d 577 (9th Cir. 1982) ......................................10

**Statutes**

18 U.S.C. § 2(a)...............................................16, 18
18 U.S.C. § 2(b)...........................................16, 17, 18
18 U.S.C. § 541...............................................passim
18 U.S.C. § 542...............................................10, 11
18 U.S.C. § 1001...................................................11

**Rules**

Fed. R. Crim. Proc. 30(d)..........................................18

ii

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3

Defendant's Rule 29 Motion is a study in misdirection.

4

Boasting that the government did not meet its burden as to "*any*

5

element*" (Mot. at 1:9), the Motion ignores swaths of evidence from

6

the government's case-in-chief, misstates the relevant legal

7

standards, and ignores the Court's prior rulings, particularly with

8

respect to the jury instructions.  Defendant fails to meet his heavy

9

burden for a Rule 29 motion.  The government respectfully requests

10

that the Court deny the Motion in its entirety.

11

**II.  FACTUAL BACKGROUND**

12

As the Court is aware, extensive testimony, photographs,

13

communications, and other documentary evidence were introduced at

14

trial regarding the Mosaic.  The facts set forth below are not

15

exhaustive and instead highlight key evidence relevant to

16

defendant's Rule 29 and Rule 33 motions.

17

**A.    Initial Discovery and Purchase of the Mosaic**

18

Evidence at trial established that defendant initially learned

19

about the Mosaic on January 1, 2015 -- over a year before it was

20

seized from his residence -- from a Syrian national named Belal

21

AlJrad.  (CR 182 at 224-25.)  In dozens of messages introduced

22

during trial, defendant and AlJrad exchanged photographs of the

23

Mosaic and discussed the Mosaic's large size, that it was "delivered

24

to Turkey," and that it could be worth $1 million.  (CR 182 at 227-

25

30.)  AlJrad also provided photographs of the Mosaic on the ground

26

before it was removed, and told defendant that "it was not

27

registered or wanted" by authorities.  (CR 182 at 233-34.)  The

28

Mosaic depicts an ancient Greek myth involving Prometheus and Hercules.  (Id. at 212.)

The jury also learned that during the execution of a search warrant at defendant's home, agents found a sales contract, in Turkish, between defendant and Ahmet Bostanci.  The contract showed that defendant agreed to buy the Mosaic for 36,000 Turkish lira (approximately $12,000 to $13,000), including shipping.  (Trial Ex. 146.)

**B.   Defendant's Importation of the Mosaic**

In August 2015, defendant hired Soo Hoo Customs Broker, Inc. ("Soo Hoo"), based in Commerce, California, to assist in the importation of the Mosaic into the United States.  The owner, Brian Soo Hoo, testified that for importations he relies on the information his customer provides "100 percent" because he cannot personally inspect items shipped from overseas.  (CR 184 at 736-37.)

In the paperwork defendant provided to Soo Hoo regarding the shipment, defendant did not tell Soo Hoo that he had paid approximately $12,000 for the Mosaic or that it was ancient.  As such, based on the information provided by defendant, the Mosaic was classified as generic mosaic tiles that "could be used as back splashes, floor coverings, etc."  (CR 184 at 741.)  Mr. Soo Hoo testified that had the paperwork provided by defendant referenced artwork or an ancient mosaic, it would have been classified differently when it was imported.  (CR 184 at 741-42.)  Mr. Soo Hoo testified that defendant never provided any documentation indicating that he was importing an ancient mosaic from Syria or an antiquity. (CR 184 at 746.)

Rebecca Sito, the Soo Hoo employee who completed certain Customs paperwork for the Mosaic importation, testified that she relied on the importer (defendant) to provide truthful and accurate information regarding what is being imported.  (CR 185 at 847.) With respect to the Mosaic, Ms. Sito testified that defendant never informed her that he was importing an antiquity or that he paid $12,000 for the importation.  (Id. at 848.)  Ms. Sito also testified as follows:

> Q:   So, by giving you a false invoice, that importer would be causing that same false statement to appear on the customs documents, right?
>
> A:   Yes.

(Id. at 849.)  Ms. Sito testified that defendant never provided her with an actual picture of the Mosaic.  (Id. at 849-50.)  She agreed that it would surprise her to learn that defendant imported an ancient mosaic from Syria.  (Id.)

Based on defendant's false statements and misrepresentations, CBP Form 7501 was provided to Customs on August 12, 2015, in order to import the Mosaic.  The form listed the Mosaic not as an ancient Syrian artwork but rather as "CERAMIC, UNGLAZED, TILES, CUB."  The form also listed the value of the Mosaic as $587, and the total value of the shipment as $2,199, far less than what defendant paid for the Mosaic or the Mosaic's fair market value.  (Trial Ex. 9.)

As a result of defendant's misrepresentations and omissions, United States Customs authorities did not scrutinize the importation containing the Mosaic.  Mr. Soo Hoo confirmed that telling Customs

that an item was a Syrian antiquity "most definitely" would have resulted in extra scrutiny.  (CR 184 at 760.)

## C.   Seizure of the Mosaic and Defendant's Recorded Admissions

In March 2016, law enforcement agents executed a search warrant at defendant's home and found the Mosaic, unrolled, in defendant's garage.  (CR 182 at 212.)  Agents also found two additional, modern mosaics and the vases.  (CR 182 at 213; 220.)  Special Agent Razmik Madoyan testified that defendant participated in a recorded interview during the execution of the search warrant.  Among other statements, defendant admitted that he paid $12,000 total for the importation containing the Mosaic.  (Trial Ex. 489.)  When asked why a lower number was reported to Soo Hoo and Customs instead of the $12,000 that he actually paid, defendant admitted that he was attempting to lower the duties he would pay.  (Id.)  When asked if anything in the shipment was old, defendant admitted that one of the mosaics was 2,000 years old and that he did not provide that information to Customs.  (CR 183 at 352; Trial Ex. 490.)

## D.   The Mosaic's Authenticity and Value

Extensive evidence was introduced at trial to establish that the Mosaic was both authentic and valuable.

Regarding authenticity, Dr. Eric Doehne, a prominent conservation scientist with vast experience scientifically evaluating ancient objects, testified that the Mosaic was ancient, approximately 1,700-1,900 years old, and likely lifted (removed) from the floor.  (CR 184 at 600.)  Dr. Doehne also opined that the Mosaic was Roman and originated in Syria.  (Id. at 601.)  Further, he testified regarding looting in Syria and that Interpol, in

collaboration with UNESCO, sent out an alert in 2012 "to alert the world that . . . we need to be on the lookout for Syrian mosaics." (CR 184 at 598.)

Stephen Miotto, the mosaic restorer hired by defendant, also testified that "[i]t just looks like a very old mosaic," and that the fabric backing used to remove the Mosaic from its original floor location was still present. (CR 184 at 651, 654.) Mr. Miotto testified that defendant paid him $40,000 to restore the Mosaic. (CR 184 at 660.) Defendant's own valuation expert also conceded that "fairly likely, almost all of the tesserae are ancient," and further clarified that although there were "stylistic inconsistencies" that impacted the Mosaic's value, he "didn't say it was a fake." (CR 183 at 409; 415.)

Defendant also made various admissions to his friends regarding the Mosaic's authenticity. For example, Dr. Timur Pogodin testified that defendant told him that the Mosaic "came from Syria, and then somewhere through Turkey to the United States" and that defendant intended to "restore it and sell it." (CR 185 at 779.) Defendant also admitted to another friend that the Mosaic was "a historical artifact" that was from Syria. (CR 185 at 795-96.)

With respect to value, the jury received a plethora of evidence that the Mosaic was worth well over the false value that defendant provided as part of the Customs documentation. That evidence includes:

- Messaging from AlJrad to defendant that the Mosaic could be worth $1 million. (CR 182 at 229.)

- An email from an antiquity dealer in the United States to AlJrad (who then emailed defendant) that the Mosaic could be worth $100,000 to $200,000. (CR 182 at 234-40.)

- Testimony from an expert antiquity appraiser estimating that the Mosaic's fair market value was $450,000 before it was restored. (CR 184 at 696.)

- Testimony from defendant's expert appraiser that the Mosaic's fair market value was "$30,000 less the cost of restoration," and that even an "outright forgery" has "value both as an illegitimate piece and decorative object."[1] (CR 183 at 414.)

- The sales contract for the Mosaic listing a purchase price of 36,000 Turkish lira (approximately $12,000), and a wire of $12,000 from defendant to the person he purchased the Mosaic from. (CR 183 at 349; Trial Exs. 18 and 146.)

- Defendant's recorded admissions to the case agent that "the mosaics – you know, all together they came to $12,000." (CR 183 at 349-50; Trial Ex. 489.)

**E.   Belal AlJrad's Absence From Trial**

The parties engaged in a number of discussions regarding defense counsel's request to call AlJrad as a witness at trial, and the government spent significant time making arrangements for AlJrad

---

[1] Much like a restored car or other object that the owner is "upside down" on (i.e., where the owner paid more to acquire and restore the object than the owner can sell it for), the object's fair market value is separate and apart from any profits the owner may receive after deducting restoration expenses.

6

to testify.[2]  This included coordinating with the FBI and U.S. Embassy in Saudi Arabia (the country in which AlJrad was located), agreeing to live testimony via video during trial, and issuing AlJrad a "safe passage" letter confirming that he would not be arrested when he appeared to testify.  During trial, counsel also coordinated the day that AlJrad would testify and the government reconfirmed that the U.S. Embassy was standing by to facilitate his testimony via video.

Nonetheless, on the eve of AlJrad's testimony during trial, defense counsel informed the government that it would not be calling AlJrad as a witness.

## III. LEGAL FRAMEWORK

Courts review motions for a judgment of acquittal under Rule 29 using legal standards that are highly deferential to the jury.

"The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge [under Rule 29] is high." United States v. Rocha, 598 F.3d 1144, 1153 (9th Cir. 2010).  The analysis is a two-step inquiry.  United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).  First, the reviewing court "must consider the evidence presented at trial in the light most favorable to the prosecution" and "may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial."  Id.  In other words, the court "'must presume -- even if it does not affirmatively appear in the record -- that the trier of

---

[2] The defense listed AlJrad on their witness lists filed on May 31, 2023, and June 7, 2023, well in advance of the June 14th trial date. (CR 124 and 139.)

fact resolved any... conflicts in favor of the prosecution, and must defer to that resolution.'" United States v. Alarcon-Simi, 300 F.3d 1172 (9th Cir. 2002) (quoting ff v. Virginia, 443 U.S. 307, 326 (1979)).  Any "[c]onflicting evidence is to be resolved in favor of the jury verdict." United States v. Corona-Verbera, 509 F.3d 1105, 1117 (9th Cir. 2007) (cleaned up).

Second, "the reviewing court must determine whether this evidence, so viewed [in the light most favorable to the prosecution], is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." Alarcon-Simi, 300 F.3d at 1172 (quoting Jackson, 443 U.S. at 319) (cleaned up).  The purpose of the second step is to protect against the "rare occasions in which a properly instructed jury may convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." Id. at 1172 (quoting Jackson, 443 U.S. at 317) (cleaned up).  At this second step, the reviewing court may not ask itself "whether it believes that the evidence at the trial established guilt beyond a reasonable doubt"; rather, the court may ask only whether "any rational trier of fact could have made that finding." Id. (quoting Jackson, 443 U.S. at 318-19) (citations omitted).

In ruling on a Rule 29 motion, the Court "must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." United States v. Rojas, 554 F.2d 938, 943 (9th Cir. 1977).  In other words, "it is not the district court's function to determine witness credibility when

1    ruling on a Rule 29 motion." Alarcon-Simi, 300 F.3d at 1176.

2        The Motion does not come close to meeting these exacting

3    standards.

4    **IV.  ARGUMENT**

5        **A.   The Government Did Not Have To Prove That the "Mistakes"
             on the CBP Entry Forms Caused the Entry of the Mosaic Into
6            the United States**

7        Defendant's first argument misstates the government's burden at

8    trial.  The government had to prove that defendant knowingly caused

9    the entry of the Mosaic into the United States and that he did so

10   having caused a false classification as to the Mosaic's value or

11   quality.  See 18 U.S.C. § 541.  The government met this burden, as

12   explained in Parts IV.B and IV.D, infra.  Defendant inflates the

13   government's burden as purportedly requiring proof that "any

14   supposed mistakes on the [CBP] entry forms" caused the entry of the

15   Mosaic into the United States.  (Mot. at 7:24.)  That is not the

16   law.

17        1.   There Is No Materiality Standard in Section 541

18       The Motion reads a non-existent materiality requirement into

19   Section 541.  Section 541 does not require that a defendant's false

20   classifications as to a smuggled object caused the entry of the

21   object into the United States.  The Motion cites no case law holding

22   otherwise.  Indeed, the Court's jury instructions did not include a

23   materiality requirement, and defendant did not advocate for such an

24   instruction or object to the omission of such a requirement.

25       Defendant essentially argues that Section 541 requires a "but

26   for" test – i.e., that the government had to prove that the Mosaic

27   would not have entered into the United States but for defendant's

28

                                    9

1    lies.  That is not the law, and the Motion cites no case holding

2    otherwise.  The government did not charge defendant with violating

3    18 U.S.C. § 542 (willfully and knowingly causing the entrance and

4    introduction into U.S. commerce of merchandise "by means of" certain

5    false statements and practices).  Although the Ninth Circuit has

6    held that "by means of" in Section 542 does require a "but for"

7    test, see United States v. Teraoka, 669 F.2d 577 (9th Cir. 1982),[3]

8    the "by means of" language is absent from Section 541 and defendant

9    has provided no legal support for grafting that standard onto

10   section 541 – the actual charge in this case.

11       The Motion focuses on information that defendant's broker

12   provided on the entry forms regarding the Mosaic's HTS Code and

13   country of origin.  (Mot. at 9-10.)  But the government did not have

14   to prove that CBP would not have allowed the Mosaic to enter the

15   United States but for the forms' description of the Mosaic as

16   falling under Chapter 69 of the HTS (rather than Chapter 97).  And

17   the government did not have to prove that CBP would not have allowed

18   the Mosaic to enter the United States but for the forms' incorrect

19   listing of Israel as the Mosaic's country of origin (rather than

20   Turkey, or Syria).

21       Instead, the government had to prove that defendant falsely

22   classified, or caused a false classification as to, the Mosaic's

---

[3] For the record, the government believes Teroaka was wrongly
decided.  Several Courts of Appeals have declined to follow Teroaka
and held that "by means of" in Section 542 does not require "but
for" causation.  See, e.g., United States v. An Antique Platter of
Gold, 184 F.3d 131, 135 (2d Cir. 1999); United States v. Holmquist,
36 F.3d 154, 160 (1st Cir. 1994); see also United States v. Bagnall,
907 F.2d 432, 436 (3d Cir. 1990).

value or quality, and that defendant knowingly effected the entry of the Mosaic into the United States.  (See CR 160 at 1, 4.)  The government met this burden.

2. Even If There Were a Materiality Requirement in Section 541, the Government Satisfied It

Even if, despite the foregoing, the Court were to impose – for the first time – a materiality requirement onto Section 541, the result would be the same because the government satisfied such a hypothetical threshold at trial.

In statutes (unlike Section 541) that either explicitly or implicitly require that a false statement have a material impact on a government agency, courts typically require that the government prove only that a false statement could have influenced the agency. For example, "[m]ateriality under 18 U.S.C. § 1001 is tested by whether the false statements could have affected or influenced the exercise of a governmental function." United States v. Chen, 324 F.3d 1103, 1104 (9th Cir. 2003) (quoting United States v. Salinas-Ceron, 731 F.2d 1375, 1377 (9th Cir. 1984)). See also United States v. Holmquist, 36 F.3d 154, 159 (1st Cir. 1994) ("a false statement is material under [18 U.S.C. §] 542 if it has the potential significantly to affect the integrity or operation of the importation process as a whole, and that neither actual causation nor actual harm to the government need be demonstrated") (citing United States v. Bagnall, 907 F.2d 432, 436 (3d Cir. 1990)) (emphasis added); Kungys v. United States, 485 U.S. 759, 770 (1988) ("a concealment or misrepresentation is material if it has a natural tendency to influence, or was capable of influencing, the decision

of the decisionmaking body to which it was addressed") (internal quotations omitted) (emphasis added).

Hence, even a hypothetical materiality requirement in Section 541 would require the government to prove only that defendant's lies about the Mosaic were capable of effecting the entry of the Mosaic into the United States.  As the Motion concedes, there was testimony on this very issue, from Brian Soo Hoo:

> Q:  In your experience, Mr. Soo Hoo, would declaring an item – declaring that an item or an antiquity is from Syria, would that have resulted in extra scrutiny?
>
> A:  Most definitely.  Generally artwork of any type is scrutinized.

(CR 184 at 760:20-25.)  This testimony by itself would satisfy a hypothetical materiality requirement and is fatal to defendant's argument in the context of a Rule 29 motion.

The Motion falsely claims that Mr. Soo Hoo's testimony was the only evidence regarding the materiality of defendant's lies. Defendant ignores other testimony showing that had defendant disclosed that he was importing a highly valuable ancient Syrian mosaic, it could have impacted CBP's scrutiny of the Mosaic. Additional witnesses testified to the undisputed fact that in 2015, when defendant smuggled the Mosaic into the United States, Syrian antiquities already faced international scrutiny, including from CBP.  As the government argued in its closing, the whole point of defendant's months-long scheme was to avoid that scrutiny.

The government's first witness, HSI Special Agent Madoyan, testified about how suspected looted antiquities from Syria are

subject to scrutiny by CBP and customs officials around the world. Specifically, Special Agent Madoyan testified about the International Council of Museums' ("ICOM") Red List, which he explained was "a tool or guide to help law enforcement, among other professionals, and customs authorities all around the world to see or to identify vulnerable objects that are being trafficked from that particular region." (CR 184 at 525:22-526:2.) Special Agent Madoyan testified that there were ICOM Red Lists "specific to Syria" starting in 2013 and these Red Lists were still in effect in 2015 when defendant smuggled the Mosaic into the United States. (Id. at 526:11-14.) And he explained that the ICOM Red List specific to Syria listed "Roman era mosaics." (Id. at 526:18-22.)

One of the government's expert witnesses, Dr. Eric Doehne, also testified about the scrutiny facing looted antiquities from Syria. Dr. Doehne told the jury about his training and experience in the looting of antiquities, including a course he teaches on that very issue and his work for the Getty Museum analyzing works of art that may have been looted. (Id. at 568:13-24, 569:8-12.) Dr. Doehne then testified as to looting in Syria specifically, where, he stated:

> [looting] has been a major problem, in particular from about 2011 into 2015, during the worst parts of the civil war that took place there. And the displacement of people meant there was ample opportunity to do tremendous damage to the cultural heritage of Syria, to the point where there was even an Interpol alert sent out in 2012 in collaboration with UNESCO to alert the world that, hey, we need to be on the lookout for Syrian mosaics.

(Id. at 598:9-16) (emphasis added.)[4]  As the Motion also fails to mention, Dr. Doehne testified that in his expert opinion the Mosaic was "roughly 1,700 to 1,900 years old" and "it's likely that this mosaic came from Syria."  (Id. at 600:5-7, 601:1-2.)

Hence the testimony of Special Agent Madoyan and Dr. Doehne established that (1) the Mosaic was ancient and most likely from Syria; (2) looting of antiquities from Syria was a significant problem in 2015; and (3) international law enforcement authorities, including CBP, were on the lookout in 2015 for Syrian mosaics.  And numerous government witnesses testified about defendant's wide-ranging and long-running scheme to conceal that the Mosaic was ancient and from Syria.

The government's closing arguments tied all of the foregoing together (if it wasn't obvious to jurors already) to show that defendant's false statements as to the Mosaic's antiquity and value avoided law enforcement scrutiny.  For example, the government argued (with no objection from the defense):

> Nobody was given that information at the broker. Rebecca Sito was never told it was ancient.  Brian Soo Hoo did not testify that he had any information that it was ancient.  That information was not given to the customs broker.  Why?  Because the defendant didn't want the customs broker to have it.
>
> Then it would have been declared as an antiquity from Syria, and you heard about red lists.  Remember the red lists of antiquities from Syria?  So, people were on alert, people were paying attention.
>
> If you would have declared this as a Syrian antiquity, you heard Soo Hoo testify that it would have most

---

[4] In contrast, Scott Case, the defense's so-called Customs expert, admitted that he was completely ignorant about the ICOM Red List for Syria and how CBP scrutinizes antiquities.  (CR 185 at 880:7-18.)

14

<u>definitely resulted in extra scrutiny by customs, and the defendant didn't want that</u>.

(CR 185 at 1026:6-19) (emphasis added.)

As a result, there was more than sufficient evidence from which a rational juror could have determined that the Mosaic would have received more scrutiny from law enforcement had defendant disclosed that it was a valuable, ancient Syrian mosaic.

The aforementioned evidence dooms defendant's claim that the government's decision not to call William Tarter as an expert witness somehow undermines the verdict. (Mot. at 8-9.) The government simply did not need to call Tarter as a witness. To prove that defendant violated 18 U.S.C. § 541, the government did not need to offer expert testimony as to how CBP scrutinizes the importation of antiquities, from Syria or elsewhere, because the testimony of Special Agent Madoyan, Dr. Doehne, and Mr. Soo Hoo already had established that Customs authorities were scrutinizing ancient Syrian mosaics. The government (correctly) decided during the trial that Tarter's testimony was superfluous because the government already had met its burden of proof; defendant is not entitled to an acquittal simply because the government did not over-try its case-in-chief. (<u>See</u> Part III, <u>supra</u>.)

Because a rational juror could have found that defendant's concealment of the fact that the Mosaic was highly valuable, ancient, and likely from Syria was capable of causing CBP to apply more scrutiny to the Mosaic, the government could satisfy a (non-existent) materiality requirement under Section 541.

**B.    The Government Proved That Defendant Effected the Entry of the Mosaic**

Defendant's next argument is difficult to follow.  The Motion claims that the Court "cannot uphold a conviction on a legal or factual theory that was not presented at trial" (Mot. at 12:6-8), but the government presented testimony from numerous witnesses regarding how defendant effected the entry of the Mosaic into the United States.  And the government argued that defendant was directly liable for the scheme and also liable under a causing theory.

The Motion conflates 18 U.S.C. § 2(b) (causing an act to be done) with 18 U.S.C. § 2(a) (aiding and abetting).  The indictment alleged that (in addition to being directly liable) defendant also was liable under Section 2(b), not Section 2(a).  While the government recognizes that Section 2(b) is sometimes referred to colloquially as "aiding and abetting," the legal distinction between Sections 2(a) and 2(b) dooms defendant's argument here.

The Motion claims – absurdly – that "[a]t trial, the government dropped the aiding and abetting theory."  (Mot. at 11:1-2.)  The government never has claimed that defendant aided and abetted the crime.  Instead, the government has claimed, from the filing of the indictment through its closing argument, that defendant (in addition to being directly liable) also <u>caused</u> the commission of the crime – by providing the false information to his broker.

Far from "dropping" the argument (<u>id.</u>), the government in its closing argued repeatedly that defendant caused the crime to be committed.  For example:

16

- "So, there are really three things in dispute.... Second, did he effect <u>or cause the entry</u> of the ancient mosaic into the United States?" (CR 185 at 954:15-18) (emphasis added).

- "So, I just summarized some of the evidence regarding <u>how defendant caused the false classification</u> of the value of that mosaic." (<u>Id.</u> at 958:14-16) (emphasis added).

- "He also <u>caused the false classification</u> of the mosaic's quality." (<u>Id.</u> at 958:19-20) (emphasis added).

- "He <u>caused the mosaic to enter</u> into the United States." (<u>Id.</u> at 982:3-4) (emphasis added.)

The defense never objected. To the contrary, the defense emphasized the government's theory by telling the jury that the "government argues that Mr. Alcharihi <u>caused</u> the customs broker to put down the wrong Harmonized Tariff Schedule classification by hiding the ancient mosaic, by sending them only a picture of the fish pond mosaic." (<u>Id.</u> at 1009:22-25) (emphasis added.)

It makes no difference that the Court did not provide a specific jury instruction regarding Section 2(b).[5] The Court <u>did</u> instruct the jury as to the government's theory:

> The Indictment alleges that ... Defendant knowingly effected the entry of goods, wares, and merchandise, <u>and willfully caused the entry of goods, wares, and merchandise</u>, upon a false classification as to quality and/or value of such items. Specifically, the Indictment alleges that Defendant knowingly claimed, <u>and caused to be claimed</u>, that he was importing a shipment of a mosaic and other items valued at $2,199, when, in fact, he knowingly imported a mosaic that itself was valued at more than $2,199 . . .

---

[5] The Court's omission appears to have been an oversight (or, if it was intentional, the parties did not notice it). The model jury instruction for Section 2(b) was included in the parties' joint proposed jury instructions. (See CR 125 at 42.)

17

(CR 160 at 1) (emphases added.)  Defendant did not object to the Court's instruction.  <u>See</u> Fed. R. Crim. Proc. 30(d) ("A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate.").

The fact that the jury instructions included the government's causing theory further dooms defendant's argument.  <u>See</u>, <u>e.g.</u>, <u>United States v. Armstrong</u>, 909 F.2d 1238, 1243 (9th Cir. 1990) (jury instructions "are considered as a whole to determine if they are misleading or inadequate") (quoting <u>United States v. Spillone</u>, 879 F.2d 514, 525 (9th Cir. 1989)).

This is not a case where there could be jury confusion as to the differences between Sections 2(a) and 2(b); neither party (nor the Court) ever mentioned Section 2(a) or aiding and abetting to the jury.  Instead, the jury consistently was told that the government's theory of liability included that defendant caused the crime.

Nor could there have been any jury confusion as to defendant's interactions with the broker.  There was little or no factual dispute regarding defendant's interactions with the broker, which were well documented in emails.  For example, nobody ever claimed that defendant was the one who filled out the Customs forms regarding the Mosaic, or that defendant approved the forms.

Finally, it bears repeating that the government did not limit its theory of liability to causing under Section 2(b).  From the filing of the indictment through the closing argument, the government also alleged that defendant was <u>directly</u> liable.  (See,

e.g., CR 160 at 4; CR 185 at 958:10-13 ("The point is that defendant, here, is admitting to Special Agent Madoyan that he falsely classified the value of the shipment and of the ancient mosaic.  That is what he is charged with here.").)  Any rational juror could have found defendant guilty for being directly liable, or under the causing theory.

### C.   The Government Did Not Need to Prove That Defendant Deprived the United States of Revenue

As the Motion concedes, the Court already has rejected defendant's argument that Section 541 requires the government to prove that defendant's conduct deprived the United States of revenue.  (Mot. at 12:18-21; CR 144, 145.)  The government incorporates by reference its previous arguments on this issue. (See, e.g., CR 130 at 9:13-12:7; CR 143.)  Defendant's argument fails for the same reason as it failed last year:  there is no statutory (or common sense) reason to require a loss of revenue. Doing so would immunize smugglers of antiquities from liability under Section 541.

### D.   The Government Proved That Defendant Caused the False Classification of the Mosaic's Quality

The Motion's final argument fares no better.  It is fatally flawed for at least three reasons.

First, defendant once again applies an overly narrow definition as to the term "quality," premising his argument on the notion "that quality encompassed country of origin and the HTS code."  (Mot. at 13:21-22.)  Defendant ignores that the term "quality" encompassed much more than the country of origin and HTS Code.

19

1    After extensive litigation and argument, the Court instructed

2  the jury that "[t]he terms 'quality' and 'value' are to be given

3  their plain and ordinary meanings as further established through the

4  evidence and testimony of witnesses."  (CR 160 at 4.)  Hence

5  "quality" also encompassed – as the government emphasized in its

6  closing – the Mosaic's appearance, its iconography, its age, and its

7  Syrian provenance.  (See CR 185 at 958:17-961:2, 982:10-13, 1021:9-

8  14, 1021:21-1027:5.)  Defendant misled the broker on each of those

9  subjects.  (See id.)

10    Second, even focusing solely on country of origin and HTS Code,

11  defendant caused a false classification.  As for the country of

12  origin, while defendant is correct that he did not cause the broker

13  to mistakenly list Israel as the Mosaic's country or origin,

14  defendant ignores that he concealed from the broker the fact that

15  the Mosaic was likely from Syria.

16    As for the HTS Code, the Motion blames Soo Hoo employee Rebecca

17  Sito for determining the wrong code for the Mosaic and not asking

18  defendant about the age of the Mosaic.  (Mot. at 14-16.)  The

19  defense employed the same finger-pointing at trial, unsuccessfully.

20  Defendant's argument ignores that defendant deceived Ms. Sito by

21  sending her photographs of very different, new mosaics (with much

22  different iconography) and not telling her that the Mosaic was

23  ancient.  (See, e.g., CR 185 at 1025:23-1027:5.)  Just as the jury

24  rejected defendant's finger-pointing, the Court should as well,

25  particularly in the context of a Rule 29 motion.

26    Against this backdrop, defendant again tries to blame the

27  broker for listing the Mosaic under Chapter 69 of the HTS instead of

28

20

Chapter 97.  (Mot. at 14-16.)  Defendant tried this approach at trial and failed.  Defendant hardly can blame the broker for not asking the right follow-up questions about the age of the Mosaic when defendant had concealed from the broker that the Mosaic was ancient in the first place, and when he had sent photographs to the broker depicting other new mosaics but not the ancient Mosaic. (See, e.g., CR 185 at 958:19-961:2.)  There is no basis for an acquittal based upon defendant's continued finger-pointing.

Third, defendant's focus on quality ignores the other half of the government's case:  all of the evidence showing that defendant lied about the Mosaic's value.  Even if for some reason the Court has any doubts as to the quality issue, the fact that defendant lied about the Mosaic's value provides an independent basis for the Court to deny the Motion.

## V.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion.