# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

| | | | | |
|---|---|---|---|---|
| Case No. | CR 20-307-GW | | Date | April 16, 2024 |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

Interpreter    NONE

| Javier Gonzalez | None Present | Mark A. Williams - not present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| Mohamad Yassin Alchirihi | not | ✔ | | Ashley Mahmoudian, DFPD | not | ✔ | |

PROCEEDINGS:    **IN CHAMBERS - TENTATIVE RULINGS ON MOHAMAD ALCHARIHI'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29 [195]; and MOHAMAD ALCHARIHI'S MOTION FOR A NEW TRIAL UNDER FED. R. CRIM. P. 33 [196]**

Attached hereto is the Court's Tentative Rulings on Defendant's Motions [195, 196], set for hearing on April 18, 2024 at 8:00 a.m.

                :

Initials of Deputy Clerk    JG

*__United States of America v. Alcharihi__*, Case No. CR 20-307-GW
Tentative Rulings on: (1) Motion for Judgment of Acquittal Under Fed. R. Crim P. 29, and (2) Motion for a New Trial under Fed. R. Crim P. 33

Following a jury trial, Mohamad Alcharihi ("Defendant") was found guilty on July 21, 2023, of Entry of Goods Falsely Classified, in violation of 18 U.S.C. § 541[1].  *See* Docket Nos. 157, 165.  As set forth in the indictment, *see* Docket No. 1, the case involved Defendant's importation of a single particular mosaic.  Defendant has now filed two post-trial motions, one seeking a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and one seeking a new trial pursuant to Federal Rule of Criminal Procedure 33.

## A. __Rule 29 Motion__

Rule 29 of the Federal Rules of Criminal Procedure provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later," Fed. R. Crim P. 29(c)(1),[2] and that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal," *id.* 29(c)(2). A motion for a judgment of acquittal examines whether "the evidence is insufficient to sustain a conviction" for any offense.  *See* Fed. R. Crim P. 29(a).  The test applied to a Rule 29 motion for acquittal is the same as for a challenge to the sufficiency of the evidence.  *See United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010); *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010); *United States v. Tisor*, 96 F.3d 370, 379 (9th Cir. 1996).  "There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Gonzalez*, 528 F.3d 1207, 1211 (9th Cir. 2008); *see also United States v. Gagarin*, 950 F.3d 596, 602 (9th Cir. 2020); *Graf*, 610 F.3d at 1166; *Tisor*, 96 F.3d at 379 ("Sufficiency of evidence is satisfied if 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

---

[1] Section 541 provides as follows:  "Whoever knowingly effects any entry of goods, wares, or merchandise, at less than the true weight or measure thereof, or upon a false classification as to quality or value, or by the payment of less than the amount of duty legally due, shall be fined under this title or imprisoned not more than two years, or both."  18 U.S.C. § 541.

[2] Here, the parties reached a series of stipulations to make timely the instant motions, notwithstanding the 14-day deadlines contained in the Federal Rules.  *See* Docket Nos. 168-169, 173-174, 193-194.

beyond a reasonable doubt.'") (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *United States v. Figueroa-Paz*, 468 F.2d 1055, 1058 (9th Cir. 1972) ("The test is whether at the time of the motion there was relevant evidence from which the jury could reasonably find appellant guilty beyond a reasonable doubt, viewing the evidence in light favorable to the Government. . . . If there appears some doubt, so that the court believes the jury might disagree, the motion must be denied.").

While preserving his argument that the Government failed to prove *any* element of a violation of Section 541 beyond a reasonable doubt, Defendant makes four specific arguments in support of his Rule 29 motion. First, he argues that the Government failed to prove that information on the customs entry form – wrong value, wrong country of origin and/or wrong Harmonized Tariff Schedule ("HTS") classification code – effected, or caused, the entry of the mosaic. Second, he argues that the Government failed to prove that Defendant *himself* effected entry upon false classification of quality or value because he hired a customs broker to fill out and submit the Customs and Border Protection ("CBP") entry form, and the jury was not instructed, and did not make a finding, regarding any aiding and abetting theory. Third, Defendant argues that loss of revenue to the United States is a necessary element of a Section 541 offense (though Defendant recognizes that the Court has already ruled against him on this issue). Finally, even if Defendant could be held directly liable absent an aiding-and-abetting instruction, Defendant argues that the Government failed to prove that he caused a false classification as to the mosaic's quality, because Defendant played no role in his customs broker listing Israel as the country of origin or in his customs broker failing to classify the mosaic as artwork.[3]

1. Lack of Evidence Inaccurate Information "Effect[ed]" Entry

Defendant argues that the Government "presented virtually no evidence that the mistakes on the [custom forms] resulted in, caused, led to, or contributed to CBP releasing the mosaic to" Defendant. Docket No. 195, at 7:25-27. Rather than presenting an expert on the topic, Defendant

---

[3] In the course of making these arguments, Defendant observes that the verdict form in the case does not reveal whether he was convicted based on false classification of value, or quality, or both. *See* Docket No. 165. "'[W]en a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . , the verdict stands if the evidence is sufficient with respect to any one of the acts charged.'" *United States v. Williams*, 441 F.3d 716, 724 (9th Cir. 2006) (quoting *Griffin v. United States*, 502 U.S. 46, 56-57 (1991)). In addition, "special verdicts are the exception, not the rule; when a special verdict is appropriate to record the jury's thinking for appeal, it is defense counsel's duty to request it." *United States v. Vasquez-Velasco*, 15 F.3d 833, 847 (9th Cir. 1994); *see also United States v. Jones*, 425 F.2d 1048, 1057 (9th Cir. 1970) (concluding that where defendant failed to ask for a special verdict, any error by a court in failing to provide for such was waived). The parties jointly proposed the verdict form that the Court used in the case. *See* Docket No. 128; *see also* Docket No. 165.

asserts that the Government limited its evidence on the point to one answer to one question posed to customs broker Brian Soo Hoo ("Soo Hoo") – asking him whether, in his experience, "declaring that an item or an antiquity is from Syria . . . would . . . have resulted in extra scrutiny by customs," to which Soo Hoo responded "Most definitely.  Generally artwork of any type is scrutinized." Defendant characterizes this response as "vague and general," Docket No. 195, at 9:24-25, and notes further that Soo Hoo offered no testimony as to whether a *change in value* would have had such an effect.  In any event, even accepting Soo Hoo's testimony, Defendant notes that the testimony would be consistent with the mosaic undergoing "extra scrutiny" and then being *released* to Defendant.  Indeed, Defendant highlights other evidence that he believes already would or should have caused CBP to further scrutinize Defendant's shipment, yet it did not do so.  He therefore argues that given the absence of further evidence, the jury would have had to *speculate* to conclude that the mosaic would have been further scrutinized *and then held and not released*, and that such speculation cannot support a finding under a Rule 29 analysis.

The Government begins its Opposition on this first argument by asserting that it did not need to prove that mistakes on the CBP entry forms caused the entry of the mosaic into this country, but only "that defendant knowingly caused the entry of the Mosaic into the United States and that he did so having caused a false classification as to the Mosaic's value or quality."  Docket No. 198, at 9:8-11; *see also id.* at 10:21-11:2 ("[T]he government had to prove that defendant falsely classified, or caused a false classification as to, the Mosaic's value or quality, and that defendant knowingly effected the entry of the Mosaic into the United States.").  As part of this argument, the Government denies that there is any "materiality" standard in Section 541, nor is there a "but for" test in its analysis, contrasting Section 541 with how cases have assessed 18 U.S.C. § 542[4] (not charged here).

The Government then continues on to argue that even if there was a "materiality" requirement under Section 541, it would require – by comparison with other statutes where

---

[4] Section 542, in pertinent part, provides for a fine or imprisonment for:

> Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties.

18 U.S.C. § 542.

materiality is required – only that the Government prove that any falsity *could have* influenced the decision to allow entry of the mosaic. The Government believes that Soo Hoo's testimony easily satisfies that standard. But it also takes the position that Soo Hoo's testimony is not the only evidence that would speak to materiality, citing testimony that Syrian antiquities were then-facing international scrutiny by way of the International Council of Museums' Red List and an Interpol alert due to the concern about looting of Syria's cultural heritage during the time in question. From all of this, it believes that "there was more than sufficient evidence from which a rational juror could have determined that the Mosaic would have received more scrutiny from law enforcement" had the disclosure of its actual value and character been revealed. *See* Docket No. 198, at 15:4-7. The Government sums up its response by arguing that Defendant "is not entitled to an acquittal simply because the government did not over-try its case-in-chief" in light of its decision not to call William Tarter as an expert witness on the question of how CBP scrutinizes the importation of antiquities. *See id.* at 15:8-21.

With respect to the no "materiality"/"but-for causation" contention in the Government's Opposition, Defendant's Reply enters into a multiple-page-long, detailed, close reading of Section 541, and reliance on the rule of lenity, in an attempt to convince the Court otherwise. At least part of this argument is that the word "upon" in Section 541 serves the same purpose as the repeated phrase "by means of" does in Section 542 (which, according to the Ninth Circuit, means a but-for causation materiality test), whereas – in Defendant's summation – the Government appears to be of the opinion that the word "upon" should be treated as if it reads "and," with the Government in effect rewriting the charged statute. Regarding the Government's attempt to argue that the "natural tendency" test applies instead of the materiality test applicable to Section 542, Defendant asserts this makes little sense, not least because the statutes where that test is applicable are much-broader and do not require that the false statement in question "bear[s] any nexus to a specific outcome," Docket No. 202, at 10:16-17, whereas Defendant describes Sections 541 and 542 as "prohibit[ing] certain false statements or representations that are made to Customs in order to achieve a specific outcome," *id.* at 10:21-23.

Whether or not it finds Defendant's current arguments regarding how to read Section 541 persuasive, the Court's first response to this is to feel somewhat bewildered that this apparent dispute between the parties was not resolved pre-trial. In any event, the Court ordered supplemental briefing in connection with Defendant's statutory interpretation argument. *See*

Docket No. 213.  Having now reviewed that briefing, *see* Docket Nos. 214-15, the Court agrees with the Government – Defendant is simply trying to read too much into the word "upon."  If "upon" in Section 541 were to mean the same thing as "by means of" in Section 542, why would Congress have used different language?  The Court is simply not convinced.  In the Court's view, Defendant's attempt to graft additional requirements onto that statute is not borne out by the statute's language.  The Court therefore has no need to resolve the parties' additional arguments regarding whether the Government actually satisfied any hypothetical materiality requirement.

In any event, Defendant responds to much of the evidence concerning additional CBP scrutiny by pointing out gaps in the reasoning which would be necessary to conclude that any of it would unquestionably lead to the mosaic being *barred entry*, contrasting the evidence here with the evidence that was before the Court in the Second Circuit's decision in *United States v. An Antique Platter of Gold*, 184 F.3d 131, 136 (2d Cir. 1999).  That Second Circuit decision, however, dealt with Section 542 of Title 18, not Section 541.  *See id.* at 134-35.  To the extent the Court would still be required to assess the sufficiency of Soo Hoo's testimony as to additional scrutiny notwithstanding the Court's agreement with how Section 541 operates, the Government does not confront Defendant's cases on "speculation" head-on, though it does note that, in the context of a Rule 29 motion, it is the jury alone that may, among other things, "draw reasonable inferences from proven facts."  *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977).

Soo Hoo testified that "[g]enerally" "artwork" is "scrutinized" in response to a question whether "declaring . . . an item or an antiquity is from Syria . . . would have resulted in extra scrutiny by customs."  *See* Docket No. 184, at 760:20-25.  The Court has to construe that evidence in the Government's favor on this motion.  The only question is whether it would be a "reasonable inference" for the jury to conclude that "extra scrutiny" would have precluded the mosaic's entry, or whether that conclusion should instead be characterized as "speculation."  The Court believes that the former designation fits.  The jury could have concluded that additional scrutiny Soo Hoo testified to would have led CBP to conclude that the mosaic was from Syria, and once such a conclusion was reached it would have likely precluded entry considering evidence regarding the state of concern about looting antiquities in Syria at the time.  *See, e.g.*, Docket No. 184, at 525:19-22, 598:8-16.

Defendant's first argument does not convince the Court that an acquittal is mandated here.

      2.  <u>Lack of Evidence that *Defendant* Effected Entry</u>

In support of this point, Defendant first argues that the Government dropped its aiding-and-abetting theory because there was no such instruction to the jury and nothing on the verdict form relating to such a theory, in aid of his ultimate assertion that his conviction cannot be upheld "on a legal or factual theory that was not presented at trial," Docket No. 195, at 12:7-8, meaning that a judgment of acquittal must be entered. As such, Defendant reasons that he must have been convicted of *directly* effecting entry, but there was no evidence in that regard because his customs broker filled out, and submitted, the customs forms.

The Government responds that it argued both that Defendant was directly liable and also liable under a "causing" theory. It specifies that the indictment alleged both direct liability and liability under 18 U.S.C. § 2(b),[5] *see* Docket No. 1, at 1:19, 1:23-26, which it notes is *colloquially* referred to sometimes as "aiding and abetting," but it never claimed Defendant had aided-and-abetted here. Instead, it asserts, he *caused* the commission of the crime by providing false information to his customs agent. The Government argues that it does not matter that there was no specific instruction regarding Section 2(b) (which, it contends, must have been an oversight, because the parties included one in their joint proposed jury instructions), because there was instruction as to *the Government's theory*. In sum, the Government believes that any rational juror could have found Defendant guilty for being directly liable or under the Government's causing theory (though it is difficult to discern where, in the Opposition, the Government explains the basis for Defendant's *direct* liability).

Defendant responds by asserting that "[i]t does not matter that the Indictment included a causing theory," "[o]r that the government actually proposed a jury instruction that encompassed its causing theory," "[o]r that the government argued in closing that it proved liability under a 'causing theory.'" Docket No. 202, at 16:24-28. The critical point, he says, is that the final jury instructions that were read to the jury did not include this causing theory. To Defendant, this means that the jury must have found that he *directly* effected entry, but that would be a finding not supported by the evidence.

However, Defendant is wrong, in a critical respect. The Court's Final Jury Instructions clearly referred to the Government's "causing" theory. *See* Docket No. 160, at pg. 2 of 7 ("The Indictment alleges that . . . Defendant . . . willfully caused the entry of goods, wares, and

---

[5] "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b).

merchandise . . . and caused to be claimed, that he was importing a shipment of a mosaic and other items valued at $2,199 . . . ."). Defendant states that "the causing theory was *not* included in the 'Instructions as to the Crime'" section of the jury instructions, Docket No. 202, at 17:4-5, but cites no case law indicating that any omission *at that particular point of the instructions* makes a difference. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").

This argument is based upon a false premise. It therefore fails.

### 3.   Lack of Evidence Regarding Deprivation of Revenue

Defendant notes that the Court already disagreed with his argument on this point and therefore did not include this element in its instructions to the jury. While he offers that he does not want to "belabor this point" as part of this motion, he does point out that there was no evidence of any loss of revenue to the United States because it is undisputed that Defendant owned no duties on the mosaic. The Government simply responds by noting the Court's prior rejection of this argument, *see* Docket Nos. 144-145, summing up its position by stating that "there is no statutory (or common sense) reason to require a loss of revenue" because "[d]oing so would immunize smugglers of antiquities from liability under Section 541." Docket No. 198, at 19:14-18.

In light of the Court's prior handling of this issue (which it finds no reason to second-guess or revisit), the Court will not discuss this argument further.

### 4.   Insufficient Evidence Regarding Causing False Classification of Quality

Here, Defendant argues that the errors on the customs form were his customs agent's fault, not his. Specifically, there was no evidence that anything Defendant did caused his customs broker to list Israel as the country of origin. He also asserts that the HTS classification code was determined not as a result of anything Defendant said or did, that the customs broker had sufficient information to qualify the mosaic as artwork, and that nothing prevented the agent from following-up on the topic if she had any questions about it.

One major problem with Defendant's argument on this point is that it does not take into account Defendant's role as to *value*. In Opposition, the Government lists what it terms "a plethora of evidence that the Mosaic was worth well over the false value" Defendant provided via the CBP documentation. *See* Docket No. 198, at 5:21-6:18.

With respect to Defendant's role in causing a misclassification as to *value*, a possible independent basis for his conviction, Defendant provides two reasons why he believes this does

not work.  He argues that the conviction *could have been* based on misclassification of quality, something that cannot be determined because of the general verdict, nor can it be determined whether some jurors voted for conviction on quality and some on value.  As noted *supra*, Footnote 3, however, Defendant's concern about this topic comes too late.  He also contends, that the Government's evidence on misclassification of value "was tainted by false testimony and prosecutorial misconduct," Docket No. 195, at 195, at 17:3-6, as set forth in his Rule 33 motion (though, as noted, *infra* at Footnote 9, his Rule 33 motion does not actually – or at least meaningfully – make an argument for prosecutorial misconduct), while not explaining how that impacts Rule 29's sufficiency-of-the-evidence and reasonable doubt analysis.  As the Court's discussion of Defendant's Rule 33 motion makes clear, even if the Court were to entirely discount – in the context of this motion – the value-related evidence concerning the October 2015 text messages that are the subject of the Rule 33 motion, that evidence was not remotely the only evidence bearing upon falsity of value.

Beyond the question of value, however, the Government also emphasizes what Defendant did *not* tell his customs broker – what he had paid for the mosaic, or that it was artwork or ancient. In addition, the Government argues that "quality" means more than country-of-origin and HTS Code, asserting that it also covers appearance, iconography, age, and Syrian provenance, and that Defendant misled his customs broker on all of these points.  It also asserts that Defendant caused a false classification by concealing from his customs broker that the mosaic was likely from Syria, and also deceived the broker as to HTS Code by sending her photographs of "very different, new mosaics (with much different iconography) and not telling her that the Mosaic was ancient." Docket No. 198, at 20:20-23.  The Government believes that the jury did, and the Court must (in the context of a Rule 29 motion), reject Defendant's "finger-pointing."

With respect to the Government's assertion that "quality" means something more than HTS code and country-of-origin, such as "appearance" or "iconography," Defendant notes that the relevant customs forms only contain fields for HTS Code and country-of-origin (at least so far as the Government's description of "quality" is concerned).  As to any possible concealment of Syria as the country-of-origin, Defendant notes that any such concealment still would not have caused Defendant's customs broker to list *Israel* in that regard.  With regard to HTS code, Defendant notes that the caption on the screen shot of the "Fish Pond" mosaic that he sent to his customs broker was "#mosaic #art."  Yet, the broker still did not classify the mosaics as art, but instead as

"ceramic, unglazed, tiles, cub." *See* Trial Exhibit 270, Docket No. 197-11, at pg. 4 of 22. As to that mistaken classification, Defendant asserts he played no role. Any questions the broker thereafter failed to ask Defendant were the result of the broker's initial mistaken decision in classifying the mosaic.

Putting aside the elephant in the room that is the question of value, the Court does not believe that it would have to rely upon the Government's expansive encapsulation of the concept of "quality" in order for it to conclude that the evidence, viewed in the favor of the Government in light of Defendant's conviction, properly could be interpreted as showing that Defendant played a role in falsely classifying the mosaic's quality. Evidence before the jury indicated that Defendant never provided his customs broker with an actual picture of the mosaic in question here. *See* Docket No. 185, at 849:22-850:5. That he used the hashtag "#art" in transmitting a different picture does not absolve him of his role, viewing the evidence in the Government's favor.

For the foregoing reasons, Defendant's fourth argument – and, indeed, his Rule 29 motion in its entirety – cannot succeed.

### B. Rule 33 Motion

Defendant's other motion seeks a new trial. Rule 33 of the Federal Rules of Criminal Procedure permits a court, upon a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires," requiring that any such motion that is "grounded on any reason other than newly discovered evidence" be filed within 14 days after the verdict or finding of guilty.[6] *See* Fed. R. Crim P. 33(a), (b)(2).

The burden of justifying a new trial rests with Defendant. *See United States v. Endicott*, 869 F.2d 452, 454 (9th Cir. 1989); *United States v. Steel*, 759 F.2d 706, 713 (9th Cir. 1985); *United States v. Katakis*, 252 F.Supp.3d 988, 992 (E.D. Cal. 2017); *United States v. Harmon*, 21 F.Supp.3d 1042, 1048 (N.D. Cal. 2014). In addition, a motion for new trial is directed to the *discretion* of the trial court judge. *See United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981); *Katakis*, 252 F.Supp.3d at 992; *Harmon*, 21 F.Supp.3d at 1048. Certain district courts have taken the approach that such motions are generally disfavored and should only be granted in exceptional cases. *See Katakis*, 252 F.Supp.3d at 992; *United States v. Capati*, 980 F.Supp. 1114, 1132 (S.D. Cal. 1997). At the same time, "'[a] district court's power to grant a motion for a new trial is much

---

[6] *See* Footnote 2, *supra*.

broader than its power to grant a motion for judgment of acquittal.'" *United States v. Felix*, 76 F.Supp.3d 984, 990 (N.D. Cal. 2014) (quoting *United States v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992)); *see also United States v. Andrade*, 993 F.Supp.2d 1269, 1280 (D. Nev. 2014).

Defendant's motion for a new trial under Rule 33 is based on testimony given by prosecution witness and case agent Razmik Madoyan ("Madoyan") regarding the value of the mosaic as compared to the $2,199 value reflected on the invoice that Defendant provided to his customs broker (and thereon to CBP), and the prosecution's reliance on that testimony in its closing argument. Defendant argues that Madoyan testified certain text messages between Defendant and Belal AlJrad[7] ("AlJrad") reflected both that Defendant actually paid $12,000 to Ahmet Bostanci ("Bostanci") for the mosaic in question in this case, and that Defendant structured two payments so as to *hide* the fact that he had paid $12,000. Defendant's theory is that the text messages, understood in their clear context (which Madoyan and the prosecution either knew and understood, or should have known and understood), reflect that the $12,000 payment covered by Madoyan's testimony was *not* for the mosaic at issue here, but was for something else entirely.

1. Principles Concerning False Evidence Generally and in the Context of a New Trial Motion

"One of the bedrock principles of our democracy, 'implicit in any concept of ordered liberty,' is that the State may not use false evidence to obtain a criminal conviction." *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (*en banc*) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Similarly, "[t]he Supreme Court has repeatedly acknowledged that the introduction of false testimony is corrosive to the 'truth-seeking function' of our adversarial system." *Dickey v. Davis*, 69 F.4th 624, 636 (9th Cir. 2023) (quoting *United States v. Agurs*, 427 U.S. 97, 103-04, 103 n.8 (1976)). Thus, "[d]ue process protects defendants against the knowing use of any false evidence by the State, whether it be by document, testimony, or any other form of admissible evidence." *Hayes*, 399 F.3d at 981. As a result, "'a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.'" *Id.* at 978 (quoting *Napue*, 360 U.S. at 269).

"A claim under *Napue* will succeed when '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material.'" *Jackson v. Brown*, 513 F.3d 1057, 1071-72 (9th Cir. 2008)

---

[7] The Court employs the spelling of this name as presented in Defendant's briefing and the trial transcripts.

(quoting *Hayes*, 399 F.3d at 984); *see also Dickey*, 69 F.4th at 636.  "In addition, the state violates a criminal defendant's right to due process of law when, although not soliciting false evidence, it allows false evidence to go uncorrected when it appears."  *Hayes*, 399 F.3d at 978; *see also Soto v. Ryan*, 760 F.3d 947, 968 (9th Cir. 2014) ("[T]he state has a constitutional duty to correct false testimony given by its witnesses, even when the defense knows the testimony was false but does nothing to point out such falsity to the jury or judge.").  Even a "false impression" created by presentation of evidence can be sufficient for such a claim.  *See Alcorta v. State of Texas*, 355 U.S. 28 (1957) (indicating that "false impression" created by witness's testimony – notwithstanding prosecutor's actual knowledge of true facts – that avoided both impeachment of witness's credibility and corroborative effect of truthful testimony was sufficient to conclude habeas petitioner was not accorded due process of law); *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019); *Soto*, 760 F.3d at 958.[8]  As the Government itself appears to concede, *see* Docket No. 199, at 7:23-25, a *Napue*-based argument is a potentially-appropriate one for a new trial under Rule 33(a).[9]  *See, e.g.*, *Giglio v. United States*, 405 U.S. 150, 151, 155 (1972); *United States v. Butler*, 567 F.2d 885, 886-91 (9th Cir. 1978); *United States v. O'Keefe*, 128 F.3d 885, 893-99 (5th Cir. 1997) (rejecting *Napue* argument, but without asserting that it was improper one for new trial-consideration under Rule 33, ultimately concluding that "[t]aking away the finding of a violation of *Napue*, we are unable to conclude that the remaining grounds for grant of new trial meet our

---

[8] As the above text demonstrates, the Government's contention that Defendant has to establish that the Government "knowingly elicit[ed] false or perjured testimony" in order prevail on his motion, *see* Docket No. 199, at 1:12-14, is simply not correct.

[9] While Defendant also observes that prosecutorial misconduct can provide a basis for a Rule 33 motion, he does not actually base his motion on that type of wrong (at least outside the context of a *Napue*-based claim).  His only attempt in his opening brief to make an argument sounding in prosecutorial misconduct that is in any possible way distinguishable from his *Napue*-based argument is the following single sentence:  "The government's continued use of Agent Madoyan's false testimony about the text messages is additional misconduct that supports granting a Rule 33 motion for a new trial."  Docket No. 196, at 22:23-25.  This contention clearly overlaps with Defendant's *Napue* claim, and given the lack of further development of the point (from a prosecutorial misconduct standpoint) in his opening brief, Defendant has not made a sufficiently-detailed argument that presents the Court with independent grounds for it to consider or resolve.  Waiting until a Reply brief to potentially further develop that argument, *see* Docket No. 203, at 15:5-10, is improper, and any attempt to rely thereby on a "harmless error" standard is inappropriate for still further reasons:  There is no separate harmless error analysis where the Supreme Court has declared a materiality standard, because "the required finding of materiality necessarily compels the conclusion that the error was not harmless."  *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (*en banc*); *see also id.* at 985 ("The materiality analysis is complete in itself; there is no need for a separate harmless error review."); *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013) (describing *Napue* materiality standard as "in effect, a form of harmless error review").

past standards for grant of new trial or would be in the 'interests of justice'"); *United States v. Wall*, 389 F.3d 457, 472-73 (5th Cir. 2004); *United States v. Smith*, No. 3:16-cr-00086-SLG, 2022 WL 17986642, *2 (D. Alaska Dec. 29, 2022); *United States v. Shayota*, No. 15-CR-00264-LHK, 2017 WL 1861889, *9, 25-30 (N.D. Cal. May 9, 2017); *United States v. Low*, Cr. No. 06-00323 ACK, 2006 WL 3734173, *2, 11-14 (D. Haw. Dec. 15, 2006).

The Ninth Circuit has at times stated that "'if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.'" *Hayes*, 399 F.3d at 978 (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991)) (omitting internal quotation marks); *see also United States v. Rodriguez*, 766 F.3d 970, 990 (9th Cir. 2014); *Sivak v. Hardison*, 658 F.3d 898, 912 (9th Cir. 2011); *United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011); *Jackson*, 513 F.3d at 1076. However, that authority often simultaneously comes with caution that "'*Napue* does not create a per se rule of reversal.'" *See Panah*, 935 F.3d at 664; *Sivak*, 658 F.3d at 912 (quoting *Jackson*, 513 F.3d at 1076); *Jackson*, 513 F.3d at 1076. Defendant acknowledges this limitation in the principle. *See* Docket No. 196, at 23:3-4. In addition, the Ninth Circuit has criticized a litigant for taking the "virtually automatic" language "out of context," emphasizing that "[t]here is no rule of automatic reversal." *Morris v. Ylst*, 447 F.3d 735, 745 (9th Cir. 2006); *see also Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013) (noting that "the government's knowing use of false testimony does not automatically require reversal"); *Hayes*, 399 F.3d at 989-90 (Tallman, J., concurring in part and dissenting in part). Thus, notwithstanding the "virtually automatic" reversal language, the elements for a *Napue* claim would appear to at least suggest that such an error only requires reversal (or a new trial, presumably) where the violation was "material." *See Jackson*, 513 F.3d at 1075-76; *Hayes*, 399 F.3d at 984.

The Ninth Circuit has also recently instructed that the "materiality inquiry examines the 'cumulative effect' of all false and misleading evidence and testimony presented at trial, as well as the effect of the prosecutor's hypothetical correction of the false testimony in front of the jury." *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 830 (9th Cir. Feb. 28, 2024) (omitting internal citation). Ultimately, "[t]he fundamental question in the materiality analysis is whether, despite the prosecution's errors, the defendant 'received . . . a trial resulting in a verdict worthy of confidence.'" *Jackson*, 513 F.3d at 1076 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)); *see also Hayes*, 399 F.3d at 984 ("Under this materiality standard, '[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'") (quoting *Hall v. Dir. of Corr.*, 343 F.3d 976, 983-84 (9th Cir. 2003) (omitting internal quotation marks).  Defendant is clearly correct that a "would have" changed the verdict standard does not apply, but instead merely a "could have" changed the verdict standard.  In other words, "[i]n assessing materiality under *Napue*, we determine whether there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury;' if so, then 'the conviction must be set aside.'"  *Hayes*, 399 F.3d at 984 (quoting *Belmontes v. Woodford*, 350 F.3d 861, 881 (9th Cir. 2003), *vacated by Brown v. Belmontes*, 544 U.S. 945 (2005)) (omitting internal quotation marks); *see also Jackson*, 513 F.3d at 1076 (emphasizing "any" and "could"); *Dickey*, 69 F.4th at 636 (same).  Thus, "*Napue*'s materiality standard is considerably less demanding than the standard for *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] claims . . . 'not just because [*Napue* cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process.'"  *Dickey*, 69 F.4th at 637 (quoting *Agurs*, 427 U.S. at 104).

## 2.   The First Two *Napue* Elements:  Falsity and Knowledge

Unless it is wrong in its conclusion that *Napue*'s materiality element actually matters (contrary to the "virtually automatic" reversal case law referenced *supra*), the Court believes that the real question on this motion will be the materiality of the testimony and evidence in question.  As to the other elements of a *Napue*-based claim, the Court is inclined to agree with Defendant.  A brief summary of Defendant's argument, followed by a recitation of the material the Government collected from Defendant, and then the limited portion of that material it introduced at trial, helps explain this conclusion.

Madoyan testified as to the meaning of text messages between Defendant and AlJrad on October 15 and October 19, 2015.  However, as Defendant argues in this motion, the *surrounding* text messages (which were *not* admitted into evidence) strongly suggest (in the Government's own rough translation of them) that Defendant and AlJrad were discussing:  the shipment of, and payment for, two *different* mosaics – mosaics that were still in Turkey at the time of the text messages, whereas the mosaic in question in this prosecution had already arrived in this country two months earlier, *see* Docket No. 182, at 224:17-225:8, and whose description (both in terms of size and depictions) differed from the mosaic at issue in this case, *see id.* at 229:1-6 and Trial Exhibit 48 (Docket No. 197-6); Defendant securing $12,000 (below a requested $15,000) to help

pay for the shipment of these two mosaics; and that the reason for the two-payment structure (first $2,199 and then $12,000) discussed in the Government's selected text messages was at AlJrad's instruction and because Defendant's bank would not transfer funds without an invoice, while Defendant only had an invoice for $2,199 at the time he made the first transfer.

Stepping back from that summary, the Court's review of the discovery and evidence related to this point reveals the following:

a.   The Texts, in Discovery and at Trial

In discovery, the Government produced an "extraction report" from Defendant's cell phone containing, among other things, text messages recovered from that phone, largely in Arabic, which the Government provided to Defendant along with a rough English translation of the text messages. *See* Declaration of Isabel Bussarakum in Support of Mohamad Alcharihi's Motions for Judgment of Acquittal and New Trial Under Federal Rules of Criminal Procedure 29 and 33 ("Bussarakum Decl."), Docket No. 197, ¶¶ 3-5.   That rough translation reflected the following text communications (among others) between Defendant and AlJrad.

First, an October 2, 2015 text message from AlJrad references "two panels/pictures" that "are now in Turkey," with the first being "the Arch 180*450," while the second "has three people 215*215 cm."  *See* Docket No. 197-1, at pg. 2 of 4.   That message further indicates that AlJrad was planning on taking money from an earlier auction to pay for shipping which "won't cost less than $35,000," adding that he has some money and borrowed some but "still needs 15,000" and asks Defendant if he "can borrow that from a friend until 16/11/2015."  *Id.*   Defendant responds by telling AlJrad "to go ahead and hopefully they will be able to secure the whole amount."  *Id.*

On October 11, 2015, Defendant texted AlJrad, telling him that "he was able to secure 12 thousand" and would wire it "to the account of a commercial company in Turkey."  *Id.*, at pg. 3 of 4.   Just over two hours later, AlJrad responded "that their agreement was for 15,000 plus the transfer of the invoice amount to Ahmad Bostanci, which means the total is about 17,000 and some."  *Id.*  With respect to transferring funds to "a commercial company," AlJrad noted that this would cause AlJrad "to pay 1500 taxes," and – after referencing a certain individual's "personal account" – that they could issue Defendant "an invoice and that way they won't pay anything."  *Id.*  A few minutes later, Defendant texted "that he was able to get 15,000 only" and "that if he transfers the money to a personal account, he could go to prison."  *Id.*  He asked AlJrad "to arrange with al-Bostanci; it is safer and better."  *Id.*

14

Two days later, AlJrad texted Defendant indicating that "they need to transfer to Bostanci the amount of the bill only" and that he would send to Defendant "the name of [a company] where he can transfer the 12,000." *Id.* AlJrad further explained "that this way they can have control over Ahmad and the money won't go into his account." *Id.* Defendant responded "that the total amount he borrowed is $12,000 and that he has $1,000 from before and that he will transfer $2100 to Bostanci and will have 11,000 remaining," with AlJrad then replying that "he would still be short $3,000." *Id.*

Then, on October 15, 2015, AlJrad texted Defendant saying

that they need the first transfer done and then a second one for $12,000 which is better and more secure and they can issue legal invoices; but there is another problem when money comes from the US to Turkey, there is a problem and a business owner they approached did not want to do it out of fear.

*Id.* On October 18, AlJrad texted Defendant to tell him "that Ahmad is awaiting the transfer for sure by tomorrow in order to facilitate their work and bring the stuff from the museum," leading Defendant to ask AlJrad for "the Bank Account Number and the SWIFT," and AlJrad to note that "they appear on the invoice but will send them again." *Id.*

The next day, October 19, Defendant texts AlJrad that "the bill amount is 2199.23," and that this amount had been transferred, asking AlJrad "to tell him when he would like him to transfer the 12000." *Id.* at pg. 4 of 4. AlJrad responds "to do it today at the same time" and tells Defendant "that he has been telling [Defendant] to do both at the same time and that Ahmad Bostanci does not move a finger if he doesn't see the money in his account." *Id.* Defendant responded "that the bank wanted a copy of the invoice for the transfer and he had a copy of the invoice for the vases so he gave them that one for the transfer," that he could not find in his emails "an invoice for 12000," and thus asked AlJrad "to send him one and tomorrow at 9 AM he will do the transfer." *Id.* AlJrad responded "that he just sent him an invoice on his email." *Id.*

At trial, the Government introduced exhibits of *two* of these text messages (with updated translations), Trial Exhibits 271-DD and 271-FF. *See* Bussarakum Decl., ¶ 8; Docket Nos. 197-12, 197-13. First, it introduced AlJrad's October 15, 2015, text message, freshly-translated as follows:

We need to transfer the amount on the initial invoice for the time being. Then, make another transfer for 12,000 dollars; that is better and safer because we have the ability to make you legitimate invoices for the amount. Here also, there is a

problem, the owner of the company refuses to receive money that comes from America to Turkey, and it concerns him.

Docket No. 197-12 (omitting emphasis).  Next, the Government introduced the back-and-forth texts from October 19, 2015.  In pertinent part, the new translation of those texts reflected the following communications:

> Defendant:  . . . The invoice is for 2199.23.
>
> Defendant:  The amount of the invoice is transferred.  I am waiting to make the transfer of the 12,000, tell me when I should make the transfer.
>
> AlJrad:  Today man!  Didn't I tell you to make the two transfers at the same time?  I swear you made me look bad.  Since we talked I told you to make the two transfers together.  I mean, Ahmad Bostanci wouldn't do anything if he doesn't see the money in his account.  I mean, seriously, I don't know what to tell you.  I seek God's help!  Man!  If a person turns out to be a liar among these people, it would be over for him; even if he has 100 million dollars, it wouldn't matter.  I told him, "You'll have copies of the transfers in the morning."
>
> Defendant:  It is not worth all this anger, the bank needs a copy of the invoice in order to approve the transfer and I have the invoice for the vases; I gave it to them in order to complete the process of the transfer.  I checked all the emails and did not find an invoice for 12,000 from you.  Make me an invoice for 12,000 and I will make you the transfer by 9 am.  There are restrictions on the transfers and you know.
>
> AlJrad:  It is in your inbox . . . the invoice.

Docket No. 197-13 (omitting emphases).  Each of these exhibits were redacted so as to remove other material appearing on the pages in question.  *See* Docket Nos. 197-12, 197-13.  The Government did not introduce any of the other text communications between Defendant and AlJrad that the Court has quoted above from the texts the Government produced during discovery.

### b.  Madoyan's Testimony

The Government introduced Exhibits 271-DD and 271-FF into evidence, and then began to question Madoyan about them.  *See* Docket No. 183, at 325:2-23.  The Government began with Exhibit 271-DD; got Madoyan to establish that it reflected a text message from October 15, 2015; and then asked Madoyan: "So, again, the mosaic enters in August of 2015, and now we're a few months after in October of 2015?," to which Madoyan responded "Yes."  *Id.* at 326:6-15.  After establishing that the texts reflected, and corresponded with, two separate wires of $2,199 and $12,000, the Government then asked Madoyan "Do you know why there were two wires?"  *Id.* at 326:16-24, 327:9.  Madoyan responded "Yes," and explained that the reason was "[b]ecause [Defendant] and . . . AlJrad wanted to separate those two dollar amounts, the 12,000 from the

2,199." *Id.* at 327:9-13.  Madoyan later testified that "several text messages" corroborated "[t]he $12,000 figure in around October of 2015." *Id.* at 341:12-21.  Madoyan also testified that, in a recorded interview of Defendant conducted in March 2016, Defendant admitted that he had paid at least $12,000 for the shipment including the mosaic involved in this case, and that one document that corroborates that figure was the "text communications." *Id.* at 348:25-349:22.

c.  <u>Falsity and Knowledge</u>

Defendant asserts that "Agent Madoyan's testimony that the text messages corroborate a $12,000 payment for the mosaic was false." Docket No. 196, at 16:24-25.  There is unquestionably a basis to believe that the Government – both the prosecution team, specifically, and Madoyan – knew or should have known about the contents of the texts reflected in the Government-produced "extraction report" given, at the very least, both the amount of time they had them in their possession and Madoyan's admissions on cross-examination that he reviewed them.  Although the Court understands the Government's responses to Defendant's particular arguments regarding what, in terms of knowledge, the Government's redaction practices in preparing its trial exhibits and evidentiary objections during Defendant's cross-examination of Madoyan at trial signify, *see* Docket No. 199, at 14:21-15:24, 16:26-17:11, 17:19-21, this does not change the fact that both the Government, and Madoyan specifically, had all of the surrounding text messages in front of them when the Government decided which text messages to introduce into evidence and to emphasize as evidence demonstrating Defendant's payment of a figure far higher than the one he reported to his customs broker and – via his customs broker – to CBP.

The Government disputes that Madoyan's testimony was false, in part by asserting that it "showed that the defendant and his co-conspirator were messaging about wire transactions and invoices around the same time that bank records reflect the movement of funds." Docket No. 199, at 1:9-11; *see also id.* at 10:17-20 ("Madoyan testified that the text messages showed defendant discussing the wiring of funds, and that the amounts corresponded to the defendant's bank records."); *id.* at 19:5-8 ("[T]he two exhibits merely corroborated the fact that defendant wired funds to the seller of the Mosaic in an amount matching his admissions, sales contracts, and wire transfers.").  But if that was all Madoyan was attempting to say, it would have been irrelevant.  It was only made relevant because the Government was attempting to tie the text messages to wire transactions, invoices and the movement of funds *for the mosaic in question in this case.*

17

Moreover, the Government's questioning of Madoyan on this point was clearly directed at demonstrating both that the $12,000 payment was for the mosaic in question in this case and that the two-payment structure was an intent to hide that payment/valuation. The Government's closing argument – quoted in the next paragraph and further *infra* – makes this abundantly clear. In other words, the Government was not simply attempting to prove Defendant and AlJrad "were messaging about wire transactions and invoices around the same time that bank records reflect the movement of funds."

The Government also takes the position that "just because the defense disagrees with . . . Madoyan's *opinion* does not mean that . . . Madoyan was not truthful, and hardly proves that his statement was 'actually false.'" Docket No. 199, at 11:21-23 (emphasis added). In response, Defendant posits simply that the text message exhibits "are not subject to interpretation," and are "unambiguous and not subject to interpretation or opinion evidence." Docket No. 203, at 4:15-16, 4:24-25. As Defendant responds further, no part of Madoyan's testimony is presented as "opinion" testimony, or as testimony that he "thinks" "in his view" that the text messages concerned the mosaic at issue here. Certainly the Government never displayed any uncertainty or "wiggle room" in that regard. And, as Defendant makes clear, the Government left no doubt about its theory in its closing argument, asserting that the two-payment structure reflected in the exhibits that were the subject of Madoyan's testimony were "part of a cover up. Defendant needed one payment to match the false number, $2,199, and then he needed to make a second payment for what he really owed Bostanci, the $12,000 that he agreed to pay Bostanci for the mosaic." Docket No. 185, at 970:10-16. A few moments later, the Government again summed up its position: "Again, so the one initial payment to match the fake invoice, and then a second payment for the 12 grand that defendant agreed in the contract with Bostanci to pay for the ancient mosaic." *Id.* at 971:6-9.

The Government also cites *United States v. Fujinaga*, Nos. 18-10222, 21-10155, 2022 WL 671018, at *2 (9th Cir. Mar. 7, 2022), for the proposition that "[m]istaken, inaccurate, or rebuttable testimony does not give rise to a *Napue* claim." Docket No. 199, at 8:7-9. *Fujinaga* is an unpublished Memorandum disposition, and therefore not precedential. *See* Ninth Cir. R. 36-3(a).[10]

However, *Fujinaga* drew its rule from *Henry v. Ryan*, 720 F.3d 1073 (9th Cir. 2013), a published/precedential Ninth Circuit decision. *Henry* used the language *Fujinaga* focused on to

---

[10] The same is true of *United States v. Kabov*, No. 19-50083, 2023 WL 4585957 (9th Cir. July 18, 2023), which Defendant relies upon in his Reply brief.

distinguish such accounts from where a witness "knowingly provide[s] false testimony." *Id.* at 1084 ("Although Henry has provided evidence rebutting Patterson's version of the facts, he has provided no evidence that Patterson *knew* his testimony was inaccurate at the time he presented it, rather than Patterson's recollection merely being mistaken, inaccurate or rebuttable."). In *Henry*, the testimony in question concerned a detective's account that footprints at a crime scene were his, leading the prosecution to argue that other footprints at the scene must have been the criminal defendant's. *See id.* at 1083-84. The Ninth Circuit agreed with the district court that the situation did not present a viable *Napue* claim, explaining that "Henry's conclusory assertion that, because [the detective] must have known where he stepped while investigating the crime scene, any testimony inconsistent with the truth must be not only inaccurate but also perjured does not constitute evidence sufficient to make out a *Napue* claim." *Id.* at 1084.

The Court does not quite understand why the fact that certain evidence is "rebuttable" would necessarily mean that it is not false within the meaning of *Napue*. Obviously, where the dividing line is between "inaccurate" and "false" may be difficult to determine in certain cases. The Court does not believe that it is here, however, given the Government's and Madoyan's access to, and obvious review of, the text messages surrounding those the Government introduced into evidence. *See Jackson*, 513 F.3d at 1075 ("If the prosecutor has a duty to investigate and disclose favorable evidence known only to the police, he 'should know' when a witness testifies falsely about such evidence."); *id.* ("*Napue* and *Giglio* make perfectly clear that the constitutional prohibition on the 'knowing' use of perjured testimony applies when *any* of the State's representatives would know the testimony was false."). At the absolute very least, the Court would conclude that a "false impression" was conveyed via exhibits Exhibits 271-DD and 271-FF and Madoyan's direct examination testimony about them.

For these reasons, the Court is comfortable concluding that Defendant can satisfactorily demonstrate the first two required *Napue* elements. Thus – again, unless the Court is wrong in its conclusion that the materiality element actually matters (contrary to the "virtually automatic" reversal case law referenced *supra*) – the success of this motion would appear to come down to materiality.

### 3.   Materiality

As to the final element of such a claim, Defendant first argues that the standard for materiality on a *Napue*-based claim is not particularly exacting. He then asserts that Madoyan's

testimony was material "because it went to the heart of the government's theory regarding false classification of value." Docket No. 196, at 23:14-16. He believes that a materiality finding is also bolstered by the Government's reliance on Madoyan's testimony in its closing argument.

To jump to the end-point the Government reaches on this topic, the Government closes its Opposition by asserting that "[t]he brief testimony [from Madoyan] was immaterial in the face of defendant's own admissions and the overwhelming evidence of his lies and deception." Docket No. 199, at 22:4-6. This approach appears consistent with Ninth Circuit case law examining the materiality question. *See Phillips v. Ornoski*, 673 F.3d 1168, 1190-92 (9th Cir. 2012) (rejecting materiality finding after reviewing other evidence of guilt); *Morris*, 447 F.3d at 743 ("We conclude . . . that Petitioner suffered no prejudice [from possible *Napue* violation] because the witness' testimony was thoroughly discredited at trial and there was independent, compelling evidence of Petitioner's guilt."); *cf. Dickey*, 69 F.4th at 646 (rejecting habeas petitioner's guilt-phase *Napue* claims – under applicable AEDPA review standards – after considering other, non-false, evidence linking petitioner to participation in robbery and burglary, including evidence that corroborated false-testifier's testimony on that point).

The Government's summary in this regard distills the emphasis in its Opposition on the other evidence supporting a conclusion that the specific amount for the mosaic that Defendant reported to CBP – $587, *see* Docket No. 199, at 4:4-7 (citing Trial Exhibit 9) – did *not* faithfully reflect the value of the mosaic. Among other things, it points to: other communications between Defendant and AlJrad, *see* Docket No. 182, at 227:4-229:20; a sales contract between Defendant and Bostanci showing an agreement to pay approximately $12,000-$13,000, including shipping, *see* Trial Exhibits 105 (Docket No. 205-2), 146 (Docket No. 205-3), and Docket No. 183, at 329:5-335:2; Defendant's admission that he paid $12,000 total for the importation containing the mosaic in question, *see* Trial Exhibit 489 (lodged as Docket No. 204) and Docket No. 183, at 349:11-350:21; evidence that Defendant paid a mosaic restorer approximately $40,000 to restore the mosaic in question, *see* Docket No. 184, at 660:3-11; and an email from an antiquities dealer suggesting that the mosaic could be worth between $100,000 and $200,000, *see* Docket No. 182, at 237:3-240:22.

The Government is thus correct that there unquestionably was other evidence introduced in this case that the valuation Defendant provided to his customs broker, and that his customs

broker then forwarded on to CBP, was *not* the value of the mosaic.[11]  The Court cannot ignore this other under-valuation evidence in making its materiality determination.  *See Alahmedalabdaloklah*, 94 F.4th at 832 ("Moreover, Al-Dhari's testimony was substantially corroborated by other evidence in the record; that is the most important consideration in our overall materiality analysis for the *Napue* claims."); *Dickey*, 69 F.4th at 646 ("Because Buchanan was not the sole witness who provided critical evidence that Dickey confessed to Goldman that he aided and abetted the robbery and burglary, the California Supreme Court did not unreasonably determine that there was no reasonable likelihood the prosecution's *Napue* and *Brady* violations could have changed the jury's guilty verdicts."); *Blumberg v. Garcia*, 687 F.Supp.2d 1074, 1115 (C.D. Cal. 2010) ("As *Napue* and its progeny make clear, whether the materiality standard is met depends on the intended and actual use of the false evidence, and whether that evidence was otherwise corroborated, or effectively impeached, by non-tainted evidence such that it is not reasonably likely that the false evidence could have affected the jury's judgment."); *compare Dow*, 729 F.3d at 1049-50 (finding *Napue* materiality standard met under *de novo* review where "[t]he evidence against [the petitioner] was weak and the prosecutor's arguments undoubtedly had an effect on the jury's decision" and petitioner's case was "a close one" and "a weak one"); *Hall*, 343 F.3d at 984 (ordering issuance of writ of habeas corpus, unless retried, because of lack of evidence – other than false evidence and "curious and largely uncorroborated confession" – connecting defendant to body or alley in which it was found).

In responding to the other evidence relevant to the question of valuation, Defendant notes, on the topic of his "admissions," that he indicated that "*all together* they came to $12,000." Defendant also provides reasons in his Reply why the sales contract evidence might have been viewed as doubtful, asserting that the sales contract was a "fake" "created to help sell the mosaic, not to deceive customs."  Docket No. 203, at 18:5-9.  There is, of course, no jury finding on whether or not the sales contract was "fake."  In any event, if these were the *only* other pieces of evidence tending to demonstrate Defendant's under-valuation of the mosaic in question, Defendant's response might be somewhat persuasive.  But, as recounted above, they are not.

---

[11] While the Government asserts that this evidence "corroborates" Madoyan's testimony for purposes of demonstrating that Madoyan's testimony was not false, *see, e.g.*, Docket No. 199, at 8:22-23, the Court disagrees. The other evidence the Government relies upon might assist in establishing Defendant's under-valuation, but for reasons explained above, Madoyan's testimony about the text message exhibits does not.  There is no *corroboration* here because Madoyan's testimony, and the text message exhibits he testified about, did not appear to concern the mosaic in question in this case.

Of course, as Defendant notes in his Reply, "[u]nlike the bank statement reflecting the $12,000 wire, or the sales contract showing a supposed $12,000 purchase price, the text messages were a supposed window into [Defendant's] state of mind and intent at the time the $12,000 was wired.  The government had no other evidence like that."  Docket No. 203, at 15:17-20 (omitting internal citations); *see also id.* at 3:3-10 (arguing that Madoyan testified "that those messages corroborated the government's exact theory of proof" and "addressed a key element of the offense, which is whether there was a false classification of the mosaic's value," but the exhibits and Madoyan's testimony about them "were not cumulative of other reliable evidence"); *id.* at 16:13-14 ("Agent Madoyan's testimony directly addressed an element of the offense, the false classification of value, and thus, was clearly material.").  While that may be true, the question is whether this intent evidence mattered all that much.  Clearly it is accurate to say that, at the very least, it mattered to *the story* the Government told (*i.e.*, the "theory of proof").  But beyond the Government's attempt to craft an understandable "story," Defendant has not explained why a "window into [Defendant's] state of mind and intent *at the time the $12,000 was wired*," Docket No. 203, at 15:18-20 (emphasis added), even matters.  Section 541 does use the term "knowingly," but it refers to the time of the "entry" of the good in question, not any later time when associated payments to sellers are arranged or completed.

Defendant is also correct that falsity need not relate to an actual element of the crime charged in order for materiality to be satisfied, because it can relate merely to a witness's credibility.  *See Giglio*, 405 U.S. at 154-55.  But Madoyan's credibility was not at issue in the trial either.  Ultimately, whether or not Defendant was attempting to hide evidence of any payment to Bostanci, the Government is correct that the actual question before the jury was whether Defendant falsely classified the quality or value of the mosaic, and there was certainly evidence – wholly ignoring Madoyan's testimony about the October 15 and 19 text messages – supporting a jury finding that Defendant did.  In other words, while Madoyan's testimony and the Government's exhibits may have "directly addressed" the "key element" of "false classification of the mosaic's value," it certainly was not the only evidence to have done so.

Beyond the other evidence on the question of Defendant's false valuation, as the Government also argues, nothing prevented Defendant from cross-examining Madoyan on his testimony, and in fact Defendant did so, as Defendant's motion admits.  *See, e.g.*, Docket No. 184, at 505:1-510:2.  Of course, without the other surrounding text messages *actually in evidence*, one

might reasonably wonder whether such cross-examination was maximally effective.   Still, Defendant could have called AlJrad to testify.   In fact, as the Government points out, Defendant planned to call AlJrad, and the Government went to significant lengths to ensure AlJrad's availability to testify, only to have Defendant elect not to call AlJrad.

In Reply, without citation to authority in support of the point, Defendant argues that "the government's ethical duty [is not] satisfied if defense counsel has an opportunity to correct false testimony on cross examination."   Docket No. 203, at 14:11-13.   Whether or not that contention about "ethical duties" is correct,[12] there are cases that have commented upon a defendant's ability to cross-examine witnesses, and present his own theory of the case, as part of a court's assessment of falsity/materiality.   *See O'Keefe*, 128 F.3d at 894 ("Not all falsehoods are material partially because of our concern with preserving the adversarial system:  it is the prerogative of defense counsel to plan his or her cross-examination strategy, and undue clarification or interruption by the prosecution might interfere with that strategy.   Thus, courts have been extremely reluctant to find a deprivation of due process when the prosecution has provided the defense with the necessary information and it can utilize the information, but decides, for tactical reasons, not to use such information."); *Katakis*, 252 F.Supp.2d at 997 ("Nor has Katakis shown that the outcome of trial would have been different without the government's statements, as Katakis' theory that he was an innocent party swindled by the real conspirators was asserted by his counsel at trial, including through examination of multiple witnesses on the financial dealings between the co-conspirators."); *cf. Henry*, 720 F.3d at 184 (indicating that mere fact that witness's testimony is rebuttable does not equate to testimony being knowingly false).   Some have done so in *dicta*.   *See, e.g., Houston*, 648 F.3d at 814-15.

Still, as the Fifth Circuit commented in *O'Keefe*, "even when the defense is aware of the falsity of the testimony, a deprivation of due process may result when the information has been provided to the defense but the government reinforces the falsehood by capitalizing on it in its

---

[12] At the very least, *Soto v. Ryan*, 760 F.3d 947 (9th Cir. 2014), appears to support Defendant's point.   *See id.* at 968 ("[T]he state has a constitutional duty to correct false testimony given by its witnesses, even when the defense knows the testimony was false but does nothing to point out such falsity to the jury or judge."); *id.* at 968 n.11 ("As this Court has stated, '[i]t is irrelevant whether the defense knew about the false testimony and failed to object or cross-examine the witness, because defendants c[an]not waive the freestanding ethical and constitutional obligation of the prosecutor as a representative of the government to protect the integrity of the court and the criminal justice system.'") (omitting internal quotation marks) (quoting *Sivak v. Hardison*, 658 F.3d 898, 909 (9th Cir. 2011)); *see also Dickey v. Davis*, 69 F.4th 624, 639 n.8 (9th Cir. 2023); *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000).

closing argument." *Id.* at 894-95.  The Government certainly did that here.  Specifically, it told the jury during closing that Defendant had to pay Bostanci for the mosaic in question in this case, but also told the jury that "the payments can get a little confusing" and that they were "confusing because [D]efendant wanted them to be confusing.  This was part of a cover up."  Docket No. 185, at 970:5-13.  The Government continued on:

> Defendant needed one payment to match the false number, $2,199, and then he needed to make a second payment for what he really owed Bostanci, the $12,000 that he agreed to pay Bostanci for the mosaic.  So, he had to make two payments.  One to kind of go along with the fake invoice for 2199, and then the second payment for the 12 grand that he really owed to Bostanci.

*Id.* at 970:13-19.  The Government then immediately gave, as "an example," the October 15 and October 19, 2015, text messages.  *See id.* at 970:20-971:5.  The Government summed up its view, arguing:  "Again, so the one initial payment to match the fake invoice, and then a second payment for the 12 grand that defendant agreed in the contract with Bostanci to pay for the ancient mosaic." *Id.* 971:6-9.

"While a prosecutor may ask the jury to draw inferences from the evidence that he or she believes in good faith might be true, the court may grant a new trial where the government 'propound[s] inferences that it knows to be false, or has very strong reason to doubt.'"  *Katakis*, 252 F.Supp.3d at 996 (quoting *United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002)).  Here, the Government re-emphasized a factual proposition that the Court would be hard-pressed to describe even as "dubious" given the contents of the texts surrounding the October 15 and October 19 texts.  At the very least, *O'Keefe* suggests that this weakens any attempt by the Government to rely on Defendant's ability to cross-examine, and actual cross-examination of, Madoyan in order to call into question Defendant's case for materiality.  Beyond that point, Ninth Circuit law at least suggests that the Court might not even need to rely on this additional observation in *O'Keefe* for it to reject the Government's emphasis on Defendant's ability to cross-examine Madoyan.  *See* Footnote 12, *supra*.

Nonetheless, the other evidence supporting the conclusion that Defendant provided a false valuation of the mosaic (*potentially* combined with Defendant's ability to cross-examine Madoyan about his interpretation of the text messages between Defendant and AlJrad, if the Court were to ignore the Government's revisitation, in its closing argument, of the point of Madoyan's testimony on direct) gives the Court significant pause about concluding that Defendant has satisfied *Napue*'s

24

materiality element.  In the end, therefore, the outcome on this motion might really come down to whether, in fact, reversal is "virtually automatic" when the Government knowingly permits the introduction of false evidence.  As explained above, there are Ninth Circuit decisions that answer that question in the affirmative, but also others that take the opposite view and that criticize the former category as taking the "virtually automatic" language "out of context."  It is worth noting here that the Government itself states – though without citation to authority for the proposition – that "[a]bsent a showing that perjured testimony was knowingly elicited by the prosecutor, the applicable standard requires defendant to show any alleged false testimony was material to the jury's determination."  Docket No. 199, at 18:28-19:3.  One could interpret this argument as *agreeing* with Defendant's "virtually automatic" reversal point, at least in certain circumstances.

Ultimately, though, the Court believes that the "virtually automatic" reversal rule is an at-times handy abstraction, but not a rule.  The Ninth Circuit's *latest* entry on this topic, less than five years ago, is that the false testimony or evidence "*must* be material" "because '*Napue* does not create a per se rule of reversal.'"  *Panah*, 935 F.3d at 664 (emphasis added) (quoting *Sivak*, 658 F.3d at 912) (omitting internal quotation marks).  In concluding – in the habeas context – that a state court did not unreasonably conclude that testimony was immaterial in that case, the Ninth Circuit noted that "[t]he State presented a powerful case of Panah's guilt, with substantial evidence linking him to Parker's murder and sexual assault," calling the case against the defendant (even without the testimony in question) "devastating," while noting that the testimony in question "was just one – and not a crucial – piece of that presentation," leading the Circuit to conclude that the verdict "is still reasonably 'worthy of confidence.'"  *Id.* (quoting *Phillips*, 673 F.3d at 1189); *see also Dow*, 729 F.3d at 1049 (commenting that "[t]he evidence against Dow was weak" in concluding that habeas petitioner sufficiently demonstrated materiality); *Morris*, 447 F.3d at 745-46.  Even those cases that have uncritically repeated the "virtually automatic" mantra have then gone on to assess the other, non-tainted, evidence against the defendant.  *See, e.g., Sivak*, 658 F.3d at 912-14; *Houston*, 648 F.3d at 815.  Other recent cases repeating the "virtually automatic" language have done so without analysis of that assertion, in *dicta*, and/or where the courts have not found the first two *Napue* elements established in any event.  *See Rodriguez*, 766 F.3d at 990; *Houston*, 648 F.3d at 814.

Beyond that observation, a return to "first principles" underlying the materiality element also would not appear to aid Defendant.  The ultimate crucial question on materiality is did

Defendant "receive[] a fair trial, understood as a trial resulting in a verdict worthy of confidence?" *Hayes*, 399 F.3d at 984; *see also Panah*, 935 F.3d at 664.  Considering both the other evidence bearing upon the question of whether he knowingly under-valued the mosaic in his documentation submitted to the CBP and the somewhat-irrelevant character of the issue addressed by the Government and Madoyan of whether there was a "cover up" in October 2015, the Court is inclined to conclude that Defendant did receive a fair trial, and that the materiality of any false – or "false impression" – evidence has not been successfully demonstrated.

In sum, the Court considers Defendant's Rule 33 motion a closer call than his Rule 29 motion.  But because of the plentiful other evidence on the issue of valuation, the Court will likely deny this motion as well.